UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NETWORK APPS, LLC, a Washington limited liability company; KYLE SCHEI, an individual; and JOHN WANTZ, an individual, <br><br> Plaintiffs, <br><br> -against- <br><br> AT&T INC., a Delaware corporation; AT&T CORP., a New York corporation; AT&T MOBILITY LLC, a Delaware limited liability company; and AT&T SERVICES, INC., a Delaware corporation, <br><br> Defendants. | Civil Action No. 21-cv-718 <br><br> **COMPLAINT FOR:** <br> **BREACH OF CONTRACT, PATENT INFRINGEMENT, AND CORRECTION OF INVENTORSHIP** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Network Apps, LLC ("Network Apps"), Kyle Schei, and John Wantz, for their Complaint against Defendants AT&T Inc., AT&T Corp., AT&T Mobility LLC and AT&T Services, Inc. (all collectively referred to as "Defendants" or "AT&T"), allege as follows:

## I.     INTRODUCTION

1.     Nowadays, we think nothing of the fact that our smart phones ring, and we can answer the call on our iPad or Apple Watch.  But if we paused to reflect, we would conclude that the technology is astonishing.  Think of it!  Your cell phone rings *at home*, and you can answer the same call on your smartwatch, *while jogging.*  And you can even make calls from that same watch or phone, and those calls appear to come from the same phone number.  In fact, all of your devices appear to have a common number, no matter how far apart your devices happen to be.  Just a few years ago, tablets and smartwatches were new technology.  When they first appeared on the market, they did not work in sync.  Each device had its own SIM card and its own number.  If you wanted to receive calls on your smartwatch, you would need to connect your smartwatch to a cell phone within close proximity or teach someone a different phone number to call.  Someone had to

develop the system necessary to handle phone calls so that the same call would reach each device. With respect to AT&T's services, that "someone" was Plaintiffs Kyle Schei, John Wantz, and their company Mya Number (now Network Apps).

2.     This is not a case where Plaintiffs invented some technology that was then locked away, moldering in a drawer, and AT&T "somehow" found that technology and stole it.  No.  Here, the parties had a relationship.  AT&T knew of Plaintiffs' expertise and existing product platform. AT&T sought out Plaintiffs *to solve this very problem* – how do we sync up a customer's smart devices so that they respond to a phone call placed to a single phone number?  AT&T entered into nondisclosure, development and licensing agreements with Mya Number.  AT&T was so eager to be first to market with this new, "twinning" technology that AT&T agreed that Mya Number would own all the intellectual property rights associated with the technology that Mya Number would license, extend, and make available.  AT&T even agreed to pay Mya Number a royalty of $1 per user per month, plus certain maintenance fees.

3.     Plaintiffs set to work.  They devoted thousands of man-hours to the project, and they developed a workable, elegant "Twinning Solution."  Plaintiffs demonstrated the concept. AT&T gasped, not because it worked so well (which it did) but because AT&T's business people realized:  (i) the market for tablets and smartwatches was exploding; (ii) the royalty AT&T had agreed to pay Mya Number would cost AT&T a fortune; and (iii) AT&T would not even own the technology.  AT&T tried desperately to retrieve the situation.  AT&T sent four different teams of lawyers in succession to meet with Plaintiffs in an effort to persuade them to reduce their royalty and transfer ownership of the technology to AT&T.  Plaintiffs would not budge – a deal was a deal.

4.      AT&T resorted to force.  AT&T told Plaintiffs that it was through with them. Approximately one year later, AT&T came out with its "own" solution, "Numbersync."  The problem is that the AT&T solution uses the same concept and architecture as Plaintiffs' "Twinning Solution," and the purported "inventors" of AT&T's solution are the very AT&T personnel who liaised with Plaintiffs, while they developed their "Twinning Solution."  In fact, AT&T's solution *is* Plaintiffs' solution with some cosmetic changes.  Now, however, AT&T is selling "its" solution to hundreds of thousands of customers each month, in violation of Plaintiffs' patent rights and without compensating Plaintiffs under Mya Number's royalty agreement.

5.      By means of the present action, Plaintiffs seek to recover from AT&T for breach of contract and patent infringement.  Given AT&T's over 170 million subscribers, and the fact that AT&T has failed to pay royalties since October of 2015, Plaintiffs estimate the damages to be in excess of $450 million.

## II.      THE PARTIES

6.      Plaintiff Network Apps is a Washington limited liability company with its principal place of business in Seattle, Washington.  Network Apps is the assignee and owner of all the assets, including the confidential and proprietary information, trade secrets, patents, contracts, and claims (collectively "Assets") previously owned by Mya Number.  The managing members of Network Apps are Kyle Schei and John Wantz (collectively the "Inventors").

7.      Plaintiff Kyle Schei is an individual residing in the State of Washington.

8.      Plaintiff John Wantz is an individual residing in the State of Texas.

9.      Upon information and belief, Defendant AT&T Inc. is a Delaware corporation with its principal place of business at 208 S. Akard Street, Dallas, Texas 75202.

10.     Upon information and belief, Defendant AT&T Corp. is a New York corporation, with its principal place of business at One AT&T Way, Bedminster, New Jersey 07921, and a

wholly owned subsidiary of AT&T Inc.  Upon information and belief, AT&T Corp. does business under at least the following names: AT&T Mobility LLC and AT&T Services, Inc.

11.     Upon information and belief, Defendant AT&T Mobility LLC is a Delaware limited liability company, with its principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, Georgia 30319, and a wholly owned subsidiary of AT&T Inc.

12.     Upon information and belief, Defendant AT&T Services, Inc. ("AT&T Services") is a Delaware corporation, with its principal place of business at 208 S. Akard Street, Dallas, Texas 75202, and a wholly owned subsidiary of AT&T Inc.

### III.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the patent claims under 28 U.S.C. § 1331, § 1332 and § 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq*.

14.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' breach of contract claims because Plaintiffs' claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

15.     Upon information and belief, at all times herein mentioned, there existed a unity of interest between AT&T Inc. and its subsidiaries, including but not limited to 100% ownership and control, common directors, officers, and managers, and participation in a common scheme of marketing, advertising, and sale of the technology in issue in this case, that any individuality and separateness between said Defendants has ceased, and each of the Defendants is the alter ego of the other Defendants, and adherence to the fiction of the separate existence of the Defendants would permit an abuse of the corporate privilege and sanction fraud and promote injustice.

16.     Upon information and belief, at all times herein mentioned, each of the Defendants was the agent and representative of the other Defendants, acting within the purpose and scope of said agency and representation, and each of the Defendants authorized and ratified the conduct of each of the other Defendants herein alleged.

17.     This Court has personal jurisdiction over Defendants, because:  Defendants conduct business in this District and have committed acts of infringement in violation of 35 U.S.C. § 271 in this District, and/or Defendants have consented to personal jurisdiction within this District by means of the contracts in issue.

18.     Venue is proper under 28 U.S.C. § 1400 for the patent claim because Defendants have a regular and established place of business in this District and have committed acts of infringement in the District.

19.     Venue is proper and convenient under 28 U.S.C. § 1391(b) for the contract claims because Defendants have consented to suit in this District by means of the contracts in issue.

20.     Joinder of Defendants in this case is proper under 35 U.S.C. § 299 because Defendants act jointly and collectively to offer for sale, sell, use, and induce the use of infringing AT&T-branded products and services.  At least some of Plaintiffs' right to relief is joint, several and/or in the alternative against Defendants and is with respect to or arises from the same transaction, occurrence, or series of transactions or occurrences relating to the same accused products and processes.  The claims against Defendants share an aggregate of operative facts, and common questions of fact will arise in this action, including: the design and creation of Plaintiffs' Twinning Solution and affiliated technology, the design and creation of the accused intellectual property; Defendants' collective actions in offering for sale, selling and using the accused

processes; and Defendants' collective actions to induce customers to use the intellectual property in question.

## IV.    FACTUAL ALLEGATIONS

### Mr. Schei and Mr. Wantz Found Mya Number and
### Successfully Develop Several Interesting Telephone Technologies

21.    Mr. Schei and Mr. Wantz are Seattle natives and college friends.  They have collaborated to create and manage a number of technology startups, including among others Mya Number, Inc. ("Mya Number").  (Mya Number is now an inactive Washington corporation, having previously transferred all of its Assets to Plaintiff Network Apps.)  Mya Number successfully developed and brought to market an internet protocol multimedia subsystem, or phone call management system, called myaNumber-for-Families$^{TM}$, which allows an unsophisticated user, such as a child or senior citizen to reach someone for help.  Using myaNumber-for-Families$^{TM}$, the caller has to remember only a single telephone number.  Calling that number would then place calls to successive recipients in a predefined order.  For example, a child's phone might first ring one parent's phone, and then the other, and then a nanny or grandparent, and then possibly the family doctor, if no one else answered first.  Or, at the user's option, the grouped numbers could ring all at once.  After the calls were placed, an email and text message report would be sent to each of the grouped phone numbers.

22.    Mya Number also developed myaNumber-autoMode$^{TM}$, a product designed to keep new drivers safe.  For a mobile phone using myaNumber-autoMode$^{TM}$, if the mobile phone detected that it was traveling at or above a certain speed (indicating that the owner was driving), the text message and voice call functions on the mobile phone would be suspended until its speed

was reduced.  The phone would also generate a text and/or email notification that would be sent to the parent's phone number.

### AT&T Takes An Interest in Mr. Schei And Mr. Wantz And Their Mya Number Technology

23.     Based on their successful track record, AT&T took an interest in Mr. Schei and Mr. Wantz and their Mya Number technology.  AT&T asked them to integrate myaNumber-for-Families<sup>TM</sup> into AT&T's own telecommunications offerings.  For this purpose, on November 28, 2012, AT&T and Mya Number entered into a Limited Application Programming Interface Usage Agreement (the "Interface Agreement").  The Interface Agreement provides, among other things, that each party's use of the other's confidential information was strictly limited to fulfilling the purposes of the project.  Moreover, the Interface Agreement specifies that each party retains exclusive rights to any exchanged information or technologies.  The Interface Agreement also provides that it binds AT&T's affiliates.

24.     AT&T also asked Mya Number to participate as a "Showcase Developer" at various marketing events.  These events were intended to demonstrate how third-party developers could create applications that would integrate with AT&T's own telecommunications offerings.  Among such events, in 2012, AT&T asked Mya Number to present during an executive keynote presentation at the AT&T Developer Summit in Las Vegas held in conjunction with the Consumer Electronics Expo in Las Vegas—the preeminent event for marketing new and upcoming consumer technology.

### AT&T Asks Mya Number To Develop A Twinning Solution; Several Agreements Are Signed To Facilitate The Project

25.     In the early 2010s, smartwatches were becoming affordable and popular, and tablets were becoming even more so.  The problem was that each device had to have its own SIM card to connect to a cellular network, and each SIM card was associated with a unique phone number.

This technology was inconvenient.  For someone to call a customer's smartwatch, the caller had to dial a phone number unique to that watch.  What was needed was a system that would allow a caller to dial a single number, that for the customer's cellphone, and have the call ring through to a smartphone or tablet as well.  On or about October 7, 2013, Ed Schmit, Executive Director of AT&T Mobility, LLC, and Kari Tillman, another employee of AT&T, contacted Mya Number and asked it to create and license the required technology.  *See* Exhibit 3 (email from Ed Schmit).  Mya Number agreed to undertake the work.  The project would come to be referred to interchangeably as the "Twinning Solution," "NumberSync," "NDA 34," or simply "myaNUMBER" – after the Plaintiffs.

26.     As part of the project, AT&T worked with Mya Number to source OEMs to deliver hardware to deploy the intended Twinning Solution.  To facilitate this portion of the project, beginning in or around November 2013, AT&T and Mya Number entered into several three-way non-disclosure agreements ("NDAs") with market-leading hardware OEMs. The NDAs each provide that a party receiving confidential information could "use the Information only as needed for the purposes of the Project."  The NDAs also prohibit each receiving party from disclosing the acquired information to third parties.

27.     After execution of the NDAs, Mr. Schei and Mr. Wantz kept a number of AT&T employees apprised of Mya Number's progress on the project, including Ed Schmit, Kari Tillman, John Powell (AT&T Lead Channel Marketing Manager), Jeff Bradley (Senior Vice President of AT&T Wireless), Carolyn Billings (Associate Vice President, AT&T Developer Program), Carlton Hill (AT&T Vice President, Device Operations and Developer Services), David Christopher (Chief Marketing Officer of AT&T Mobility).  In addition, Mr. Schei and Mr. Wantz

kept representatives of the OEMs apprised as well, to facilitate incorporation of the Twinning Solution into the OEM hardware.

**Mya Number Develops An Elegant, Commercially Viable Solution**

28.     Mya Number's efforts proved successful.  At its own expense, and under the direction of Mr. Schei and Mr. Wantz, Mya Number designed and developed an elegant, commercially viable, "Twinning Solution".  That solution enables a user with multiple devices to group them together on a cellular network and have those various devices function seamlessly as though they were all associated with a single telephone number, with no distinction to the user. Calls to the user ring through to each device.  And calls emanating from any of the devices appear to emanate from one telephone number.  The Twinning Solution also permits the same grouping for incoming and outgoing text messages.  Importantly, the Twinning Solution accomplishes this result through the cellular network, so that the devices need not be physically proximate, connected by Bluetooth, or on the same WiFi network.

29.     As part of its Twinning Solution, Mya Number created NumberSync Grouping, Call Delivery, and Messaging Services Platform, as well as software development kits/Android application packages for OEM hardware integration, messaging services, other executable and non-executable code, and an end-user interface to connect the NumberSync Grouping, Call Delivery, and Messaging Services Platform to the AT&T network and the OEM hardware. Pursuant to the Interface Agreement and the NDAs, Mya Number retained the rights to all patents, copyrights, trade secrets, and other confidential and proprietary information it developed as part of the Twinning Solution.

30.     On or about January 8, 2014, Mya Number successfully demonstrated its NumberSync Grouping, Call Delivery, and Messaging Services Platform to Jeff Bradley (Senior Vice President of AT&T Wireless), Ralph De La Vega (Vice-Chairman of AT&T Inc.), David

Christopher (Chief Marketing Officer of AT&T Mobility), and the OEM hardware leadership by executing inbound and outbound calls and text messages to and from grouped devices using an existing phone number.

## Mya Number And AT&T Enter Into The Professional Services Agreement and Statement Of Work

31.     On or about June 27, 2014, Mya Number and AT&T entered into a Professional Services Agreement ("PSA") and an accompanying Statement of Work ("SOW").  The PSA contemplates that both parties would exchange confidential information, but that each party's use of such information would be restricted and permitted only as needed for the purpose of further development of the Twinning Solution.  The PSA further specified that each party would retain its own intellectual property rights to the material exchanged, including patent, copyright, trademark, service mark, and any other property rights.

32.     The SOW sets forth terms under which Mya Number would provide its Twinning Solution to AT&T.  The Twinning Solution was acknowledged as Mya Number's proprietary hardware, software, and services-based solution that enables a mobile smartphone and a separate device (such as a tablet or smartwatch) to link for purposes of mobile voice, text, and data over the network by using a unique subscription identification number.  The contract required that Mya Number deploy its own hosted Twinning Solution, the use of which AT&T would be able to license, and also provides for an exclusivity period, during which Mya Number could not license a "Twinning Solution" to any other mobile carrier.  The SOW further memorialized AT&T's agreement that Mya Number retains all rights to the Twinning Solution.  Moreover, the SOW stated that, even if AT&T obtained any rights to the Twinning Solution during its work with Mya Number, AT&T must transfer and assign all such rights to Mya Number.

33.     Further, the SOW provides that AT&T would pay Mya Number support, maintenance and license fees.  The license fees include $1 per twinned device per month for all active twinning devices over the initial 30,000 (for which no payment was required.)  In addition, Mya Number would receive maintenance/support fees per twinned device ranging from $1.48 for the first 30,000 devices to $0.15 per device for every device over 75,000 devices.  In exchange, Mya Number agreed to grant AT&T a non-transferrable license.

34.     As Mya Number was fulfilling its obligations under the SOW by implementing the Twinning Solution in AT&T's network, Mya Number filed U.S. Patent Application number 14/525,039 on October 27, 2014, which encompassed the Twinning Solution.  The application was duly and legally granted by the U.S. Patent and Trademark Office on September 6, 2016 as United States Patent No. 9,438,728 (the "'728 Patent"), entitled "Telephone Number Grouping Service for Telephone Service Providers."  The '728 Patent is attached hereto as Exhibit 1.

### AT&T Employees Contemporaneously Recognize Mya Number's Intellectual Property Rights

35.     Throughout Mya Number's engagement under the Interface Agreement, the PSA and the SOW, AT&T employees recognized that Mya Number had retained ownership over every aspect of the Twinning Solution.

36.     For example, in October 2013, Mya Number sent an email to certain AT&T executives describing Mya Number's proposed Twinning Solution.  Responsive emails confirm that AT&T had "bought off" on the idea and wanted Mya Number to move quickly, targeting a December 2015 launch date.

37.     In another email, AT&T employee Kari Tillman introduced Mr. Schei to OEM manufacturers by noting that Mya Number developed the Twinning Solution AT&T was seeking to implement:  "Kyle is the CEO of myaNUMBER, the developer with a very promising solution

that allows the mobile number of the watch and smartphone to bet [sic] 'twinned' and allows the customer to keep their existing number, while also 'masking' the outgoing calls from the watch." A copy of an email thread between Kari Tilmann and Mya Number is attached hereto as Exhibit 4.

38.     As AT&T and Mya Number were negotiating the licensing fees that Mya Number would receive, Mr. Schmit wrote in a December 23, 2013 email that Mya Number "built this for AT&T," and "You guys are in a great position—our execs and others at AT&T know this.  We are paying you to build up unique expertise and AT&T is viewed as carrier leader."  A copy of the email thread between Mr. Schmit and Mr. Schei is attached hereto as Exhibit 5.

39.     In February 2014, when Mya Number was introduced to other device manufacturers, AT&T asked Mya Number to provide explanations, documents, diagrams, and code that could help AT&T and OEM manufacturers understand how the Twinning Solution worked and how it could be extended to work with equivalents manufactured by other OEMs.

40.     AT&T continued to acknowledge that Mya Number had developed and designed the Twinning Solution by referring third-party device manufacturers to Mya Number.  For example, in March of 2014, an employee working on a high-profile smartwatch contacted Mya Number because he understood that Mya Number had developed the Twinning Solution and wrote, "My name is Ed Campbell and I am a Systems Engineer . . . and I received some documentation today on the myaNUMBER service that your company provides for AT&T."

**AT&T Terminates Mya Number And Launches NumberSync**

41.     Starting in the fall of 2014, AT&T started complaining to Mya Number about the projected royalties that it would incur, by using Mya Number's Twinning Solution.  Thereafter, AT&T sent, one after another, four sets of lawyers to negotiate with Mya Number about:  (i) reducing the royalty and (ii) transferring the technology rights to AT&T.  Mya Number refused to

renegotiate.  On or about October 23, 2014, AT&T informed Mya Number that it would "no longer be pursuing the launch of the NumberSync service."  Exhibit 6 (email from John Powell).  At no point had AT&T expressed any complaints or concerns to Mya Number regarding the Twinning Solution itself, and AT&T provided no explanation as to why the NumberSync service was terminated.

42.     Exactly one year later, AT&T began deploying "AT&T NumberSync."  *See, e.g.*, https://www.fiercewireless.com/wireless/at-t-to-let-customers-link-their-smartphone-number-to-wearables-and-other-devices-through; https://about.att.com/innovationblog/erik_sundelof.  Upon information and belief, AT&T continues to provide AT&T NumberSync as a standard value-add for all its subscribers.  *See, e.g.*, https://www.att.com/shop/wireless/features/numbersync.html.

43.     Upon information and belief, AT&T assigned employees, who had access to Mya Number's intellectual property and confidential information, to replicate Mya Number's Twinning Solution and launch AT&T's own NumberSync service.  As one example, Kari Tillman worked with Mya Number on behalf of AT&T during the Mya Number "Twinning Solution" project.  Ms. Tillman had access to Mya Number's trade secrets, confidential information, hardware designs, software code, and innovative solution during the project and was subject to the provisions of the PSA, SOW, NDAs and Interface Agreement.  Ms. Tillman indicates on her LinkedIn profile that she directed the development of AT&T NumberSync.  Exhibit 7 (https://www.linkedin.com/in/karitillman ("Direct the development of complementary services for connected wearables, including AT&T NumberSync")).  Upon information and belief, other individuals at AT&T, who had access to Mya Number's confidential and proprietary information, also worked to develop and launch AT&T NumberSync.

44.     Upon information and belief, AT&T used without permission Mya Number's proprietary intellectual property and information, disclosed to AT&T pursuant to the Interface Agreement, NDAs, and PSA, in connection with the development of its NumberSync.

45.     In addition, on information and belief, AT&T used intellectual property and proprietary information obtained from Mya Number under the PSA, NDAs and Interface Agreement to pursue AT&T's own patent related to "twinning."  In this respect, AT&T filed U.S. Patent Application number 14/536,418 on November 7, 2014, which issued as U.S. Patent Number 9,723,462 (the "'462 Patent"), entitled "Cloud-Based Device Twinning."  *See* Exhibit 2.  The '462 Patent application was granted on August 1, 2017.  Ed Schmit and Jayanta Das are listed as the named inventors on the '462 Patent.  Mr. Schmit worked with Mya Number on behalf of AT&T during the Mya Number "Twinning Solution" project and had access to and knowledge of Mya Number's confidential information and innovative technology under the provisions of the PSA, NDAs and Interface Agreement.  Upon information and belief, Mr. Schmit improperly used such information obtained from Mya Number in pursuit of the invention in the '462 Patent.

46.     Because the solution described in the '462 Patent restates the Twinning Solution invented by Mr. Schei and Mr. Wantz and assigned to Mya Number, as embodied in the '728 Patent, Mr. Schei and Mr. Wantz are the true inventors, and Mya Number is the true owner of the '462 Patent.

47.     AT&T has not assigned the '462 Patent and the related family of patents to Mya Number.

48.     AT&T has not paid any royalties to Mya Number in conjunction with AT&T's deployment of AT&T's NumberSync, in violation of Mya Number's contractual and intellectual property rights.

49. And now, AT&T is claiming credit for Mya Number's work. For example, AT&T now claims to have developed NumberSync from ideation through to the solution:

> **Describe a project you saw from concept to implementation.**
>
> *Project Cascade*, now known as NumberSync, was taken from an idea to concept and, ultimately, to an implemented solution. NumberSync lets you call and text from your smartwatch, tablet or connected car using the same mobile number your family, friends and colleagues already know.

*See* https://about.att.com/innovationblog/erik_sundelof.

50. AT&T also claims credit for Mya Number's myaNumber-autoMode™ product:

> You've probably used – or at least heard of – DriveMode, a mobile app that sends automated replies to people texting you while you're on the road. It was a cornerstone of our *It Can Wait* campaign. *The idea for that app originated from one of our AT&T call center employees who was personally affected by texting while driving*. It's just one of many innovations that have come through [The Innovation Pipeline] that have cut costs, improved efficiencies, and enhanced the way we and our customers live, work and play.

https://about.att.com/innovationblog/2019/05/innovation_pipeline_anniversary.html    (emphasis added). In the same press release, AT&T again claims credit for creating NumberSync:

> Additional projects that have come through our TIP program include:
>
> . . .
>
> NumberSync: This solution enabled customers to use their mobile numbers on any compatible device. While it's a fairly standard feature today, the concept of being able to receive calls using your mobile number on any device was a revolutionary one just a few years back.

*Id*.

51. On December 2, 2016, Mya Number assigned all of its intellectual property, assets and claims to Network Apps.

## COUNT 1 – BREACH OF CONTRACT

52. Paragraphs 1-51 are incorporated by reference as if fully set forth herein.

53.     The SOW expressly states that Mya Number retains the intellectual property it developed for the Twinning Solution.  Furthermore, AT&T agreed that it would not reverse engineer, decompile, or disassemble the Twinning Solution or any other aspect of the Twinning Solution.

54.     AT&T has used and continues to use Mya Number's intellectual property in its AT&T NumberSync product.

55.     AT&T agreed to pay Mya Number a royalty and maintenance fees in consideration for use of Mya Number's intellectual property.

56.     AT&T has failed to pay any royalty or maintenance fees to Mya Number pursuant to the SOW.

57.     AT&T agreed to assign to Mya Number any intellectual property rights to the Twinning Solution that AT&T obtains.

58.     AT&T has failed to assign to Mya Number U.S. Pat. No. 9,723,462, (and a series of follow-on continuation patents, namely, U.S. Patent Nos. 10,057,738, 10,200,832, 10,484,846 and 10,750,332), which cover the Twinning Solution.

59.     AT&T has breached the terms of the Interface Agreement, the NDAs, the PSA and the SOW.

60.     As a result of AT&T's breach of the these agreements, Network Apps has suffered and will continue to suffer damage.  Network Apps is entitled to recover from AT&T the damages it has suffered as a result of AT&T's breach in an amount in excess of $450 million to be proven at trial.

61.     Network Apps is further entitled to an injunction causing AT&T to assign full ownership, right, title, and interests to U.S. Pat. Nos. 9,723,462; 10,057,738; 10,200,832; 10,484,846; and 10,750,332 (and all other related patents and applications) to Network Apps.

## COUNT 2 – PATENT INFRINGEMENT UNDER 35 U.S.C. § 271

62.     Paragraphs 1-61 are hereby incorporated by reference as if fully set forth herein.

63.     The '728 patent generally relates to a method and system for associating multiple telephone numbers with distinct physical devices, grouping at least two of the telephone numbers for incoming and outgoing calls and text messages, providing controls such that the grouped telephone numbers are capable of activating one or more of the multiple physical devices in response to an incoming call on one of the numbers and allowing outgoing calls from any of the devices to appear to come from a selected number.

64.     AT&T is and has been literally or under the doctrine of equivalents directly infringing, contributing to the infringement of, and/or inducing others to infringe the one or more claims of the '728 Patent, including at least claims 1, 8 and 17 ("the independent claims"), by making, using, selling, and/or offering to sell in the United States, or importing into the United States products or processes that practice the inventions claimed in the '728 Patent, including without limitation the offering of AT&T NumberSync to all subscribers to the AT&T network.

65.     According to AT&T's website, AT&T NumberSync allows AT&T customers to "use your smartphone number on any compatible device," "[y]ou can use your smartphone number with multiple devices," "[f]riends and family can recognize your call even when using a device other than your phone" and "[m]ake and receive calls and texts from whichever synced device you choose":



https://www.att.com/shop/wireless/features/numbersync.html.  AT&T's website explains that the

AT&T NumberSync can be used with Apple products, Android tablets, and wearables.  *See id.*

66.    AT&T directly infringes, either literally or under the doctrine of equivalents, claims

1, 8, and 17 of the '728 Patent, for example, by making, using, selling, and/or offering to sell and/or

importing the AT&T NumberSync.  For example, claim 1 of the '728 patent is recited below, along

with bracketed annotations providing preliminary details of AT&T's infringement:

A method for telephone number grouping, comprising:

provisioning, by a telephone service provider [*AT&T*], a plurality of telephone numbers

including associating each of the plurality of telephone numbers with a distinct physical

telephone service user device of a grouped plurality of physical telephone service user devices [*AT&T provides unique telephone numbers for a user's smartphone and a user's smartwatch*], the quantity of the plurality of telephone numbers being no greater than the quantity of the grouped plurality of physical telephone service user devices [*AT&T provides a single telephone number for each unique smartphone and smartwatch, such that the quantity of the telephone numbers does not exceed the quantity of the devices*];

registering, with a telephone number grouping service [*AT&T's NumberSync*], at least two telephone numbers of the plurality of telephone numbers as grouped telephone numbers with respect to incoming and outgoing telephone calls to and from the grouped plurality of physical telephone service user devices [*AT&T's NumberSync groups together a user's telephone number for her/his smartphone and the telephone number for her/his smartwatch*];

providing, by the telephone service provider to the telephone number grouping service [*AT&T provides NumberSync with the call control described below*], at least partial call control for incoming and outgoing telephone calls with respect to the grouped telephone numbers [*NumberSync controls the user's telephone numbers such that ingoing and outgoing calls from the same telephone number can be made on multiple devices*];

with respect to incoming telephone calls to the grouped telephone numbers [*the user's telephone numbers registered with NumberSync*], activating one or more of the grouped plurality of physical telephone service user devices associated with the grouped telephone numbers [*NumberSync allows for both the user's smartphone and*

*smartwatch to ring when receiving an incoming call to the user's main "personal" telephone number, which is the telephone number associated with the user's smartphone*] in accordance with a grouped telephone number incoming call policy that governs incoming telephone calls to the grouped plurality of physical telephone service user devices [a *user registers her/his devices to use NumberSync and initiates settings for incoming calls to the same phone number to be received by the user's smartphone and smartwatch*], the grouped telephone number incoming call policy being capable of causing activation of multiple of the grouped plurality of physical telephone service user devices responsive to an incoming call [*NumberSync allows for simultaneous ringing of a user's smartphone and smartwatch*]; and

with respect to an outgoing telephone call from a physical telephone service user device associated with the grouped telephone numbers [*outgoing calls from a user's smartphone or smartwatch*], causing the outgoing telephone call to appear to originate from a selected telephone number of the grouped telephone numbers in accordance with a grouped telephone number outgoing call policy that governs outgoing telephone calls from the grouped plurality of physical telephone service user devices [*NumberSync allows for all calls originating from a user's smartphone or smartwatch to appear that they all come from the user's main "personal" number associated with the user's smartphone*], the grouped telephone number outgoing call policy being capable of designating each of the grouped telephone numbers associated with the grouped plurality of physical telephone service user devices as the selected telephone number [*NumberSync is capable of designating one of the user's telephone numbers as the selected telephone number, such as the user's main "personal" number*].

67.     Upon information and belief, AT&T NumberSync includes each of the recited steps of claim 1 of the '728 Patent, as shown above.

68.     In addition, AT&T knowingly induces its customers to directly infringe, either literally or under the doctrine of equivalents, claims 1, 8, and 17 of the '728 Patent. AT&T has been on notice of the '728 Patent before the filing of this Complaint and since no later than the time of the filing of the previous lawsuit against AT&T on December 3, 2016, *Network Apps, LLC v. AT&T Inc., et al.*, Case No. 2:16-cv-01852-TSZ (WDWA). AT&T advertises and promotes its NumberSync system online (https://www.att.com/features/numbersync/). AT&T directs, instructs, and supports  its business customers, small business customers, and retail customers for using the NumberSync system through websites such as https://www.business.att.com/solutions/service/mobility-services/mobile-rate-plans/numbersync.html, https://www.att.com/support/article/wireless/KM1223159/, and https://www.att.com/support/smallbusiness/article/smb-wireless/KM1225992/. In particular, AT&T instructs its customers to use the infringing AT&T NumberSync system "user interface . . . to register at least two telephone numbers of a plurality of telephone numbers as grouped telephone numbers . . . .", with knowledge of the '728 Patent and its scope.

69.     AT&T also indirectly infringes by contributing to the infringement of the '728 Patent by the end-users of the NumberSync system, either literally or under the doctrine of equivalents. NumberSync has special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe the claims of the '728 Patent. The special features include registering multiple phone numbers associated with multiple physical devices, and allowing incoming and outgoing calls to be made from a single number on those multiple devise. The special features constitute a material part of the invention

of one or more of the claims of the '728 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

70.     As a result of AT&T's unlawful infringement of the '728 Patent, Network Apps has suffered and will continue to suffer damage.  Network Apps is entitled to recover from AT&T the damages suffered by Network Apps as a result of AT&T's unlawful acts.

71.     AT&T was aware of and has been on notice of the '728 Patent before the filing of this Complaint and its infringement has been willful and egregious.  AT&T has been aware of the '728 Patent since no later than the time of the filing of the previous lawsuit against AT&T on December 3, 2016, *Network Apps, LLC v. AT&T Inc., et al.*, Case No. 2:16-cv-01852-TSZ (WDWA).

72.     Because of AT&T's willful and egregious infringement, Network is entitled to enhanced damages, in the form of treble damages, under 35 U.S.C. § 284.

73.     Further, because AT&T's infringement of the '728 Patent is willful, this action is "exceptional" within the meaning of 35 U.S.C. § 285, entitling Network Apps to its attorneys' fees and expenses.

74.     On information and belief, AT&T intends to continue its unlawful infringing activity, and Network Apps will suffer irreparable harm for which there is no adequate remedy at law unless this court enjoins AT&T from further infringing activity..

### COUNT 3 – CORRECTION OF INVENTORSHIP – 35 U.S.C. § 256

75.     Paragraphs 1-85 are hereby incorporated by reference as if fully set forth herein.

76.     Mr. Schei and Mr. Wantz co-invented and developed the Twinning Solution described and embodied in the '728 Patent.  The invention described in the '462 Patent is the same solution described and claimed in the '728 Patent.

77.    Moreover, AT&T unlawfully used information disclosed by Mya Number pursuant to the Interface Agreement, PSA, NDAs, and SOW to develop and file its application for the '462 Patent.

78.    As a result, Mr. Schei and Mr. Wantz are the true inventors and Mya Number is the true original assignee of the '462 Patent.

79.    Under 35 U.S.C. § 256, Mr. Schei and Mr. Wantz should be named as inventors on the '462 Patent and the remaining continuations, including U.S. Patent Nos. 10,057,738; 10,200,832; 10,484,846; and 10,750,332.

80.    The omission of Mr. Schei and Mr. Wantz as inventors arose without any deceptive intent on the part of Plaintiffs.

81.    As a result of AT&T's unlawful and erroneous claim of inventorship of the '462 Patent, Network Apps has suffered and will continue to suffer damage.  Network Apps is entitled to a judgment adjudicating that Network Apps is the lawful assignee of the '462 Patent recover from AT&T the damages suffered by Network Apps as a result of AT&T's unlawful acts.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Network Apps prays for judgment in its favor and against Defendants as follows:

A.    A judgment against Defendants for breach of contract;

B.    An award of general and actual damages from AT&T, jointly and severally, including license fees, maintenance fees, royalties, and other direct damages, consequential damages, economic damages, out-of-pocket expenses or damages, reliance damages, lost profits, restitution damages, unjust enrichment damages, and disgorgement, in excess of $450 million, according to proof;

C.    An award of pre- and post-judgment interest, as allowed by law;

D.      A judgment that Defendants have infringed one or more claims of the '728 Patent;

E.      An award of enhanced damages under 35 U.S.C. § 284, in the form of treble damages.

F.      An award of on-going royalties for any continuing or future breach of contract and infringement of Plaintiff's intellectual property;

G.      An award of Plaintiff's reasonable attorneys' fees, costs, and expenses pursuant to 35 U.S.C. §§ 284 and 285 or as otherwise permitted by law;

H.      An injunction against Defendants prohibiting Defendants and their officers, agents, servants, employees, and all persons acting in concert with them, from directly or indirectly: (1) using, manufacturing, offering to sell or selling any products falling within the scope of the claims of the '728 patent; (2) actively inducing others to infringe any of the claims of the '728 patent; (3) engaging in acts constituting contributory infringement of any of the claims of the '728 patent; (4) engaging in all other acts of infringement of any of the claims of the '728 patent; and

I.      A judgment declaring that Mr. Schei and Mr. Wantz are the true inventors of the '462 Patent and any and all other related continuation and divisional patents, including U.S. Patent Nos. 10,057,738; 10,200,832; 10,484,846; and 10,750,332; and directing the Director of the U.S. Patent & Trademark Office to issue a Certificate of Correction reflecting the same;

J.      A judgment declaring that Network Apps is the true assignee of the '462 Patent and any and all other related continuation and divisional patents, including U.S. Patent Nos. 10,057,738; 10,200,832; 10,484,846; and 10,750,332, pursuant to 35 U.S.C. § 256 or as otherwise permitted by law;

K.      Such other and further relief at law or in equity as the Court determines is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all claims and issues so triable.

Dated:  New York, New York
        January 26, 2021

                BROWNE GEORGE ROSS
                O'BRIEN ANNAGUEY & ELLIS LLP
                    Peter W. Ross*
                    Richard A. Schwartz*
                2121 Avenue of the Stars, Suite 2800
                Los Angeles, California  90071
                Telephone:  (310) 274-7100
                Facsimile:  (310) 275-5697 (310)
                pross@bgrfirm.com
                rschwartz@bgrfirm.com

                BROWNE GEORGE ROSS
                O'BRIEN ANNAGUEY & ELLIS LLP

                By:   s/Jeffrey A. Mitchell
                    Jeffrey A. Mitchell
                    Stephen P. Farrelly
                 5 Penn Plaza, 24th Floor
                New York, New York 10001
                Telephone:  (212) 413-2600
                Facsimile:  (212) 413-2629
                jmitchell@bgrfirm.com
                sfarrelly@bgrfirm.com

                CADWELL CLONTS & REEDER LLP
                    Kevin E. Cadwell*
                    David R. Clonts*
                    Michael F. Reeder II*
                One Riverway, Suite 1700
                Houston, Texas 77056
                Telephone:  (713) 360-1560
                kcadwell@cadwellclontsreeder.com
                dclonts@cadwellclontsreeder.com
                mreeder@cadwellclontsreeder.com

                   *Pending admission pro hac vice

                *Attorneys for Plaintiffs*