L4SANETCps

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NETWORK APPS, LLC, et al.,

 4                   Plaintiffs,

 5           v.                          21-cv-718 (KPF)

 6   AT&T Inc., et al.,

 7                   Defendants.         Conference

 8   ------------------------------x

 9                                       New York, N.Y.
                                         (remote)
10
                                         April 28, 2021
11                                       4:10 p.m.

12   Before:

13                      HON. KATHERINE POLK FAILLA

14                                       District Judge

15                           APPEARANCES

16   CADWELL CLONTS & REEDER LLP
          Attorneys for Plaintiffs
17   BY:  KEVIN E. CADWELL
          MICHAEL REEDER
18        LISA M. THOMAS
          -and-
19   BROWNE GEORGE ROSS O'BRIEN ANNAGUEY & ELLIS LLP
          Attorneys for Plaintiffs
20   BY:  STEPHEN P. FARRELLY
          PETER W. ROSS
21        RICHARD A. SCHWARTZ
          ROSS LIPMAN
22
     PAUL HASTINGS LLP
23        Attorneys for Defendants
     BY:  CHRISTOPHER W. KENNERLY
24        JOSHUA YIN
          ROBERT R. LAURENZI
25        ALEXANDER LEE
```

L4SANETCps

1          (Remote)

2          (Case called)

3          THE CLERK:  Counsel, please state your name for the

4     record, beginning with plaintiff.

5          MR. ROSS:  Good afternoon, your Honor.  Pete Ross,

6     representing the plaintiffs, along with Richard Schwartz, Steve

7     Farrelly, and Ross Lipman from my firm; and Kevin Cadwell,

8     Michael Reeder, and Lisa Thomas from the Cadwell firm.

9          THE COURT:  Mr. Ross, is it you to whom I should be

10    directing my questions in the first instance?

11         MR. ROSS:  Yes, your Honor.

12         THE COURT:  OK.  Thank you very much.  And good

13    afternoon to each of you.

14         And, Mr. Ross, just to be clear, are there any other

15    representatives of either plaintiffs' counsel or plaintiffs who

16    are on the call?

17         MR. ROSS:  No, there are none.

18         THE COURT:  OK.  Thank you so much.

19         And representing the defendants this afternoon?

20         MR. KENNERLY:  Hello, your Honor.  This is Chris

21    Kennerly with Paul Hastings for the AT&T defendants.  I have

22    with me Robert Laurenzi, who is admitted in this court;

23    Mr. Joshua Yin, and Mr. Alexander Lee.  And with your Honor's

24    permission, Mr. Yin will address certain of the arguments,

25    should they come up.

L4SANETCps

1          THE COURT:  OK.  Thank you.

2          Mister -- I'm sorry.  Did I understand Mr. Yin is an

3     admitted member to this district, sir?

4          MR. KENNERLY:  That's incorrect.  Mr. Laurenzi is

5     admitted, and --

6          THE COURT:  OK.

7          MR. KENNERLY:  -- Mr. Yin is not.

8          THE COURT:  All right.  So are you asking for Mr. Yin

9     to be admitted pro hac vice for purposes of this conference?

10          MR. KENNERLY:  It sounds like I should.

11          THE COURT:  Yes.

12          MR. KENNERLY:  And we would request that.  Thank you,

13     your Honor.

14          THE COURT:  OK.  Right.  Because otherwise he doesn't

15     get to talk, and he wishes to talk.  So that is fine.  He is

16     admitted pro hac vice with my thanks.  And Mr. Kennerly, you

17     will let me know which of you or Mr. Yin would be answering

18     questions in this matter.

19          Are there other defense counsel on the line who wish

20     to introduce themselves?

21          MR. KENNERLY:  That's all for defendants, your Honor.

22          THE COURT:  I thank you very much.

23          OK.  Thank you.

24          Mr. Ross, I'd like to begin with you, please.  We have

25     a number of issues to address in this, our initial pretrial

L4SANETCps

1    conference in this case.  There is as well a pre-motion

2    conference aspect to this case, and so that may end up being

3    where we go very quickly.  But before we do that, I wanted to

4    make sure you understood that I have read the complaint in this

5    case and the various letters about the parties' anticipated

6    motions.

7          Before we start addressing those motions, is there

8    something that you'd like me to know about this case that might

9    not be obvious from the materials that I've just outlined?

10         MR. ROSS:  Pete Ross speaking.  I don't believe so,

11   your Honor.  I think that presents a fairly good overview of

12   the matter.

13         THE COURT:  OK.  Then let me please pivot to something

14   else, sir.  There are issues here regarding standing and a

15   possibility of a motion to dismiss, and there's a question

16   about targeted or bifurcated discovery in this regard.  And

17   separately there is the issue of the motion to disqualify.

18         I'm just going to pause, sir, because someone is --

19   I'm hearing some background noise and it's making it very

20   difficult for me to speak.  So let me pause while that resolves

21   itself.

22         And hopefully it has.  Thank you.

23         So, Mr. Ross, one of the things you mentioned with

24   respect, I think, to the motion to dismiss is that you can and

25   intend to amend the pleadings.  And so I was wondering if we

L4SANETCps

1   could talk about the manner in which you intend to amend the

2   pleadings and, perhaps more broadly, why it is you believe that

3   the plaintiffs in this case, in particular Network Apps LLC,

4   have the ability and standing to file this action.

5          MR. ROSS:  Yes.  Pete Ross speaking.  With respect to

6   that issue in particular, the defense points out a number of

7   issues that they believe indicates that standing doesn't exist.

8   In our letter addressing those issues, we point out that, under

9   Washington law, we're on firm footing with respect to each of

10  those issues.  For example, they say that Mya Number, which was

11  the company that initially entered into a license agreement

12  with AT&T, dissolved before it transferred the rights.  But

13  under Washington law, a company in dissolution or dissolved

14  continues to exist, to wind up its affairs and dispose of its

15  assets.  So in that fashion, we addressed each of their issues.

16         They do point out that there is one place in the case,

17  in the complaint, where we refer to Mya Number as Mya Number

18  Inc. instead of Mya Number Corp.

19         THE COURT:  Yes.

20         MR. ROSS:  We could of course easily address that.

21  But the bottom line is that we represent as plaintiffs here all

22  of the principals of Mya Number LLC, Mya Number Corp., and

23  Network Apps, which are the same people.  And whatever

24  complaint could be raised, we'll be able to address it and cure

25  it, even if a problem did exist.  So we don't think that's the

L4SANETCps

1   issue that should hold up this litigation or result in

2   bifurcated discovery.

3          THE COURT:  And let me please make sure I understand

4   that.  If you could just take me through the history.  In the

5   beginning there was Mya Number LLC.

6          MR. ROSS:  Yes.

7          THE COURT:  And that company is no longer in

8   existence, correct, sir?

9          MR. ROSS:  Correct.

10          THE COURT:  And there is no Mya Number Incorporated.

11   Also correct, sir?

12          MR. ROSS:  Correct.

13          THE COURT:  I see.  And Mya Number LLC assigned the

14   rights to Network Apps LLC?  Also correct?

15          MR. ROSS:  I believe that the actual chain was that it

16   assigned rights to John Wantz and Kyle Schei, and they assigned

17   those rights in turn to Network Apps LLC.

18          THE COURT:  And just so that I'm clear, Mr. Schei and

19   Mr. Wantz were associated with Mya Number LLC prior to its

20   dissolution?

21          MR. ROSS:  They were the principals and the only

22   principals of that company.

23          THE COURT:  And so when you indicated that you could

24   amend the complaint in order to avoid motion practice, one

25   thing was to remove the reference to Mya Number Incorporated,

L4SANETCps

1    which you've indicated is a scrivener's error.  Were you also

2    planning on making clear that under Washington law Mya Number

3    LLC had the right to transfer these rights to Mr. Schei and

4    Mr. Wantz, or was there something else that you were thinking

5    about adding in your amendments to the complaint?

6              MR. ROSS:  We could certainly clarify those matters,

7    in that the steps taken were appropriate and allowed under

8    Washington law.

9              THE COURT:  OK.  And let me do this, please.  Let me

10   turn to Mr. Kennerly for a moment.  And, Mr. Kennerly, please

11   understand, sir, and I say this to everyone on this call, one

12   of the reasons that I have pre-motion conferences is so that I

13   get a better sense of the contemplated motion practice.  In

14   some instances I am able to persuade parties not to file

15   motions.  In some instances I'm able to shorten or restrict the

16   motion practice by cutting off certain lines of argument that

17   don't need to be argued at all.

18             So, Mr. Kennerly, now that you -- since you are aware,

19   from Mr. Ross's submission and from our conversation this

20   afternoon, about his contemplated amendments to the complaint,

21   what do you think still exists in the vein of a standing

22   argument?

23             MR. KENNERLY:  Thank you, your Honor.  Chris Kennerly

24   for defendants.  The reality is that neither of those

25   amendments to the complaint would really get to the real

L4SANETCps

1   standing issues here.  That would, I guess, eliminate one

2   initial head-scratcher regarding Inc. versus Corp., but the

3   problems with the chain of title and other reasons why there's

4   no standing are really deeper than that and would not be

5   resolved by either of the amendments that counsel describes.

6           THE COURT:  OK.  So let me understand, then.  What are

7   the problems with the chain of title that you believe render

8   these plaintiffs without standing?

9           MR. KENNERLY:  Well, the -- and unfortunately, I

10  suppose, there are so many issues here, and the standing

11  defects vary depending on the count or claim in the complaint.

12  So we have breach of contract.  There's one set of issues.

13  There are slightly different issues with respect to patent

14  infringement.  And then yet a third set of issues with respect

15  to the correction of inventorship claim.  So I'm happy to sort

16  of proceed through those order, if that suits the Court.

17          THE COURT:  It would.  It would.  Thank you very much.

18          MR. KENNERLY:  OK.  With respect to the breach of

19  contract claim, the standing defects are really twofold.

20  First, the chain of title, let's assume from Mya Number Corp.

21  through to Network Apps, is broken.  And I can walk through why

22  it is that that's the case despite the claim of Mya Number

23  Corp. being in dissolution and disposing of its assets

24  accordingly.

25          Additionally, with respect to the breach of contract

L4SANETCps

claim, there's been a failure to comply with the assignment

clause of the underlying agreements.  And so that is a second

additional reason why standing does not exist with respect to

the breach of contract claim.

        And I can walk --

        THE COURT:  I'd like, sir -- yes.  I'd like you to

walk me through the first of those more than the second of

those.  But when you are ready.

        MR. KENNERLY:  OK.  Well, it's clear enough that

Washington law allows windup activity for a dissolved

corporation.  What's not clear is that that's what actually

happened here.  So the Court may recall that Network Apps filed

a first lawsuit against AT&T on December 3rd of 2016.  And AT&T

filed a motion to dismiss challenging, among other things,

standing.  Network Apps didn't respond to that motion.  They

walked away from the case in April of 2017.

        And in the response letter brief in this case, this is

the first we've heard of this two-step assignment existing or

the first time it's been argued in any way.  So all of this

supposedly happened before the last lawsuit, but despite our

motion to dismiss and other correspondence and such, this

argument was never raised before.

        THE COURT:  Sir, just pause for a moment there.  And

therefore what?  Do you believe there's some sort of estoppel

argument that you can make that it should have been raised back

L4SANETCps

1    then?  What is the significance of the fact that they may not

2    have been as together for their last round of litigation as for

3    this round?

4           MR. KENNERLY:  The significance is that if you walk

5    through the dates and other, let's call them curiosities of the

6    chain of title, it reveals itself that these alleged

7    assignments could not have been sort of implemented the way

8    it's now claimed.  And I can walk through that with the Court.

9    But the circumstances show that to be, let's call them highly

10    suspect.  And that's one of the reasons we requested discovery

11    into certain things related to that.

12           If I may, your Honor, briefly, plaintiffs say that Mya

13    Number Corp. assigned its rights to individuals, Schei and

14    Wantz, on December 1st of 2016.  Schei and Wantz then assigned

15    their rights to Network Apps, they say, on December 2nd, 2016.

16    And then Network Apps filed the first lawsuit on December 3rd,

17    2016.

18           Now, neither of these assignment agreements were

19    recorded at the time with the Patent Office.  And, again, we

20    never heard about them until now.  In fact, those assignment

21    agreements were not recorded at the Patent Office until October

22    30 of 2020, so shortly before this present lawsuit was filed.

23    And in the alleged assignment agreement from Mya Number Corp.

24    to Schei and Wantz, which was supposedly executed nearly four

25    years earlier, on December 1, 2016, we see for the first time

L4SANETCps

1    this statement regarding alleged dissolution and liquidation of

2    Mya Number Corp. in the recitals.

3            So what it appears, strongly, is that these alleged

4    December 1st, 2016 assignment agreements and the second one on

5    December 2nd was in fact executed nearly four years later,

6    shortly before the filing of this lawsuit, and that language

7    was stuffed in there to attempt to avoid this 18-month gap

8    issue with respect to the dissolution of Mya Number Corp.

9            So what we expect to show and we think discovery will

10   reveal is that these agreements were never executed back in

11   late 2016.  That's why we never heard about them in connection

12   with the first lawsuit.  They were in fact signed

13   electronically in October of 2020.  And that this chain of

14   title that's alleged to have flown from Mya Number Corp. all

15   the way through to Network Apps here is invalid and indeed

16   false.

17           THE COURT:  And, sir, let's just say that you're

18   correct and that these assignments that purport to happen in

19   December of 2016 are not actually happening until October of

20   2020.  What is your argument with respect to the Mya

21   Corporation, or to Network Apps?  That simply no one, that, to

22   the extent that there were any rights out there, they just

23   dissipated, or they -- something -- you know, they could not be

24   assigned four years later?

25           MR. KENNERLY:  The rights that Mya Number Corp. would

L4SANETCps

1   have had -- and Mya Number Corp. was dissolved, I think,

2   December 2nd of 2015 -- there were no assignments as alleged

3   back in December 1st and 2nd of 2016.  Those were in fact done

4   later, alleged to have occurred earlier so it lines up with the

5   facts.  But these assignment agreements in essence are

6   fraudulent and, we would say, insufficient to form part of the

7   chain of title, first to Schei and Wantz, and then to Network

8   Apps.

9           So that's, you know, the first aspect of the lack of

10  standing, and then of course I said there is additionally the

11  failure to comply with the assignment clause of the agreements.

12          THE COURT:  OK.  And so your overarching point is that

13  there is no amount of amending that can be done to obviate the

14  need, you believe, for either motion to dismiss for lack of

15  standing or, more broadly, discovery into this issue.

16          MR. KENNERLY:  That's correct, your Honor.

17          THE COURT:  OK.

18          Mr. Ross, I'm returning to you, sir.  And let me hear

19  from you very briefly in reply.  And then we can talk a little

20  bit more -- well, I suppose I should talk to you.  Do you want

21  to be heard on the timeline that's just been argued by

22  Mr. Kennerly?

23          MR. ROSS:  Yes.

24          THE COURT:  OK.  Then was the assignment to Mr. Wantz

25  and Mr. Schei undertaken on or about December 1st of 2016?

L4SANETCps

1          MR. ROSS:  Pete Ross speaking.  My understanding is

2     that that is when the assignments took place.  But beyond that,

3     the assignment agreement not being recorded, the timing of the

4     assignment, the 18 months' gap referred to by Mr. Kennerly,

5     will not be of any consequence in this litigation.  If it turns

6     out that Mya Number Corp. still owns the rights, then its

7     winding up has never been completed and we could assign them

8     right now.  There would be no one to challenge that.  This is

9     between Mya Number, the founders, Mr. Wantz and Mr. Schei, and

10    Network Apps.  No one outside of that process could say, no,

11    that assignment is not valid, you can't transfer those rights,

12    even though everyone involved agrees who owns the rights, it's

13    of no consequence.

14         THE COURT:  OK.  Mr. Ross, I do want you to stop right

15    there because I want to be clear that if you have suggested or

16    your clients have suggested that certain assignments took place

17    in 2016 and in fact they took place at another time frame, the

18    fact that they can do it later, whether they -- doesn't matter

19    as much to me as the fact that they are telling me these things

20    are being done in 2016 when they are not.  So I understand your

21    point about the amount of time that Mya had to conduct these

22    assignments.  But I will be very concerned if there are

23    representations made to me, either in the complaints or in the

24    submissions, or by you this afternoon, that suggest that

25    certain things happened in 2016, when in fact they did not

L4SANETCps

1    happen until 2020.

2           So I -- if the issue is one of recording in 2020

3    something that happened in 2016, really I am as unconcerned as

4    you are.  But if somehow these assignments of December -- or

5    that are dated as of December of 2016 were not in fact prepared

6    or drafted until 2020, I need to know that now, and I will not

7    handle it well if I find out that I have been misled in the

8    course of this case.

9           So hold that legal argument, sir.  That remains.  But

10   I'm asking you a specific question.  When were these

11   assignments effected?

12          MR. ROSS:  OK.  I understand that they were done in

13   2016.  If there's some member of my team on this phone call who

14   has any contrary knowledge, I would ask that they speak up so

15   we're clear on this.

16          THE COURT:  And no one is speaking up.  All right.

17          So, again, you've made your legal argument about the

18   ability or not of Mya Number to continue to make these

19   assignments.  And you may ultimately be proven correct.  But I

20   will not countenance misstatements made to me in this

21   litigation.

22          OK.  I don't know, Mr. Ross, if you wish to speak

23   about the second argument that was made to me by Mr. Kennerly.

24   And that regards the compliance or not with the assignment

25   agreement.

L4SANETCps

1          MR. ROSS:  I can address that briefly, your Honor.

2     That clause in our view is not pertinent to the assignments

3     here.  We're not assigning our contractual obligations, which

4     don't exist, in my view, at this point.  We're just assigning

5     the rights and the opportunity to bring this lawsuit.

6          THE COURT:  Could you speak a little bit more about

7     that, sir, please?

8          MR. ROSS:  Yes.  This sort of assignment clause, which

9     requires approval, is in there for the protection of AT&T in

10    the event that we are continuing -- by "we" I mean Mya Number

11    and its principals -- are continuing to provide services to

12    that company.  That is no longer the case.  AT&T terminated the

13    contract, from its end.  And so, having terminated the

14    contract, they cannot dictate the assignment of the rights that

15    exist, in my view.

16         THE COURT:  OK.  All right.  Thank you.  I think I

17    understand that a little bit better.  Thank you.

18         And I believe I understand your position with respect

19    to the statute of limitations.  On the issue of patent validity

20    or not, do you wish to be heard as to any contemplated

21    amendments to the pleading, or do you believe that the

22    complaint as it now stands adequately explains the validity of

23    the patent?

24         MR. ROSS:  With respect to the patent issues, your

25    Honor, I'm going to have to ask that Mr. Cadwell address those,

L4SANETCps

1    since I have no patent expertise whatsoever.

2                THE COURT:  I see.  OK.

3                Mr. Cadwell, you've been drafted to speak on this

4    issue.  Let me hear from you, please.

5                MR. CADWELL:  I have, your Honor.  Kevin Cadwell.  And

6    I am in a game of tag team.  Mr. Reeder is prepared to address

7    these today.  So I'm going to turn it to him with your Honor's

8    permission.

9                THE COURT:  Yes.  But I'm hoping it ends at

10   Mr. Reeder.  Because it wasn't my intention to have every

11   single member of plaintiffs' counsel tell me that they are not

12   handling the issue of patent issues.

13               So, Mr. Reeder, it's you and you alone.

14               MR. REEDER:  Yes, your Honor.  I'm ready to go.

15               So the plaintiffs, in their -- excuse me -- the

16   defendant AT&T in their letter brief basically has not really

17   addressed the 101 issue in any manner of completeness, and this

18   is what we laid out in our own opposition, that for 101, the

19   issue is really, it's a two-step process to figure out, is this

20   patent directed to some sort of abstract idea or not.  And the

21   second issue is then, even if it is directed to an abstract

22   idea, is there something inventive that the patentee came up

23   with that would make it patent-eligible.

24               And in this patent, I think it's clear if you look at

25   the claims and what the specification is all about, that it's

L4SANETCps

1   not directed to an abstract idea, that this is really a

2   technological solution to this highly technical, computerized

3   telecom network.  This is a problem all about, how do you make

4   two devices with different mobile numbers act as one; how do

5   you twin those together.  And that is a technological solution.

6   That was something that AT&T was unable to come up with,

7   something our -- the plaintiff, Mya Number, came up with and

8   invented for AT&T, and that they ultimately implemented.  So

9   it's our contention that you can stop at Step 1 of this

10  analysis and just find that this is not an abstract idea, and

11  that should be the end of the inquiry.

12          We can talk about Step 2 if you'd like.  AT&T has not

13  addressed Step 2 in their letter brief.  They basically said

14  that -- they pulled out a random, you know, a random line from

15  the specifications and said this patent is about sequentially

16  dialing a list of phone numbers.  That is not what the patent

17  is about by any means.  It's one feature that you could do, so

18  it was listed in the specifications as something you could do

19  with this invention, but it is not the heart of the invention.

20  It would not be fairly characterized as what this invention is

21  actually about.

22          THE COURT:  OK.  Thank you.

23          Mr. Kennerly, I'm not sure that this is a viable topic

24  for a motion to dismiss.  And I have read the parties' briefing

25  on the issue.  But if you want to be heard or if one of your --

L4SANETCps

1   Mr. Yin perhaps wants to be heard briefly on this issue, then I

2   will hear from you.

3          I should also note, my deputy reminds me, Mr. Yin did

4   in fact move pro hac vice and was admitted, so he could have

5   spoken even if I hadn't let him speak today.

6          Mr. Kennerly, is it you or Mr. Yin who will speak to

7   this issue?

8          MR. KENNERLY:  I'll address it, your Honor.  This is

9   Chris Kennerly.

10          THE COURT:  Thank you very much.  Go ahead, sir.

11          MR. KENNERLY:  Well, I hope it's not surprising that

12   in roughly a, you know, a half-page of a letter brief we were

13   not able to lay out in detail the argument here.  But I would

14   say that it is very plainly a strong argument here, and I'd be

15   happy to address the abstract-idea part of this as well as, if

16   the Court would like, *Alice* Step 2.

17          THE COURT:  Go ahead, sir.  Please do.

18          MR. KENNERLY:  Thank you.

19          Plaintiffs call the idea here simply grouping or

20   twinning devices.  And in substance that's all the patent

21   discloses and claims.  In the 1970s, for example, if someone

22   called your home phone number, the phone in the kitchen, the

23   living room, and the den would all ring.  And if you picked any

24   of them up, the line would connect and you could have a

25   conversation.  And that really needs to be the starting point

L4SANETCps

1    for any patent eligibility analysis here as well.  If we look

2    at claim 8 of the '728 patent, for example, it's just talking

3    about the same idea and applying it to multiple devices with

4    different numbers.  So if someone dials your primary phone, say

5    your work phone, then your home phone and your cellphone also

6    ring.  And if you pick any of them up, the line will connect

7    and you can have a conversation.  And the other way around,

8    conversely, if you make a call from any of your phones, the

9    caller ID will show the phone number of your work phone.  And

10   that's really it.

11          And in plaintiffs' response letter brief, they say

12   themselves, "The '728 patent discloses a specific improvement

13   for a telecommunications network by using hardware and software

14   for grouping, or twinning, cellular devices, and controlling

15   the devices so they can make and receive calls and texts from

16   the same phone number."  That's at docket no. 51 at 2.

17          So if you strip out the generic language about network

18   hardware and software, you're left with the same basic idea of

19   simply grouping, or twinning devices, and nothing more.  And we

20   see that later in the letter and other places.

21          So that, I would venture to say, is clearly an

22   abstract idea.  And we have a highly similar case in the

23   *BroadSoft* case, finding invalid claims very, very similar to

24   that.  We know from the Federal Circuit's *Enfish* case that

25   really, the way this is done, as these cases have come out over

L4SANETCps

1   time, is to compare the claims at issue to those claims already

2   found to be directed to an abstract idea in previous cases.

3   That's Federal Circuit law.  That's Supreme Court law.

4          So I think it's very important that AT&T be given a

5   chance to brief this and given sufficient pages.  We can

6   demonstrate clearly, I would say, that this is an abstract

7   idea, and there's nothing that goes beyond that that provides

8   significantly more, as *Alice* requires, in order to get past

9   Step 2.

10         So these claims are ineligible, invalid under Section

11  101, and with respect, your Honor, I would say that these

12  definitely warrant the Court examining them up front along with

13  the other issues before the real merits of the case begin.

14         THE COURT:  All right.  But before, it seems to me, we

15  get even to the issue of the bifurcated discovery that you want

16  on the standing matter, there is the issue, I think, of the

17  motion to disqualify plaintiffs' counsel.  I presume,

18  Mr. Kennerly, that that is something that your client still

19  wishes to pursue?

20         MR. KENNERLY:  It is, your Honor.

21         THE COURT:  OK.  I mean, it seems, before I figure out

22  what discovery is and before I figure out what are the

23  appropriate bases for the motion to dismiss or page limits or

24  things of that nature, I think I need to know who I'm dealing

25  with in this case.  And it is your clients' position that I

L4SANETCps

1    ought not be dealing with a number of plaintiffs' counsel.  So

2    let me please understand, particularly since you've now

3    received the opposition from your adversaries, why it is you

4    believe that I should entertain a motion to disqualify.

5                MR. KENNERLY:  Thank you, your Honor.  And my

6    colleague, Joshua Yin, will address this part of the argument.

7                THE COURT:  Thank you.

8                Mr. Yin.

9                MR. YIN:  Thank you, your Honor.  Joshua Yin for AT&T.

10    You know, I think the first point to clarify, looking through

11    plaintiffs' responsive letter brief, is that one of plaintiffs'

12    key arguments that they alleged they hadn't represented AT&T in

13    any patent matter for nearly four years.  And I think, just

14    starting there, there are some points that we need to clarify.

15                So if you take a look at Exhibit 3 to AT&T's letter

16    brief and you compare that -- that's a notice of appearance --

17    and you compare that to the filing date of the complaint, the

18    actual time frame we're talking about is actually three years,

19    three and a half months.  And presumably it took some time to

20    actually draft the complaint, conduct a pre-suit investigation

21    in this case.  So right there we're really talking about a time

22    frame of something closer to three years.  And even that

23    three-year number is problematic.

24                So in plaintiffs' responsive letter brief in a

25    footnote they mention that Mr. Reeder, one of the counsel that

L4SANETCps

1    we're seeking to disqualify in this case, assisted AT&T in an

2    international tax matter in 2019.  And that's another point

3    that we want to clarify, which is that that case was actually a

4    breach of contract litigation filed in New York for failure to

5    indemnify for a foreign tax settlement.  And of course that's

6    significant for this case because this is also a breach of

7    contract case involving AT&T.

8              And so, you know, these are just two points that we

9    want to start off with by clarifying what the numbers are

10   talking about.

11             And then the other point on top of that that is worth

12   clarifying is that the plaintiffs aren't disputing any of the

13   magnitudes of the numbers that AT&T raised in its opening

14   letter brief for disqualification.  So this is a case where,

15   you know, this is not a case where there is plaintiffs' counsel

16   previously represented AT&T one time a decade ago.  We're

17   actually talking about continuously representing AT&T in over

18   100 patent infringement cases over the course of a decade.  And

19   we're talking about a grand total of nearly 25,000 hours of

20   billable services that counsel have previously provided to

21   AT&T.  And so I think that's probably the starting point, when

22   it comes to the question of whether or not disqualification is

23   warranted in this case.

24             THE COURT:  OK.  And, Mr. Yin, then let's go to that

25   point.  I mean, would you agree with me that if plaintiffs'

L4SANETCps

1    counsel had represented AT&T in a hundred personal injury

2    cases, that your argument would have less force?

3            MR. YIN:  Yes, your Honor, I would agree with that,

4    but I would also draw the Court's attention to the cases that

5    were cited in AT&T's opening letter brief that involve cases

6    with insurance defense and things of that nature, where there

7    was less overlapping than would be the case in a patent

8    infringement case but nonetheless disqualifying was warranted.

9            THE COURT:  All right.  My point, sir, is that I'm not

10   sure that having the playbook, as you've described it, is

11   sufficient, because I've seen cases where counsel's access to

12   strategic thinking or litigation thinking is insufficient to

13   warrant disqualification, but extensive access into and insight

14   into the client's strategies on similar subject matter issues

15   or similar legal issues would be a basis for disqualification.

16   So I guess I'm less concerned that these attorneys may have

17   represented AT&T in patent infringement cases.  I'd be more

18   concerned if the subject matter of those patent infringement

19   cases was in any way analogous to what I'm seeing before me.

20   Are you able to speak to that issue, sir?

21           MR. YIN:  Yes, your Honor.  And I think there would be

22   really three points that I want to raise with respect to this,

23   the first point being that I think the Second Circuit case law

24   is very clear that AT&T doesn't have to disclose the nature and

25   extent of client confidences in order for there to be a basis

L4SANETCps

1   for disqualification; the second point being that if we are

2   going to get into the specifics of what precise information was

3   disclosed to counsel in a previous representation, that AT&T

4   should have the opportunity to do that during ex parte in

5   camera review; and the third point is that during that in

6   camera review, that AT&T will be able to point to plenty of

7   specific instances of factual overlap between this case and the

8   previous cases.

9          So it sounds like, your Honor, that you would prefer

10   me to address that third point first?

11          THE COURT:  Yes, I would.  Thank you.

12          MR. YIN:  So, you know, again, we're talking about

13   records for over ten years, and, you know, 25,000 hours of

14   work.  We have to get records from two different law firms.

15   And so there's a lot of documents that we're still going

16   through.  So this is just what we've been able to identify so

17   far.  And as we expect that if we keep digging that we'll find

18   more issues that arise.

19          But one issue that's already arisen is that we've been

20   able to identify a patent infringement case that Mr. Cadwell

21   previously represented AT&T and billed almost 4,000 hours for

22   over two years.  And that previous case pertained to the

23   sending of SMS text messages through AT&T's network

24   infrastructure.  And that is directly implicated here, because

25   the claims of the '728 patent pertain to the interception

L4SANETCps

1    and/or forwarding of telephone service activity, such as SMS

2    messaging.

3            And just so we're clear, we're looking at claims 11

4    and 12 of the '728 patent.

5            THE COURT:  OK.

6            MR. YIN:  And so, you know, Mr. Cadwell represented

7    AT&T for over two years on this case, and during that process

8    he became intimately familiar with AT&T's systems and AT&T's

9    network and the forwarding of SMS text messages through AT&T's

10   network.  And this is information that he presumably gleaned

11   from countless emails and calls and meetings and witness prep

12   sessions with AT&T employees, all by virtue of being AT&T's

13   attorney at the time.  And so Mr. Cadwell became familiar with

14   parts of AT&T's network, such as -- and I don't want to get too

15   far into it -- but the home location register, the mobile

16   switching center, the short message service center, parts of

17   AT&T's network that will be relevant in the current case.

18           And of particular note, Mr. Cadwell billed over 120

19   hours of work where the narrative entry mentioned a particular

20   AT&T witness who, it looks like, is likely to testify in the

21   present case.

22           And that's just one example with respect to

23   Mr. Cadwell.

24           In addition, as a second example, Mr. Clonts worked on

25   a nonlitigation matter for AT&T on and off for about five

L4SANETCps

1    years.  And in this nonlitigation matter, his work was directly

2    relating to the process of provisioning.  And provisioning is

3    the process, in essence, by which, you know, AT -- the process

4    that tells AT&T tells which phone is associated with which

5    phone number.  And again, in order to do his work for AT&T in

6    that case, Mr. Clonts became familiar with the HLR and the MSC

7    parts of AT&T's network that would be relevant in the current

8    case.  And it's relevant to the current case overall, because

9    if you take a look at claim 1, you'll see the first step of the

10   method claim is provisioning by telephone service provider a

11   plurality of telephone numbers.

12        And so those are two examples of direct overlap

13   between counsel's previous work on behalf of AT&T and the

14   current case.

15        THE COURT:  OK.  Sir, was there something else you

16   wanted me to know?

17        MR. YIN:  I would also note that, in Mr. Clonts's

18   nonlitigation work that I mentioned just now, he interviewed an

19   AT&T lead principal technical architect who was directly

20   involved in the deployment of NumberSync.  This is the same

21   NumberSync that is alleged in paragraph 42 of the complaint.

22        THE COURT:  Excuse me just while a make a note of

23   that.

24        Mr. Yin, as I understand your argument, you actually

25   believe this these individuals, these attorneys, cannot be

L4SANETCps

1    isolated within their firms and that, were I to find a

2    conflict, I would be required to disqualify the firms

3    collectively.  Do I understand your argument correctly, sir?

4              MR. YIN:  Yes, your Honor.  My understanding is that

5    the firm of Cadwell Clonts & Reeder is a four-attorney firm and

6    that all four attorneys, three of whom are currently on this

7    call, have been involved in this case.  So there's really no

8    possibility whatsoever of avoiding an imputed conflict by

9    creating some kind of ethical wall to divide the firm.

10             Now, it's a separate issue with respect to the law

11   firm of Brown George.  And our position on that is that we

12   really need discovery in order to understand the closeness and

13   extensiveness of the relationship between the two law firms.

14             THE COURT:  Yes.  That's what I'm trying to

15   understand.  What is it that you think you're going to obtain

16   in discovery on the issue of disqualification?

17             MR. YIN:  One of the cases that we cite in our opening

18   brief, your Honor, is *Benevida Foods v. Advance Magazine*

19   *Publishers*.  And what that case requires that defendants be

20   able to demonstrate for disqualification of the Brown George

21   firm is the closeness and extensiveness of the relationship

22   between co-counsel and the likelihood that confidential client

23   information has actually been shared.  That would be AT&T's

24   client information.

25             And so obviously the law can't require that we

L4SANETCps

1    demonstrate something but also prohibit us from being able to

2    do so from seeking that in discovery.

3           THE COURT:  OK.  Just one moment, please.

4           Mr. Yin, I do think I'd like a little bit more clarity

5    on precisely what you think discovery would look like on the

6    issues of disqualification.  What would you contemplate asking

7    of the Cadwell firm?  What would you contemplate asking of the

8    Brown George firm?

9           MR. YIN:  Well, your Honor, I'm not entirely sure that

10   the specifics are ripe for a court decision in terms of whether

11   or not there is a dispute.  But at the outset, one of the

12   things that we would be interested in exploring with opposing

13   counsel and seeing where they stand on certain issues is the

14   production of a privilege log, you know, outlining

15   communications between the law firms Brown George, Cadwell

16   Clonts & Reeder, and/or their clients.

17          Now, recognizing that might actually be very

18   burdensome for them to produce --

19          THE COURT:  Yes.

20          MR. YIN:  -- this results in a situation where the

21   other side says, "we can't produce that, there are 3,000 email

22   communications that are responsive," that's fine, if you

23   stipulate to that fact we can probably take that and that will

24   be sufficient to establish the closeness and extensiveness of

25   the relationship between co-counsel that we need to establish

L4SANETCps

1   under *Benevida Foods.*

2          THE COURT:  OK.  But I guess I'm realizing that I'm to

3   a degree putting cart before horse, because you have offered,

4   if I think it appropriate, to make an in camera submission to

5   me.  I don't know.  It seems to me that it would sort of be at

6   cross-purposes for you to tell me what that in camera

7   submission would be.  But your belief is that you have enough

8   material already that you can show that material to me and, at

9   the very least, obtain discovery on the question of whether

10  disqualification is warranted.

11         MR. YIN:  Yes, your Honor.

12         THE COURT:  OK.  OK.

13         Mr. Ross, who in the group of plaintiffs' counsel will

14  be responding to this?

15         MR. ROSS:  I will be.  Pete Ross.

16         THE COURT:  Thank you, sir.  Go ahead.

17         MR. ROSS:  Thank you, your Honor.

18         In AT&T's letter brief, it conflates "did a lot of

19  work for AT&T" with "disqualification."  But that's not the

20  test.  A substantial relationship must exist between the

21  subject matter of the prior representation in this case.  And

22  here, AT&T in its letter brief does not cite any relationship

23  at all between the subject matter of a prior case and the

24  present one.  No one at the Cadwell firm, in my understanding,

25  previously worked on the license agreement in issue or the

L4SANETCps

1   patents in issue here.  And to my knowledge, no case has ever

2   held that work on a previous patent matter disqualifies counsel

3   from suing on an unrelated patent matter.

4           In Mr. Yin's oral presentation, he talks about three

5   more specific things.  One is he says that Mr. Cadwell worked

6   on a case involving SMS text messaging and became familiar with

7   the SMS text messaging system at AT&T.  To me that sounds like

8   something that would be discoverable, how their system works,

9   and the features of that system is not privileged.  So that

10  would not be a basis for disqualification.

11          Mr. Yin says that Mr. Clonts worked on a nonlitigation

12  matter regarding provisioning.  But, again, that doesn't sound

13  like something that would be proof against discovery.  It's not

14  privileged, how their provisioning worked.

15          And then finally, Mr. Yin said that Mr. Cadwell talked

16  in the past with one or two witnesses, who later became

17  involved in NumberSync.  But my understanding is that whatever

18  Mr. Cadwell was working on in the past had nothing to do with

19  NumberSync or the patents in issue here.  And therefore the

20  mere fact that he talked to witnesses who may have knowledge

21  about this case doesn't, in my view, or would not warrant

22  disqualification.

23          And then we have the issue of discovery.  Clearly the

24  defendants could not get our communications with our

25  co-counsel.  Those would be privileged.  So then all we would

L4SANETCps

1  be talking about would be production of a privilege log.  And I
2  don't see that that's a worthwhile use of our time, given the
3  burden involved.

4          In addition, I think that there is an overarching
5  matter that would lead the Court, at least in my view, to
6  decide that nothing from the Cadwell firm could in fact -- the
7  Brown George Ross firm at this point.  And that's this.  We
8  have no patent expertise.  We don't do patent cases.  We have
9  to associate patent counsel with us to take on a patent case.
10  So to the extent that Mr. Cadwell or Mr. Clonts or Mr. Reeder
11  know something about AT&T's patent playbook or something about
12  the way AT&T has litigated patent cases in the past, that would
13  not be meaningful to us.  We would have to find new patent
14  counsel to handle those aspects of the case.

15          Thank you, your Honor

16          THE COURT:  No, no.  Actually, Mr. Ross, you were
17  doing fine and you were very clear until the very end of your
18  argument.  I'll really not sure whether -- I'm sure you weren't
19  throwing the Cadwell firm under the bus in making that
20  statement, but I just, I wasn't sure what you were saying.
21  Were you saying that because your firm, the Brown firm, doesn't
22  do patent work, that it could never be enmeshed in a situation
23  or in a litigation with a local counsel or a co-counsel such
24  that any disqualification could be imputed to it, or were you
25  arguing something else?

L4SANETCps

1          MR. ROSS:  No.  I was arguing that.  And I by no means

2     want to throw the Cadwell firm under the bus.  I don't think

3     that there is anything here to warrant disqualification of that

4     firm.  But if by chance they knew something about AT&T's patent

5     strategies, that would not be something that we would be

6     familiar with or would infect our firm in this matter.

7          THE COURT:  I see.  OK.  Thank you.

8          Mr. Yin, do you wish to be heard in reply?

9          MR. YIN:  Yes, your Honor, just briefly.

10          I think the first thing to note is that counsel's

11     description of what is required for the substantial

12     relationship test is somewhat -- is a little too narrow.  If

13     you take a look at the cases that AT&T cites in its opening

14     brief -- *Consolidated Theatres*, *Mitchell*, and *Battagliola* --

15     those cases make it clear what is actually required and not

16     required for there to be a substantial-relationship test to be

17     met.  And it doesn't have to be the exact same case or the

18     exact same contract that counsel previously worked on.

19          The second thing, you know, just to clarify, is that

20     counsel, Mr. Cadwell and Mr. Clonts, they did become intimately

21     familiar with parts of AT&T's systems and AT&T's networks

22     through privileged communications with AT&T employees.  So

23     we're not just talking about a situation where the material to

24     be protected is a single instance, something from a prior case,

25     and that that single piece of information was nonetheless

L4SANETCps

1    disclosed in discovery.

2              And just as an example of that, if you could bear with

3    me for one second, your Honor.

4              THE COURT:  Yes, sir.

5              MR. YIN:  So the case that I mentioned earlier, where

6    Mr. Cadwell represented AT&T for over two years when the

7    technology involved pertained to forwarding, sending its text

8    messages through AT&T's systems, Mr. Cadwell himself signed the

9    notice by AT&T of compliance regarding service of a privilege

10   log.  So we're talking about, in that particular instance,

11   information that Mr. Cadwell had access to that counsel was

12   refusing to disclose in discovery.  And so that, together with

13   the fact that we're talking about deposition-prep sessions,

14   internal email communications back and forth between counsel

15   and AT&T's in-house counsel in these previous cases, basically

16   we're not limited to information that would otherwise be

17   disclosed in discovery.  In fact this is information that was

18   not disclosed in discovery and could not be disclosed in

19   discovery.

20             THE COURT:  But I understood, for example, one of

21   Mr. Ross's arguments to be that it wasn't enough to deal with

22   an AT&T employee who happened to have knowledge about

23   NumberSync, unless of course Mr. Cadwell's interview of that

24   employee was to understand better or to prepare for a case that

25   itself involved NumberSync.  Do you agree with that

L4SANETCps

1       proposition, sir?

2                   MR. YIN:  No, your Honor, we don't.  And we think the

3       cases that AT&T cited in its opening brief make that clear.

4                   THE COURT:  You're saying if the interviews -- let's

5       just use that example.  If he's interviewing a particular

6       engineer who understands the NumberSync program but he asks him

7       not one question about NumberSync, he asks him about some other

8       area of expertise that this employee has, is there a basis to

9       disqualify Mr. Cadwell as a consequence of that interview?

10                  MR. YIN:  Well, your Honor, just to be clear, I think

11      in that particular instance, it would be Mr. Clonts who

12      interviewed the witness, who later became involved --

13                  THE COURT:  Excuse me.  You're right.  You're right.

14      Thank you.  Mr. Clonts and not Mr. Cadwell.  Excuse me.  Go

15      ahead.

16                  MR. YIN:  Yes, your Honor.  But I think it's not just

17      an issue of, did Mr. Clonts ask the witness about his work on

18      NumberSync.  And the problem of course is that at that point in

19      time, NumberSync had not been publicly released at the time.

20      But the bigger question is whether or not Mr. Clonts was

21      talking to that particular AT&T engineer about AT&T's

22      provisioning process and how phone numbers get assigned on

23      AT&T's network.  And that's significant where, in this case,

24      provisioning is one of the elements of the '728 patent claim.

25                  THE COURT:  Yes, sir.  I'm just thinking through what

L4SANETCps

1    you've just said.

2            All right.  Now I understand that better.

3            Anything else you'd like to say in reply, sir?

4            MR. YIN:  Nothing that I haven't already said

5    previously, your Honor.

6            THE COURT:  All right.  Then let me ask this, Mr. Yin.

7    I sense, but perhaps I am mistaken, that, to a degree, your

8    letter to me of April 5th is restricted, as it needs to be,

9    because there is information you're not showing to me or you

10   haven't yet shown to me.  So I'm trying to figure out how much

11   of your anticipated or contemplated disqualification motion is

12   based on information that you think I ought to see ex parte and

13   how much of it is based on what you have announced in your

14   pre-motion submission.

15           MR. YIN:  Your Honor, I think the response to that

16   would be that we have information that we can basically divide

17   into three categories.  There is a category of information that

18   we're happy to make arguments on in a public setting, which we

19   have discussed in our opening letter brief, questions of what

20   the law is and all the issues related to the extensiveness of

21   counsel's prior participation in AT&T legal matters.

22           There is a second category of documents and

23   information that we don't think would be appropriate for public

24   consumption but that could potentially be filed under seal.

25           And then the third category of information and

L4SANETCps

1    documents is really the actual privileged information that

2    counsel had access to.  You know, the last thing we would want

3    is for them to be able to see all that same information again

4    and refresh their recollections and be able to use it to drive

5    their litigation and discovery strategy.

6              I hope that answers your question.

7              THE COURT:  It does.  Thank you.

8              Counsel, I believe that the antecedent issue here was

9    the question of bifurcating discovery, but the more I talk to

10   the parties the more I think the antecedent issue is the degree

11   to which I should permit a motion to disqualify plaintiffs'

12   counsel and the degree to which I need information in order to

13   do that.  So I do want to hear from you if there are other

14   discrete issues you wish to bring to my attention in this

15   conference.  But when I leave this conference, I am going to be

16   thinking about whether to schedule a motion for

17   disqualification and, if so, whether to include in that

18   schedule some period of time for the provision of information

19   to me ex parte and whether I should permit some discovery as

20   well.

21             So I will be thinking about those issues.  And that's

22   on the question of disqualification and on the question of

23   bifurcation of discovery.  That's where I am right now.

24             Mr. Ross, before I bring this to a close, are there

25   other areas that you think we should be discussing in this call

L4SANETCps

1    today?

2              MR. ROSS:  No, none, your Honor.  Thank you.

3              THE COURT:  OK.  Thank you very much.

4              And Mr. Kennerly, lest I forget, I am going to ask

5    you, please, to obtain a transcript of this conference in the

6    ordinary course, because there have been substantive

7    discussions that I suspect I will be referring to in the coming

8    weeks.  If you order a copy, I will receive one automatically.

9              But could you tell me, please, Mr. Kennerly, are there

10   other issues that you would like to bring to my attention in

11   this conference that have not been covered?

12             MR. KENNERLY:  Well, with my apologies, your Honor,

13   there was one large issue here.  And I maybe alluded to it at

14   the outset.  And it's that the standing defects vary, depending

15   on the count.

16             THE COURT:  Yes, sir.

17             MR. KENNERLY:  And I walked through, or summarized,

18   the argument with respect to the breach of contract claim.  But

19   the patent infringement claim defects are even worse.  The

20   assignment agreement issue is there as well.  But there are two

21   or three sort of insurmountable hurdles beyond that with

22   respect to the patent infringement claim.  And I'm happy to

23   walk through those.  But as we requested, really, we would like

24   the opportunity to present a full motion and lay these out for

25   the Court.

L4SANETCps

1          THE COURT:  No.  And I certainly understand that, sir.

2     Maybe you and I are speaking past each other.  It seems to me

3     that the first issue is who gets to talk to me.  And that's the

4     disqualification issue.  And though I normally would take

5     standing as the first issue in a case of this type, this to me

6     is that rare case where I first have to figure out who can

7     speak to me, and then have them speak about the issue of

8     standing, and then have, potentially have them speak about

9     other defects or not in the complaint.  Do you have a different

10    view of the order in which I should be addressing these issues?

11         MR. KENNERLY:  No, that order sounds perfectly

12    reasonable and appropriate, your Honor.

13         THE COURT:  OK.  But some day you wish to talk to me

14    about why there are standing defects with respect to each

15    count, that they vary, and that, at least with respect to the

16    patent issue, the defects are worse than the breach of contract

17    issue.  I understand you correctly?

18         MR. KENNERLY:  Well said, your Honor.

19         THE COURT:  Let's not go that far, but thank you very

20    much.

21         OK.  Let me please, then, take the time that I need to

22    take to think about the issue of disqualification.  I have to

23    tell you, it must be feast or famine with disqualification

24    motions because I've been dealing with several of them recently

25    and I've had years go by without a disqualification motion, so

L4SANETCps

1    this is a surprise to have three at the same time.

2             So I will think about those.  I want to think about

3    discovery if any that is appropriate, whether I need to see

4    something in camera.  And I will get back to you as promptly as

5    I can with respect to that information.

6             In the interim, I will not be signing the parties'

7    proposed case management plan.  I do thank you for preparing

8    it.  I do thank you for outlining your disagreements.  But I

9    think that such discovery deadlines or discovery schedules are

10   a little bit premature given the antecedent issues that I have

11   raised.

12            With that, I am going to bring this conference to a

13   close.  I'm going to wish to you, to your families, and to your

14   clients safety and good health during this pandemic.  We are

15   adjourned.  Thank you very much.

16            (Adjourned)

17

18

19

20

21

22

23

24

25