UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NETWORK APPS, LLC, KYLE SCHEI, and JOHN WANTZ,<br><br>                              Plaintiffs,<br><br>             -v.-<br><br>AT&T MOBILITY LLC and AT&T SERVICES, INC.,<br><br>                              Defendants. | 21 Civ. 718 (KPF)<br><br>**REDACTED**<br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Network Apps, LLC, Kyle Schei, and John Wantz commenced this action against AT&T Mobility LLC and AT&T Services, Inc., asserting claims for breach of contract and patent infringement. Now before the Court is Defendants' motion to disqualify Plaintiffs' counsel for a purported ethical conflict arising out of counsel's prior representation of AT&T. For the reasons that follow, the Court denies Defendants' motion.

**BACKGROUND**[1]

**A.     Factual Background**

Plaintiff Network Apps is a Seattle-based company managed by Plaintiffs Kyle Schei and John Wantz. (Compl. ¶ 6). Network Apps is the assignee and

---

[1]     This Opinion draws its facts from the Complaint, the well-pleaded allegations of which are taken as true for purposes of this motion. (*See* Dkt. #1 ("Compl.")).

For ease of reference, the Court refers to Defendants' unredacted memorandum of law in support of their motion to disqualify counsel as "Def. Br." (Dkt. #68); Plaintiffs' unredacted memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #80); Defendants' unredacted reply memorandum in further support of their motion as "Def. Reply" (Dkt. # 97); and Plaintiffs' supplemental memorandum of law in opposition to Defendants' motion as "Pl. Sur-Reply" (Dkt. #111).

owner of all assets previously owned by Mya Number, a telecommunications technology company.  (*Id.*).

Mya Number, before it assigned its assets to Network Apps, worked with AT&T on certain telecommunications projects that lie at the heart of this case. The parties' relationship began on November 28, 2012, when AT&T and Mya Number entered into a Limited Application Programming Interface Usage Agreement ("Interface Agreement") so that Mya Number could integrate one of its products into AT&T's own telecommunications offerings.  (Compl. ¶ 23).  In October 2013, as the popularity of smartwatches began to rise, AT&T asked Mya Number to create and license technology that would allow a caller to dial a single number and have the call ring through to the call recipient's smartphone, tablet, and smartwatch.  (*Id.* at ¶ 25).  Mya Number agreed to undertake the project, which would come to be referred to interchangeably as the "Twinning Solution," "NumberSync," "NDA 34," or simply "myaNUMBER." (*Id.*).  Pursuant to the Interface Agreement, Mya Number retained the rights to all patents it developed as part of the Twinning Solution.  (*Id.* at ¶ 29).

In June 2014, Mya Number and AT&T entered into two agreements to facilitate the development of the Twinning Solution.  The first agreement was a Professional Services Agreement ("PSA"), which contemplated that both parties would exchange confidential information, but which made clear that each party would retain its own intellectual property rights to the material exchanged. (Compl. ¶ 31).  The second agreement was an accompanying Statement of Work ("SOW"), which set forth terms under which Mya Number would license its

2

Twinning Solution to AT&T.  (*Id.* at ¶¶ 31-32).  Following the execution of these agreements, Mya Number began fulfilling its obligations under the SOW by implementing the Twinning Solution in AT&T's network.  (*Id.* at ¶ 34).

In the fall of 2014, AT&T began to complain to Mya Number about the projected royalties that it would incur by using Mya Number's Twinning Solution. (Compl. ¶ 41).  Thereafter, AT&T attempted to negotiate with Mya Number about reducing the royalty payments and transferring the technology rights to AT&T.  (*Id.*).  Mya Number refused to renegotiate.  (*Id.*).  Perhaps not coincidentally, on October 23, 2014, AT&T informed Mya Number that it had decided not to pursue the launch of the Twinning Solution.  (*Id.*).

Plaintiffs allege that AT&T used intellectual property and proprietary information obtained from Mya Number pursuant to the above-described agreements to pursue its own patent related to "twinning."  (*Id.* at ¶ 45).  On October 27, 2014, Mya Number filed U.S. Patent Application number 14/525,039, which encompassed the Twinning Solution.  (*Id.* at ¶ 34).  The application was granted by the U.S. Patent and Trademark Office on September 6, 2016, as U.S. Patent No. 9,438,728 (the "'728 Patent"), entitled "Telephone Number Grouping Service for Telephone Service Providers."  (*Id.*).  On November 7, 2014, AT&T filed U.S. Patent Application number 14/536,418, which was granted on August 1, 2017, as U.S. Patent Number 9,723,462 (the "'462 Patent"), entitled "Cloud-Based Device Twinning."  (*Id.* at ¶ 45).  As relevant here, Plaintiffs allege that one of the two named inventors on the '462 Patent, who worked with Mya Number on behalf of AT&T during the "Twinning

Solution" project, improperly used information obtained from Mya Number in prosecuting the '462 Patent.  (*Id.*).

Plaintiffs allege that AT&T has not paid any royalties to Mya Number in conjunction with AT&T's deployment of the Twinning Solution, in violation of Mya Number's contractual and intellectual property rights, and, worse yet, that AT&T is now claiming credit for Mya Number's work.  (Compl. ¶¶ 48-49).  Plaintiffs allege that they are entitled to, *inter alia*, a judgment against Defendants for breach of contract; a judgment that Defendants have infringed one or more claims of the '728 Patent; damages, including both compensatory damages and enhanced damages as a result of Defendants' willful infringement; injunctive relief; and a declaration that Plaintiffs Schei and Wantz are the true inventors of the '462 Patent (and a series of follow-on patents).  (*Id.* at 23-24).

## B.  Procedural Background

Plaintiffs commenced this suit on January 26, 2021, with the filing of a Complaint asserting claims of breach of contract and patent infringement against AT&T Inc., AT&T Corp., AT&T Mobility LLC, and AT&T Services, Inc. (Dkt. #1).  On March 31, 2021, the parties filed a stipulation of voluntary dismissal, dismissing without prejudice all claims against AT&T Inc. and AT&T Corp. (Dkt. #42), which stipulation the Court entered on April 1, 2021 (Dkt. #43).

On April 5, 2021, Defendants filed a letter motion requesting a conference regarding their anticipated motion to dismiss for lack of standing,

expiration of the statute of limitations, failure to abide by a mandatory dispute resolution clause in the parties' various agreements, and patent ineligibility under 35 U.S.C. § 101. (Dkt. #46). That same day, Defendants filed two letter motions for a conference regarding their contemplated motions (i) to disqualify Plaintiffs' counsel (Dkt. #47) and (ii) to stay general discovery pending both motions, and for limited and expedited discovery on certain threshold issues (Dkt. #48). Plaintiffs filed their responses to these letters on April 8, 2021. (Dkt. #51-53). On April 9, 2021, the Court converted the initial pretrial conference scheduled in this case to a pre-motion conference. (Dkt. #54). That conference was held on April 28, 2021. (*See* Minute Entry for April 28, 2021).

For reasons discussed at the pre-motion conference, the Court determined that it must resolve Defendants' anticipated motion to disqualify Plaintiffs' counsel before addressing Defendants' other contemplated motions. (Dkt. #60). Accordingly, on April 29, 2021, the Court entered a briefing schedule for Defendants' motion to disqualify Plaintiffs' counsel, but did not authorize any further discovery into the issue of disqualification. (*Id.*).

Defendants filed their motion to disqualify papers on June 29, 2021. (Dkt. #62-66, 68-72). Plaintiffs filed their opposition papers on July 29, 2021. (Dkt. #77-88). Defendants filed reply papers on August 12, 2021. (Dkt. #91-102). On August 16, 2021, Plaintiffs filed a letter motion for leave to file a sur-reply (Dkt. #104), and Defendants filed an opposition to that letter on August 20, 2021 (Dkt. #106). On August 23, 2021, the Court granted

Plaintiffs' application (Dkt. #107), and they filed their sur-reply papers on August 30, 2021 (Dkt. #109-111).

In the time since Defendants filed their motion, there have been changes with respect to the attorneys and law firms representing Plaintiffs.[2]  On March 17, 2022, Defendants clarified that the instant motion seeks disqualification of Cadwell Clonts Reeder & Thomas LLP ("CCRT") and its individual attorneys Kevin Cadwell, David Clonts, Michael Reeder, and Lisa Thomas.  (Dkt. #122).  Additionally, Defendants seek disqualification of Ross LLP and its individual attorneys Peter Ross and Richard Schwartz.  (*Id.*). Defendants do not currently seek disqualification of Lazare Potter & Giacovas LLP or David Potter, who first appeared in this case on March 2, 2022.  (*Id.*; *see also* Dkt. #121).

## C.   The Prior Relationships Between Plaintiffs' Counsel and AT&T[3]

### 1.   CCRT

Defendants assert that CCRT, together with its individual attorneys Cadwell, Clonts, Reeder, and Thomas, must be disqualified from representing

---

[2]   Plaintiffs were originally represented by Cadwell, Clonts, & Reeder LLP, which is now Cadwell Clonts Reeder & Thomas LLP ("CCRT"); and Browne George Ross O'Brien Annaguey & Ellis LLP ("BGR"), which has since split into two firms: Ross LLP, which continues to represent Plaintiffs in this matter; and Ellis George Cipollone O'Brien Annaguey LLP, which does not.  Defendants' motion is therefore moot as to Ellis George Cipollone O'Brien Annaguey LLP.

[3]   The Court draws the information contained in this section from the sealed versions of the declarations and exhibits submitted in connection with Defendants' motion to disqualify.  Along with their moving papers, Defendants submitted declarations from Feza Buyukdura, a Lead Principal Technical Architect at AT&T Mobility LLC ("Buyukdura Decl." (Dkt. #69)); Justin McNamara, Assistant Vice President of Product Management at AT&T ("McNamara Decl." (Dkt. #70)); and defense counsel Joshua Yin ("Yin Decl." (Dkt. #72)).

Plaintiffs in this action.  Neither CCRT (as a firm), nor Thomas (as an individual attorney), nor Ross LLP (or its individual attorneys Ross and Schwartz) have ever represented AT&T; but Cadwell, Clonts, and Reeder have represented AT&T while working for other law firms.  Accordingly, the Court examines each attorney's relationship with AT&T to determine whether any should be disqualified from representing Plaintiff, and if so, whether that conflict should be imputed to the attorney's firm.  For ease of reference, the Court refers to Cadwell, Clonts, and Reeder collectively as "Counsel."

### a.   Cadwell

Cadwell is currently a partner at CCRT, a firm he and his partners started as Cadwell Clonts & Reeder in July 2020.  (Cadwell Decl. ¶ 2).  Over the course of his career, Cadwell has represented AT&T in at least 59 patent cases and billed 12,965 hours for legal services.  (Def. Br. 2; *see also* Yin Decl., Ex. 1-2).  From 2002 to 2015, Cadwell was an attorney at the law firm Baker Botts, which represents AT&T.  (Cadwell Decl. ¶ 3).  In 2015, Cadwell left Baker Botts and joined Reed Smith LLP, where he did not work on any matters for AT&T.

---

Plaintiffs submitted declarations from attorneys Kevin Cadwell ("Cadwell Decl." (Dkt. #77)); David Clonts ("Clonts Decl." (Dkt. #78)); Michael Reeder ("Reeder Decl." (Dkt. #85)); and Lisa Thomas (Thomas Decl." (Dkt. #86)).  In addition, Plaintiffs submitted a declaration from Dr. Michael Mitzenmacher, a Professor of Computer Science at Harvard University ("Mitzenmacher Decl." (Dkt. #84)).

Along with their reply brief, Defendants submitted declarations from James Bress, President and Chief Technical Officer of AST Technology Labs, Inc. ("Bress Decl." (Dkt. #92)); Roger Fulghum, Co-Chair of the IP Litigation Practice at Baker Botts ("Fulghum Decl." (Dkt. #93)); Paula Phillips, Litigation Manager at AT&T ("Phillips Decl." (Dkt. #94)); and Clare Tokarski, IP Practice Manager at Akin Gump ("Tokarski Decl." (Dkt. #95)), as well as a supplemental declaration from Joshua Yin ("Yin Supp. Decl." (Dkt. #96)).

Portions of these materials were redacted from the parties' public filings out of respect to attorney-client privilege and/or a business interest in confidentiality.

(*Id.* at ¶ 4). Cadwell left Reed Smith LLP in 2017 and joined the firm Akin Gump Strauss Hauer & Feld ("Akin Gump"), where he again worked on matters for AT&T. (*Id.* at ¶ 5). In that capacity, Cadwell appeared in various matters on behalf of AT&T, most recently in October 2017. (*Id.* at ¶¶ 7-8). That matter ended in a settlement in November 2017, before the start of fact discovery, and appears to have involved a patent unrelated to this case. (*See id.* at ¶ 8; Def. Br. 2). Cadwell left Akin Gump in April 2019 and has done no further work for AT&T since that time. (Cadwell Decl. ¶¶ 9-10). Cadwell has no records of these past matters. (*Id.* at ¶ 16). Cadwell attests that he never worked on AT&T's Number Sync product; never worked on the '728 Patent before this case; never worked on matters involving twinning technology before this case; and never worked on any matters involving Network Apps or Mya Number prior to this case. (*Id.* at ¶¶ 11-14).

In their brief, Defendants focus on Cadwell's role in defending AT&T in two specific patent infringement suits: *Technology Patents LLC* v. *AT&T Mobility LLC*, No. 8:07 Civ. 3012 (AW) (D. Md. Jan. 14, 2008); and *Celltrace LLC* v. *AT&T Inc.*, No. 6:09 Civ. 294 (RWS) (E.D. Tex. July 5, 2011). (Def. Br. 2-3). In *Technology Patents*, the patent at issue taught a "global paging system using packet-switched digital data network and remote country designation." (Yin Decl., Ex. 34 at 3). In *Celltrace*, ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ (Def. Br. 3-4 (citing Yin Decl.,

Ex. 14)).

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

████████ (Def. Br. 4-5).  McNamara is currently an Assistant Vice President

of Product Management at AT&T, and he is expected to testify in this matter

that ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████ (Def. Br. 6; *see also* McNamara

Decl. ¶¶ 2-3).  McNamara recalls that ████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

████████████████████ (McNamara Decl. ¶ 7).  While McNamara does

not specifically name Cadwell ████████████████████████████

██████████████████████████████████████

████████████████████. (Def. Br. 4-5; *see generally* Yin Decl., Ex. 2).

Cadwell attests that he "never discussed twinning with Mr. McNamara" and

has no recollection of "learning anything from Mr. McNamara" about anything

relevant to this matter.  (Cadwell Decl. ¶ 17).

### b.   Clonts

Clonts is also a founding partner at CCRT.  (Clonts Decl. ¶ 2).  From 1999 to 2019, Clonts was an attorney at Akin Gump, where he worked on matters for AT&T.  (*Id.* at ¶ 3; Def. Br. 8).  Clonts represented AT&T in at least 45 patent cases and billed 7,283 hours for legal services.  (Def. Br. 3; *see also* Yin Decl. Ex. 1, 4).  One of those matters, ████████████████████████ ████████ (the "Provisioning Matter"), ████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████ (the "Call Intercept Matter"), ██████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ (Def. Br. 6, 9).  Clonts attests that he has no records of these past matters.  (Clonts Decl. at ¶ 12).

While working on the Provisioning Matter for AT&T from May 2008 to December 2013, ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████ (Def. Br. 8; *see* Yin Decl., Ex. 25-30).  ████████████████ ██████████████████████████████████████ ████████████ (Buyukdura Decl. ¶ 3).  However, nothing in Buyukdura's declaration suggests that Clonts was ever privy to information about that technology.  And in fact, Clonts attests that he has never discussed twinning technology with Mr. Buyukdura.  (Clonts Decl. ¶ 13).

The last matter in which Clonts appeared on behalf of AT&T was filed on February 20, 2017, ended on September 25, 2017, and concerned a patent unrelated to the instant litigation.  (*See* Clonts Decl. ¶ 4; Def. Br. 3).  In April 2019, Clonts left Akin Gump and joined the firm Kelley Drye & Warren.  (*Id.* at ¶ 5).  That firm does not represent AT&T.  (*Id.*).  Since leaving Akin Gump, Clonts has not worked for AT&T.  (*Id.* at ¶ 6).  Clonts attests that he has never worked on AT&T's NumberSync product; never worked on the '728 Patent prior to this case; never worked on matters involving twinning technology prior to this case; and never worked on matters involving Network Apps or Mya Number prior to this case.  (*Id.* at ¶¶ 7-10).

### c.   Reeder

Reeder is another founding partner of CCRT.  (Reeder Decl. ¶ 2).  From 2009 to 2020, Reeder was an attorney at Akin Gump, where he worked on matters for AT&T.  (*Id.* at ¶ 3).  Reeder represented AT&T in at least 16 patent cases and billed 4,390 hours for legal services.  (Def. Br. 3; *see also* Yin Decl., Ex. 1, 4).  The last patent matter in which Reeder appeared on behalf of AT&T was filed on February 20, 2017, ended on September 25, 2017, and concerned a patent unrelated to the instant litigation.  (*See* Reeder Decl. ¶ 4; Def. Br. 3).  Reeder also worked for AT&T on a contract matter in November 2019.  (Def. Br. 3).  Reeder's recollection is that this litigation related to international tax obligations and was not a patent matter.  (Reeder Decl. ¶ 11).  Reeder was not on the pleadings in the case, did not enter an appearance, and did not participate in the litigation.  (*Id.* at ¶ 12).

Since leaving Akin Gump in 2020, Reeder has not performed any further work for AT&T.  (Reeder Decl. ¶ 5).  Reeder attests that he never worked on AT&T's NumberSync product; never worked on the '728 Patent before this case; never worked on matters involving twinning technology prior to this case; and never worked on matters involving Network Apps or Mya Number prior to this case.  (*Id.* at ¶¶ 6-9).

### d.    Thomas

While Thomas has never represented AT&T, "[a]n attorney's conflicts are ordinarily imputed to [her] firm based on the presumption that 'associated' attorneys share client confidences."  *Hempstead Video, Inc.* v. *Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005).  Therefore, it is likely that if AT&T demonstrates that Counsel should be disqualified from representing Plaintiffs in this matter, that conflict would be imputed to CCRT such that Thomas would also be disqualified.

### 2.    Ross LLP

Defendants also seek disqualification of Ross LLP and its individual attorneys (Ross and Schwartz), albeit on a different theory, namely, the "closeness and extensiveness of the relationship between co-counsel" and the consequent "likelihood that confidential client information has actually been shared."  (Def. Br. 18 n.1).  At the April 28, 2021 pre-motion conference, Ross explained to the Court, "We have no patent expertise.  We don't do patent cases.  We have to associate patent counsel with us to take on a patent case." (Dkt. #61 at 31:7-9).  Building on this acknowledgement, Defendants argue

12

that Ross LLP must have had "a close working relationship" with CCRT to have properly and ethically investigated, filed, and litigated this patent infringement case involving complex telecommunications technology.  (Def. Br. 18-19 n.1). Therefore, Defendants argue, disqualification of both CCRT and Ross LLP is warranted.  (*Id.*).  Cadwell, Clont, and Reeder all attest that no confidential, non-public information about AT&T has been exchanged with either Ross or Schwartz.  (Cadwell Decl. ¶ 19; Clonts Decl. ¶ 14; Reeder Decl. ¶ 14).

## DISCUSSION

### A.     Applicable Law

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process."  *First NBC Bank* v. *Murex, LLC*, 259 F. Supp. 3d 38, 55 (S.D.N.Y. 2017) (quoting *Hempstead Video, Inc.*, 409 F.3d at 132).  In exercising this power, the Court must balance a client's right to freely choose his counsel against the need to maintain the highest standard of the profession.  *Id.* at 55-56 (citing *Hempstead Video, Inc.*, 409 F.3d at 132).

"Motions to disqualify are disfavored and subject to a high standard of proof."  *First NBC Bank*, 259 F. Supp. 3d at 56.  Among other concerns that courts have identified, (i) disqualification impinges on a party's right to employ the counsel of its choice; (ii) a motion to disqualify has potential to be used for tactical purposes; and (iii) even when brought in good faith, such a motion can cause delay, impose expenses, and interfere with the attorney-client relationship.  *Id.* (collecting cases).  "[U]nless an attorney's conduct tends to

'taint the underlying trial' … courts should be quite hesitant to disqualify an attorney." *Bd. of Ed. of City of N.Y.* v. *Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).  "On the other hand, the Second Circuit has held that any doubt should be resolved in favor of disqualification." *First NBC Bank*, 259 F. Supp. 3d at 56 (citing *Hull* v. *Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975)).  "In the end, after careful analysis, a motion to disqualify is 'committed to the sound discretion of the district court.'" *Id.* (quoting *Purgess* v. *Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994)).

 "In considering motions to disqualify, courts often benefit from valuable guidance offered by the American Bar Association (ABA) and state disciplinary rules." *First NBC Bank*, 259 F. Supp. 3d at 56.  As relevant here, Rule 1.9(a) of the New York Rules of Professional Conduct provides, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  N.Y. R. Prof'l Conduct 1.9.  Matters are "substantially related" for purposes of this Rule "if they involve the same transaction or legal dispute" or "if, under the circumstances, a reasonable lawyer would conclude that there is otherwise a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Id.* cmt. 3.  The Rule cautions that in determining whether a substantial relationship exists, it "may be relevant" that

"[i]nformation acquired in a prior representation may have been rendered obsolete by the passage of time." *Id.* Additionally, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation. On the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." *Id.*

Significantly, however, rules of professional conduct "merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *First NBC Bank*, 259 F. Supp. 3d at 56 (quoting *Hempstead Video, Inc.*, 409 F.3d at 132). "Given the availability of both federal and state comprehensive disciplinary machinery … there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface." *Nyquist*, 590 F.2d at 1246. On the other hand, "disqualification may be justified even in the absence of a clear ethical breach 'where necessary to preserve the integrity of the adversary process.'" *First NBC Bank*, 259 F. Supp. 3d at 56 (quoting *Nyquist*, 590 F.2d at 1246).

"When a conflict has been found between two client representations by an attorney, the standard for disqualification varies depending on whether the representations were successive or concurrent." *First NBC Bank*, 259 F. Supp. 3d at 57 (quoting *Hempstead Video*, 409 F.3d at 133). Here, Defendants allege that Plaintiffs' counsel's representation of Plaintiffs is successive to their representation of Defendants. (*See* Def. Br. 2 ("Plaintiffs' counsel performed legal services for AT&T continuously for over a decade … and as recently as

15

November 2019.")).  The disqualification standard for successive representations turns on whether there is a "substantial relationship" between the prior and present matters.  *First NBC Bank*, 259 F. Supp. 3d at 57.  In such cases, the attorney may be disqualified if: (i) "the moving party is a former client of the adverse party's counsel"; (ii) "there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit"; and (iii) "the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client."  *Id.* (quoting *Hempstead Video*, 409 F.3d at 127).

**B.     The Court Denies Defendants' Motion to Disqualify Counsel**

The parties here do not dispute that Counsel formerly represented AT&T while at other law firms.  Therefore, whether Counsel may represent Plaintiffs in this case turns on (i) whether a substantial relationship exists between Counsel's prior representation of AT&T and the present litigation; and (ii) whether Counsel had access to, or were likely to have had access to, relevant privileged information during their prior representations of AT&T.  The Court considers each question in turn, but to preview, answers both in the negative.

**1.     Defendants Have Not Demonstrated a Substantial Relationship**

The Court begins by addressing whether Counsel's prior work for AT&T bears a substantial relationship to the work they will perform in this case. "[T]he Second Circuit has determined that as a practical matter, motions to

disqualify should be granted only when the relationship between issues in the prior and present cases is 'patently clear' or that the issues involved are 'identical' or 'essentially the same.'"  *Mitchell* v. *Metro. Life Ins. Co.*, No. 01 Civ. 2112 (WHP), 2002 WL 441194, at *4 (S.D.N.Y. Mar. 21, 2002) (internal punctuation omitted) (quoting *Gov't of India* v. *Cook Indus., Inc.*, 569 F.2d 737, 739-40 (2d Cir. 1978)); *accord Jose Luis Pelaez, Inc.* v. *McGraw-Hill Glob. Educ. Holdings LLC*, 366 F. Supp. 3d 567, 573 (S.D.N.Y. 2019); *Revise Clothing, Inc.* v. *Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 392 (S.D.N.Y. 2010); *Scantek Med., Inc.* v. *Sabella*, 693 F. Supp. 2d 235, 239 (S.D.N.Y. 2008).

"It is the congruence of *factual* matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes."  *Revise Clothing, Inc.*, 687 F. Supp. 2d at 392 (emphasis in original) (quoting *U.S. Football League* v. *Nat'l Football League*, 605 F. Supp. 1448, 1460 n.26 (S.D.N.Y. 1985)); *accord Cole Mech. Corp.* v. *Nat'l Grange Mut. Ins. Co.*, No. 06 Civ. 2875 (LAK) (HBP), 2007 WL 2593000, at *1 (S.D.N.Y. Sept. 7, 2007) (granting disqualification motion where issues central to the previous claim would also be implicated in the current claim because it concerned the same construction project, even if the principal focus of the earlier claim did not relate to the current plaintiff).  In other words, "the relevant inquiry is not limited to whether there are common legal claims or theories between the representations, but extends to whether there are common factual issues that are material to the adjudication of the prior and current representations."  *Mitchell*, 2002 WL 441194, at *8.  Where both the

prior and present representations involve litigation, there is a substantial relationship between the representations for purposes of a disqualification motion where "the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same." *Revise Clothing, Inc.*, 687 F. Supp. 2d at 392 (quoting *Guerrilla Girls, Inc.* v. *Kaz*, No. 03 Civ. 4619 (LLS), 2004 WL 2238510, at *3 (S.D.N.Y. Oct. 4, 2004); *see also Cmty. Programs of Westchester Jewish Cmty. Servs.* v. *City of Mount Vernon*, No. 06 Civ. 3332 (SCR) (GAY), 2007 WL 1484037, at *1 (S.D.N.Y. May 21, 2007) (denying disqualification motion where "the prior case and the present case share a broad similarity in that both generally involve zoning issues," but "apart from conclusory allegations, [movants] proffer no evidence that the material facts in the prior litigation are the same as those involved in the present case").

In the context of patent litigation, a party who is moving to disqualify counsel must generally demonstrate "a fairly close legal and factual nexus between the present and prior representations." *Regalo Int'l, LLC* v. *Munchkin, Inc.*, 211 F. Supp. 3d 682, 689 (D. Del. 2016). As one district court explained, "the outcomes in patent cases like these have tended to turn on whether there is an understandable connection between prior patent work done by the law firm at issue and the patents or technology areas at issue in the current litigation." *Id.* at 690; *see also Decora Inc.* v. *DW Wallcovering, Inc.*, 899 F. Supp. 132, 138 (S.D.N.Y. 1995) (disqualifying attorney whose prior representation related to the validity of the patent that was directly at issue in

18

the present case).  A court may deny a motion for disqualification where, although plaintiff's counsel previously represented the defendant in the field of patent litigation, those matters involved "different patents and different products" from those at issue in the present suit.  *Sonos, Inc.* v. *D & M Holdings Inc.*, No. 14 Civ. 1330 (RGA), 2015 WL 5277194, at *4 (D. Del. Sept. 9, 2015) (finding no substantial relationship between prior and present cases).  In *Sonos*, for example, the lack of factual overlap was fatal to the disqualification motion — even though there was some overlap in the legal issues between the prior and current representations (in that both involved patent litigation matters) and the attorney in question had some understanding of the prior client's "general strategy."  *Regalo Int'l, LLC*, 211 F. Supp. 3d at 689-90 (describing *Sonos, Inc.*, 2015 WL 5277194); *see also* N.Y. R. Prof'l Conduct 1.9, cmt. 2 ("[A] lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type, even though the subsequent representation involves a position adverse to the prior client.").

In the instant matter, Defendants claim that there is a substantial relationship between Counsel's prior work for AT&T and the NumberSync technology at issue in this case.  To review, Plaintiffs allege that AT&T's NumberSync service infringes upon the '728 Patent, which describes and embodies the Twinning Solution.  (*See* Compl. ¶¶ 66, 76).  In layman's terms, the Twinning Solution "enables a user with multiple devices to group them together on a cellular network and have those various devices function

seamlessly as though they were all associated with a single telephone number, with no distinction to the user." (*Id.* at ¶ 28). The patented technology groups the telephone numbers for incoming and outgoing calls and text messages. (*Id.* at ¶ 63). Defendants claim that this technology is substantially related to the matters at issue in Counsel's prior representations, which involved how AT&T's proprietary systems handle SMS text messages, provisioning numbers, and intercepting phone calls. (Def. Br. 14-17; *see also* Bress Decl. ¶¶ 39-55).

While Plaintiffs agree that "how AT&T's proprietary systems handle SMS text messages, provision[ed] telephone number, and intercept[ed] calls *in the context of AT&T NumberSync* will be key issues with respect to evaluating alleged patent infringement in the instant case" (Pl. Opp. 13 (emphasis added)), they argue that "AT&T cannot simply gesture towards nebulous 'proprietary systems' in lieu of showing *how* Cadwell's or Clonts's old matters involved any issues 'identical' or 'essentially the same' as those here" (Pl. Sur-Reply 2 (emphasis in original)). More specifically, Plaintiffs argue that the way AT&T's products, in general, handled SMS text messages, provisioned numbers, and intercepted calls is irrelevant to the question of how the specific challenged product, NumberSync, works and whether it infringes the claims of the '728 Patent. (Pl. Opp. 13-14). Moreover, Plaintiffs argue that AT&T is relying on "general, categorical allegations of similarity, akin to saying that this matter is substantially related because it involves 'telecommunications' or 'phone numbers.'" (*Id.* at 14). Indeed, a search of issued patents reveals that the term "short message service" (long form for "SMS") returns over 45,000 issued

20

patents (Bress Decl. 11); the term "provisioning" returns over 77,000 issued patents (Mitzenmacher Decl. ¶ 22); and the term "call intercept" returns over 21,000 issued patents (*id.* at ¶ 25).

On this record, the Court finds that Defendants have not demonstrated how Counsel's prior patent litigation matters from 2008 and 2009, which involved such broad-ranging topics as ██████████████████████████ ████████████████████, would be "identical" to or "essentially the same" as the patent at issue in this litigation, such that Counsel would have acquired relevant information bearing on the Twinning Solution. Indeed, while Defendants describe the *Technology Patents* case as involving "how SMS text messages are handled by AT&T's proprietary systems" (Def. Br. 6), the record suggests the specific patent at issue in that case involved a global paging system (Yin Decl., Ex. 34 at 3). The fact that generic telecommunications concepts like "SMS messaging," "provisioning," and "call interception" are named in both the '728 Patent and in AT&T's prior patent matters is insufficient to create a substantial relationship. (*See* Mitzenmacher Decl. ¶¶ 17, 25). *See Volterra Semiconductor LLC* v. *Monolithic Power Sys.*, No. 19 Civ. 2240 (CFC), 2020 WL 8340048, at *4 (D. Del. Aug. 26, 2020) (finding that "DC-to-DC converter technology" was too broad a subject area to establish a substantial relationship between two representations because the technology is employed in "various electronic equipment and systems," and observing that more than 36,000 U.S. patents mention the technology); *Secure Axcess, LLC* v. *Dell Inc.*, No. 6:11 Civ. 338 (LD), 2012 WL 12919543, at *3 (E.D. Tex. Feb. 23,

21

2012) ("Cases are not substantially related just because they involve the same general subject matter and area of the law."); *Biax Corp.* v. *Fujitsu Computer Sys. Corp.*, No. 2:06 Civ. 364 (TJW), 2007 WL 1466638, at *2 (E.D. Tex. May 16, 2007) ("[Movant's] argument that both representations involve server architecture is too broad for purposes of establishing a substantial relationship."); *Power Mosfet Techs., LLC.* v. *Siemens AG*, No. 2:99 Civ. 168 (DF), 2002 WL 32785219, at *3 (E.D. Tex. Sept. 30, 2002) ("Just because two devices fall into the same general category, e.g. photocopiers ... does not necessarily mean patent infringement cases in that same category will be substantially related. ... Moreover, as advances have propelled technology forward, earlier products can differ dramatically from later products."); *cf. Sunbeam Prod. Inc.* v. *Oliso, Inc.*, No. 13 Civ. 3577 (SI), 2014 WL 892918, at *4 (N.D. Cal. Mar. 4, 2014) (finding representations substantially related where (i) both patents involved "vacuum sealing technology," (ii) the patents with which counsel was previously involved were cited as prior art during the prosecution of the patent at issue, and (iii) in his motion for summary judgment, counsel referenced a patent he was formerly responsible for defending).

At its core, Defendants' argument is that Counsel has billed so many hours representing AT&T that they cannot possibly be permitted to represent AT&T's adversary in the instant litigation. Defendants argue that two cases can be considered substantially related (and disqualification warranted) even when the matters involve different patents and different products, if counsel has a lengthy relationship with the movant and has been exposed to the

movant's litigation and settlement strategies.  (Def. Reply 3-5).  Defendants cite two Federal Circuit cases in support of their argument: *In re Apeldyn Corp.*, Misc. No. 934, 391 F. App'x 873 (Fed. Cir. 2010) (unpublished opinion), and *In re Riles*, No. 620, 2000 WL 1062086 (Fed. Cir. July 20, 2000).  In each of these cases, the Federal Circuit denied a petition for a writ of mandamus directing the district court to vacate an order disqualifying counsel.  In *Apeldyn*, the district court found that counsel's prior representation of the movant "exposed [him] to factors that [the movant] considers important in settlement," but importantly, the court also emphasized that "it was likely that specimens and documentation at this trial will be the same as those previously collected and reviewed by [counsel]."  391 F. App'x at 875.  In *Riles*, the district court disqualified counsel even though the earlier representation had involved a different patent and different accused product, and supported its decision with "findings regarding the length of the prior relationship as well as the specific knowledge gained from the prior relationship, [including] information regarding [the movant's] litigation and settlement strategies in infringement actions." 2000 WL 1062086, at *3.

These decisions do not alter the Court's analysis.  As an initial matter, the Court notes that the mandamus standard is an exacting one: petitioners in these cases were required to demonstrate that their right to issuance of the writ was "clear and indisputable," *Riles*, 2000 WL 1062086 at *2, or that "the district court's disqualification of counsel was so clearly an abuse of discretion that it amounted to an unlawful exercise of judicial authority," *Apeldyn*, 391 F.

App'x at 875.  More to the point, while the Court agrees with Defendants that there is no bright-line rule foreclosing a court from finding a substantial relationship between matters involving different patents and different products, it finds that Defendants have failed to demonstrate a substantial relationship here, even under an expansive view of that term.  That the Federal Circuit has twice declined to issue a writ of mandamus where a lower court found a "substantial relationship" based, in part, on the length of counsel's prior relationship and counsel's exposure to litigation strategies, does not persuade this Court to depart from case law finding contrariwise in this District.  For example, in *Agilent Techs., Inc.* v. *Micromuse, Inc.*, No. 04 Civ. 3090 (RWS), the court denied a motion to disqualify even though counsel had represented Agilent for five years, had drafted and filed several patent applications relating to Agilent's software products, and was informed of virtually all attributes and potential uses of Agilent's suite of proprietary intelligent software agents, as well as the company's plans for future software applications and services. 2004 WL 2346152, at *11 (S.D.N.Y. Oct. 19, 2004).  The court found that Agilent had failed to demonstrate that counsel had advised Agilent regarding the patents in suit and had not established a "substantial relationship" between counsel's former representation of Agilent and current representation of Micromuse.  *Id.*

Moreover, other cases that have emphasized the length of counsel's prior representation have *also* found the requisite factual overlap between the prior and current representations.  For example, in *Mitchell*, disqualification was

24

granted in an employment discrimination suit against MetLife where the attorney had billed over 1,500 hours annually defending MetLife in approximately 50 different matters, which required her to interview employees and defend employees at depositions.  2002 WL 441194, at *2.  Though none of her work directly related to employment discrimination, the attorney had become privy to information regarding hiring, training, supervising, compensating, and disciplining account representatives, and had primarily learned of this information in privileged communications with her then-client.  *Id.*  The court found that this information was substantially related to the pending action in which plaintiffs, on an institutional level, attacked MetLife's employment policies and practices.  *Id.* at *6; *see also Ullrich* v. *Hearst Corp.*, 809 F. Supp. 229, 234-35 (S.D.N.Y. 1992) (holding that attorney, who had represented employer for over 20 years on specific lawsuits and also in general matters of employment law, was precluded from representing former employees in suits against employer for illegal discrimination and retaliation).

In the patent context, disqualification was found to be appropriate in a District of Delaware case in which two of the firm's lawyers had represented the defendant in eleven prior patent and trade secret cases over a term of 14 years, and would likely have had to depose a number of defendant's witnesses, with whom they had worked closely during their prior representation of the defendant.  *Innovative Memory Sols., Inc.* v. *Micron Tech., Inc.*, No. 14 Civ. 1480 (RGA), 2015 WL 2345657, at *1 (D. Del. May 15, 2015).  Importantly, the court found that seven of the eleven prior patent cases had involved the very

technology at issue in the present litigation.  *Id.* at \*3.  The court concluded that the attorneys' "lengthy and involved experience" with the defendant, combined with the "factual overlap between past and present representations," made disqualification appropriate.  Id. at \*5.

### 2.    Defendants Have Not Demonstrated That Counsel Had Prior Access to Relevant Privileged Information

The Court considers next whether Counsel had prior access to relevant privileged information.  While a showing of a substantial relationship between the cases entitles the moving party to a presumption that "confidences were shared," *United States* v. *Prevezon Holdings Ltd.*, 839 F.3d 227, 240 (2d Cir. 2016), a moving party that is unable to make such a showing can demonstrate instead that its former attorneys actually received confidential information that may now be used against it.  *See Revise Clothing, Inc.*, 687 F. Supp. 2d at 395; *see also Hickman* v. *Burlington Bio-Medical Corp.*, 371 F. Supp. 2d 225, 231 (E.D.N.Y. 2005) ("The failure to prove a substantial relationship between the earlier and present litigation destroys any presumption of relevant shared confidences[.]").  Given Defendants' failure to demonstrate a substantial relationship, it is not entitled to a presumption that Counsel had access to AT&T's relevant confidential information.  Defendants therefore must demonstrate that Counsel actually received confidential information that may now be used against Defendants in the present litigation.  The Court finds that Defendants have not met this burden.

At the outset, the Court notes that access to discoverable confidential information in this suit, on its own, does not warrant disqualification.  If a

party is capable of securing confidential information by means other than through prior representation — such as through discovery — disqualification may not be merited.  *See Med. Diagnostic Imaging, PLLC* v. *CareCore Nat., LLC*, 542 F. Supp. 2d 296, 315 (S.D.N.Y. 2008); *see also DeVittorio* v. *Hall*, No. 07 Civ. 812 (WCC), 2007 WL 4372872, at *10 (S.D.N.Y. Dec. 12, 2007) (finding that counsel's exposure to adversary's information, obtained during prior attorney-client relationship, did not create unfair advantage warranting disqualification, in part because "to the extent that information is relevant in the present action it would presumably be discoverable").  Conversely, an attorney's prior access to relevant *non*-discoverable information (such as relevant privileged communications) gives him an unfair advantage in litigation against a former client.  *Tradewinds Airlines, Inc.* v. *Soros*, No. 08 Civ. 5901 (JFK), 2009 WL 1321695, at *8 (S.D.N.Y. May 12, 2009).

In this case, Defendants argue that Counsel must be disqualified because they (i) were actively representing AT&T during the relevant dates mentioned in the Complaint and interacted extensively with two anticipated witnesses in this case during that time period; (ii) became familiar with AT&T's operations, policies, procedures, people, and network architecture over the course of their prior representation; and (iii) worked closely with AT&T in-house lawyers discussing strategy, and were thereby exposed to AT&T's litigation and settlement strategies.  (Def. Br. 18-25).  The Court does not agree that these considerations compel disqualification in this case.

*First*, Defendants argue that Counsel must be disqualified because they were actively representing AT&T during the relevant dates referenced in the Complaint and interacted extensively with two anticipated witnesses in this case during that time period.  During Cadwell's prior representations of AT&T, he interacted extensively with McNamara, who is expected to be a witness in this case.  (Def. Br. 14).  Defendants claim McNamara is expected to testify that AT&T was developing "twinning" technology well before AT&T's earliest contact with Plaintiffs.  (*Id.* at 14-15 (citing McNamara Decl. ¶ 3)).  Indeed, in his declaration, ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ AT&T Messages allows AT&T users to send and receive texts from a smartwatch or tablet using their mobile phone number."  (McNamara Decl. ¶ 3).  McNamara is also expected to testify that he personally worked on and witnessed AT&T's working demonstration of "twinning" capability prior to AT&T's earliest contact with Plaintiffs.  (Def. Br. 15 (citing McNamara Decl. ¶ 4)).  Additionally, Defendants point out that Clonts consulted on numerous occasions with Buyukdura about the Provisioning and Call Intercept Matters.  (*Id.* at 8-9).  In the instant litigation, Buyukdura is expected to testify that prior to AT&T's earliest contact with Plaintiffs, AT&T had already begun development of an initiative that would become AT&T NumberSync, the accused product in the instant case.  (*Id.* at 9).

The Court finds Counsel's prior dealings with these AT&T employees to be insufficient to warrant dismissal.  Defendants have not demonstrated that

the information Counsel would have obtained during these interactions is relevant to the instant litigation or would give Counsel any unfair advantage. *Cf. Decora Inc.*, 899 F. Supp. at 138 (disqualifying counsel where "[t]he related nature of the matters [was] sufficient to raise the presumption that [counsel] gained confidential information that would require his disqualification," and further, movant presented *ex parte* evidence that counsel had actually received confidential information related to patent at issue).  To be sure, Cadwell and Clonts interacted with McNamara and Buyukdura, but they did so in connection with matters pre-dating NumberSync and the '728 Patent. Moreover, neither McNamara nor Buyukdura attested that they disclosed any information about NumberSync (or any predecessor to NumberSync) to Cadwell or Clonts during those interactions.  (*See* Pl. Opp. 22-23).[4]  Without that link, AT&T is asking this Court to disqualify counsel "based on information that was allegedly in the heads of McNamara and Buyukdura" during that time.  (*Id.* at 22).

---

[4]     As Plaintiffs depict graphically in their opposition brief, Defendants' characterization of McNamara's Declaration overstates McNamara's statements about his involvement with Cadwell.  (Pl. Opp. 9-10).  Defendants claim that McNamara is expected to testify that ████████████████████████████████████████████████████████████ (Def. Br. 6).  In fact, ████████████████████████████████████████████████████████████ (McNamara Decl. ¶ 7). ████████ (*see generally* Yin Decl., Ex. 2), the Court notes that McNamara does not mention Cadwell by name and that his recollections are strikingly imprecise.  Even if he had recalled Cadwell specifically, Defendants have not alleged that the information McNamara purportedly shared with Cadwell is sufficiently relevant to the instant litigation, or that it would give Cadwell an unfair advantage in this litigation, such that disqualification is required.

Furthermore, Counsel attest that they never worked on NumberSync, never worked on the '728 Patent before this case, and never worked on twinning technology.  (Pl. Opp. 13-14 (citing Cadwell Decl. ¶¶ 11-13; Clonts Decl. ¶¶ 7-9; Reeder Decl. ¶¶ 6-8)).  The Court agrees with Defendants that disqualification does not depend on the court's acceptance of the lawyers' own representations.  (Def. Br. 17 (citing *United States* v. *Reynoso*, 6 F. Supp. 2d 269, 271 (S.D.N.Y. 1998))).  However, Defendants have not provided evidence contradicting Counsel's declarations.  Defendants submitted hundreds of pages of attorney records for *in camera* review, but have not pointed to any specific evidence that Counsel previously worked on NumberSync, the '728 Patent, or twinning technology.  (*See* Yin Decl., Ex. 2-5).  Instead, they point to evidence that Counsel spent many hours representing AT&T, met extensively with potential witnesses, and are familiar with AT&T's litigation and settlement strategies.  (*See, e.g.*, *id.*, Ex. 2, 16; Def. Br. 24).  In the instant case, the fact that two witnesses happen to be the same as in prior, at-most-tangentially-related matters that began over a decade ago is insufficient to warrant disqualification.  *See Med. Diagnostic Imaging*, 542 F. Supp. 2d at 315 ("The risk that an attorney may cross-examine a former client is not sufficient to disqualify an attorney."); *Olajide* v. *Palisades Collection, LLC*, No. 15 Civ. 7673 (JMF), 2016 WL 1448859, at *4 (S.D.N.Y. Apr. 12, 2016) (denying motion to disqualify where movants merely demonstrated that counsel recurrently handled "factually distinct" matters of the same "type" as the present litigation).

*Second*, Defendants argue that Counsel must be disqualified because they became familiar with AT&T's operations, policies, procedures, people, and network architecture over the course of their prior representation.  (Def. Br. 18).  This argument also fails because courts have held that unless the later litigation puts at issue the client's entire background, "an attorney's knowledge of the client's general business and financial background is not a proper basis for disqualification."  *Scantek Med., Inc.*, 693 F. Supp. 2d at 240.  Here, AT&T has merely "establishe[d] that [counsel] 'recurrently handled' (or at least supervised) 'factually distinct' matters of the same 'type' as this suit, and may have had 'general knowledge' of [movant's] 'policies and practices.'"  *Olajide*, 2016 WL 1448859, at *4.  Such a showing is insufficient to compel disqualification.  *See id.*

*Third* and finally, Defendants argue that Counsel must be disqualified because they worked closely with AT&T in-house lawyers discussing strategy.  (Def. Br. 18).  However, a former client's litigation strategy is not considered "relevant privileged information" in deciding a motion for disqualification.  *See Emps. Ins. Co. of Wausau* v. *Munich Reinsurance Am., Inc.*, No. 10 Civ. 3558 (PKC), 2011 WL 1873123, at *5 (S.D.N.Y. May 16, 2011) ("General 'litigation thinking' — the general strategic plan or hopes of the lawyer and client on how best to pursue or defend claims — does not satisfy, without more, the substantial relationship test.");  *see also Sonos, Inc.*, 2015 WL 5277194, at *4 (finding that no relevant confidential information was disclosed where counsel's prior representation occurred six years prior to the instant litigation and

involved unrelated patents and technology, and noting that "[a]t most, Defendants disclosed their general strategy for handling patent litigation, which is not enough to warrant disqualification"); *cf. In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 Civ. 7488 (CM), 2017 WL 3613663, at *7 (S.D.N.Y. Aug. 21, 2017) (granting motion to disqualify expert witness in case involving propriety of settlement agreement between parties, where expert had knowledge of movant's litigation and settlement strategy).  "[I]f insight into a former client's general 'litigation thinking' were to constitute 'relevant privileged information', then disqualification would be mandated in virtually every instance of successive representation." *Revise Clothing, Inc.*, 687 F. Supp. 2d at 393-94.  That clearly is not the law. *Id.* (quoting *Vestron, Inc.* v. *Nat'l Geographic Soc.*, 750 F. Supp. 586, 595 (S.D.N.Y. 1990)).

All said, Defendants have demonstrated that Counsel exchanged privileged communications with AT&T during their prior representations of AT&T, including communications related to strategy in those matters, but they have failed to demonstrate that those communications are relevant to this litigation.  Therefore, those communications do not give Counsel an advantage that they could now use against their former client and do not weigh in favor of recusal. *Accord Revise Clothing, Inc.*, 687 F. Supp. 2d at 395.  Accordingly, the Court denies Defendants' motion to disqualify Counsel.

## C.    The Court Denies Defendants' Motion to Disqualify CCRT and Ross LLP

Because the Court finds that no conflict exists that warrants disqualification of Cadwell, Clonts, or Reeder, it also finds that no conflict can

be imputed to CCRT such that Thomas must be disqualified.  And because the

Court finds that CCRT is not conflicted, it also finds that there is no conflict to

be imputed to Ross LLP such that Ross and Schwartz must be disqualified.

Accordingly, the Court denies Defendants' motion as to both firms.

## CONCLUSION

For the foregoing reasons, Defendants' motion to disqualify Plaintiffs'

counsel is DENIED.  The parties are directed to submit a joint letter regarding

proposed next steps on or before **April 20, 2022**.

The Clerk of Court is directed to terminate the pending motion at docket

entry 62.

The Clerk of Court is further directed to file this Opinion under seal with

viewing privileges granted only to the Court and parties.  On or before **April 13,**

**2022**, the parties are ORDERED to submit proposed redactions to this

Opinion, to the Court via email, for the reasons explained in their motions to

seal (Dkt. #67, 76, 90, 108), and the Court's orders granting such requests

(Dkt. # 73, 89, 103, 112).

SO ORDERED.

Dated:     March 30, 2022
           New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge