UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NETWORK APPS, LLC, a Washington limited liability company; KYLE SCHEI, an individual; and JOHN WANTZ, an individual,<br><br>     Plaintiffs,<br><br>  -against-<br><br>AT&T, INC., a Delaware corporation; AT&T CORP., a New York corporation; AT&T MOBILITY LLC, a Delaware limited liability company; and AT&T SERVICES, INC., a Delaware corporation,<br><br>     Defendants. | Case No. 1:21-cv-00718-KPF<br><br>JURY TRIAL DEMANDED<br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
AT&T DEFENDANTS' MOTION TO DISMISS**

**REDACTED VERSION**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................ 2

III.   LEGAL STANDARD ........................................................................................... 4

IV.    ARGUMENT ........................................................................................................ 5

    A.  Plaintiffs' breach of contract cause of action is time-barred. ................................ 5

        1.  Applicable Law ............................................................................................ 5

        2.  The alleged breach of contract took place in October–November 2014, more than six years before the filing of the Complaint. .................. 6

        3.  The continuing violation doctrine did not toll the limitations period. ........................................................................................................ 7

        4.  Plaintiffs' knowledge of the '418 Application was not necessary to start the statute of limitations running .................................................... 10

        5.  Filing Network Apps I did not toll the statute of limitations. ................. 11

    B.  Plaintiffs lack standing to bring this lawsuit. .................................................... 12

        1.  Applicable Law .......................................................................................... 12

        2.  The undisputed facts warrant dismissal. ................................................. 13

        3.  Plaintiffs' standing defects cannot be cured. ........................................... 14

        4.  The December 1, 2016 Assignment is void on its face ............................ 14

        5.  Mya Number Corp. had already assigned away its right to sue for breach of contract .................................................................................... 15

        6.  Mya Number Corp. was administratively dissolved nearly two years earlier on February 2, 2015. ........................................................... 16

        7.  The purported December 1, 2016 Assignment was not part of proper wind up and liquidation of Mya Number Corp. ........................... 17

        8.  Mya Number Corp.'s creditors were not paid and did not even know about its dissolution, much less the purported December 1, 2016 Assignment. ..................................................................................... 18

        9.  Plaintiffs cannot cure defective standing retroactively. ........................... 20

        10. Plaintiffs cannot cure standing defects by identifying additional documents. ................................................................................................ 21

    C.  The breach of contract claim should be dismissed because Plaintiffs failed to abide by the mandatory dispute resolution clause. ........................................ 22

    D.  The correction of inventorship cause of action should be dismissed ................. 25

    E.  The claims of the '728 Patent are patent ineligible under 35 U.S.C. § 101 ........ 26

**TABLE OF CONTENTS**
(continued)

**Page**

1.  Applicable Law ........................................................................... 27

2.  The '728 Patent is directed to the idea of grouping telephone
    numbers. ................................................................................... 28

3.  Grouping telephone numbers is a patent ineligible abstract idea. ........... 30

4.  There is no saving inventive concept in the claim elements
    individually or as an ordered combination. ............................................ 34

V.  CONCLUSION ............................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*,
 96 F. Supp. 3d 182 (S.D.N.Y. 2015) .......................................................................................... 6

*Abraxis Biosci., Inc. v. Navinta LLC*,
 625 F.3d 1359 (Fed. Cir. 2010) ............................................................................................... 20

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
 838 F.3d 1253 (Fed. Cir. 2016) .......................................................................................... 33, 34

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
 134 S. Ct. 2347 (2014) ................................................................................................. 27, 28, 31

*Alps S., LLC v. Ohio Willow Wood Co.*,
 787 F.3d 1379 (Fed. Cir. 2015) .......................................................................................... 13, 20

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
 841 F.3d 1288 (Fed. Cir. 2016) ............................................................................................... 30

*Arcadia Bioscis., Inc. v. Vilmorin & Cie*,
 356 F. Supp. 3d 379 (S.D.N.Y. 2019) ....................................................................................... 6

*Attachmate Corp. v. Health Net, Inc.*,
 No. C09-1161 MJP, 2010 U.S. Dist. LEXIS 114445 (W.D. Wash. Oct. 26,
 2010) .......................................................................................................................................... 9

*AuthWallet, LLC v. Block, Inc.*,
 No. 21-cv-5463 (LJL), 2022 U.S. Dist. LEXIS 80358 (S.D.N.Y. May 3, 2022) ................... 27

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) .................................................................................................................... 4

*BroadSoft, Inc. v. CallWave Commc'ns, LLC*,
 282 F. Supp. 3d 771 (D. Del. 2017), *aff'd*, 739 F. App'x 985 (Fed. Cir. 2018) .... 30, 31, 32, 35

*Bryant v. Broadcast Music Inc.*,
 721 F. App'x 78 (2d Cir. 2018) ............................................................................................ 8, 10

*Cave Man Kitchens Inc. v. Caveman Foods LLC*,
 No. C18-1274 TSZ, 2020 U.S. Dist. LEXIS 219328 (W.D. Wash. Nov. 23,
 2020) .................................................................................................................................... 16, 17

*Cloanto Corp. v. Hyperion Entm't CVBA*,
 No. C18-381 RSM, 2019 U.S. Dist. LEXIS 83030 (W.D. Wash. May 16,
 2019) ........................................................................................................................................ 13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Collins v. Quintana*,
   No. C15-1619RAJ, 2016 U.S. Dist. LEXIS 11000 (W.D. Wash. Jan. 28, 2016)....................13

*Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns., S.a.r.l.*,
   790 F.3d 411 (2d Cir. 2015)..................................................................................................12

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010)....................................................................................................4

*Dorchester Fin. Sec., Inc. v. Banco BRJ S.A.*,
   No. 11-CV-1529 (KMW), 2014 U.S. Dist. LEXIS 150372 (S.D.N.Y. Oct. 22,
   2014) .......................................................................................................................................11

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   261 F. Supp. 2d 293 (S.D.N.Y. 2003).............................................................................23, 25

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016)..............................................................................................28

*Ely-Cruikshank Co. v. Bank of Montreal*,
   81 N.Y.2d 399 (1993) ......................................................................................................10, 11

*Equipto Div. Aurora Equip. Co. v. Yarmouth*,
   134 Wash. 2d 356 (1998)........................................................................................................17

*FDIC v. Uribe, Inc.*,
   171 Wash. App. 683 (2012)....................................................................................................15

*Fountain v. Karim*,
   838 F.3d 129 (2d Cir. 2016).....................................................................................................4

*Henry v. Bank of Am.*,
   48 N.Y.S.3d 67 (N.Y. App. Div. 2017) ...................................................................................8

*Herbruger v. Bellevue Coll.*,
   No. 82419-8-I, 2022 Wash. App. LEXIS 262 (Ct. App. Feb. 7, 2022)...................................15

*Hooks v. Forman Holt Eliades & Ravin LLC*,
   No. 11 Civ. 2767 (LAP), 2015 U.S. Dist. LEXIS 122418 (S.D.N.Y. Sept. 14,
   2015) .......................................................................................................................................21

*Int'l Mins. & Res., S.A. v. Pappas*,
   96 F.3d 586 (2d Cir. 1996)......................................................................................................13

*iSentium, LLC v. Bloomberg Fin. L.P.*,
   No. 17-cv-7601 (PKC), 2020 U.S. Dist. LEXIS 7808 (S.D.N.Y. Jan. 16, 2020)...................10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*ISS Facility Servs., Inc. v. Fedcap Rehab. Servs., Inc.*,
No. 20-CV-6591 (RA), 2021 U.S. Dist. LEXIS 124400 (S.D.N.Y. July 2,
2021) ................................................................................................................22, 23, 25

*Karpstein v. Allianz Life Ins. Co. of N. Am.*,
No. C15-966RSL, 2016 U.S. Dist. LEXIS 150648 (W.D. Wash. Oct. 31,
2016) .........................................................................................................................11

*Kautsman v. Carrington Mortg. Servs., LLC*,
No. C16-1940-JCC, 2018 U.S. Dist. LEXIS 10688 (W.D. Wash. Jan. 23,
2018) .........................................................................................................................14

*Keystone Land & Dev. Co. v. Xerox Corp.*,
152 Wn.2d 171 (2004) ..............................................................................................15

*Kirsch v. Cranberry Fin., LLC*,
No. 69959-8-I, 2013 Wash. App. LEXIS 2871 (Ct. App. Dec. 23, 2013)...............12

*Larson v. Correct Craft, Inc.*,
569 F.3d 1319 (Fed. Cir. 2009)................................................................................25

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
925 F.3d 1225 (Fed. Cir. 2019)................................................................................13

*Maloul v. New Colom. Res., Inc.*,
2017 U.S. Dist. LEXIS 108701 (S.D.N.Y. July 13, 2017) (Failla, J.)...................5, 9

*Mayer v. Pierce Cty. Med. Bureau, Inc.*,
80 Wash. App. 416 (1995).........................................................................................24

*Merch. House v. Am. S.S. Owners Mutual Prot. & Indem. Ass'n*,
No. 12 Civ. 6982 (RJS), 2013 U.S. Dist. LEXIS 91259 (S.D.N.Y. May 31,
2013) ..............................................................................................................22, 23, 25

*Miller v. Metro. Life Ins. Co.*,
979 F.3d 118 (2d Cir. 2020)........................................................................................7

*Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*,
171 F. Supp. 3d 107 (S.D.N.Y. 2016).........................................................................8

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)........................................................................................4

*Nuance Commc'ns, Inc. v. Int'l Bus. Machs. Corp.*,
544 F. Supp. 3d 353 (S.D.N.Y. 2021).....................................................................8, 9

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Opternative, Inc. v. JAND, Inc.*,
  No. 17 Civ. 6936 (JFK), 2018 U.S. Dist. LEXIS 132827 (S.D.N.Y. Aug. 7,
  2018) ..................................................................................................................25, 26

*Reese v. Sprint Nextel Corp.*,
  774 F. App'x 656 (Fed. Cir. 2019) ...............................................................27

*Riverfront Landing Phase II Owners' Ass'n v. Assurance Co. of Am.*,
  No. C08-0656RSL, 2009 U.S. Dist. LEXIS 57089 (W.D. Wash. July 6, 2009)....................20

*Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*,
  No. 10 CIV. 5999 GBD, 2012 WL 488257 (S.D.N.Y. Feb. 14, 2012)................................5, 12

*Schreiner Farms, Inc. v. Am. Tower, Inc.*,
  173 Wash. App. 154 (2013)...........................................................................10, 11

*Seaside Inland Transp. v. Coastal Carriers LLC*,
  No. 2:17-cv-00143-SMJ, 2019 U.S. Dist. LEXIS 172913 (E.D. Wash. Oct. 4,
  2019) ..................................................................................................................10

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
  506 F.3d 832, 838 (9th Cir. 2007) ...............................................................20

*Stanacard v. Rubard, LLC*,
  No. 12 Civ. 5176 (CM), 2015 U.S. Dist. LEXIS 157345 (S.D.N.Y. Nov. 18,
  2015) ..................................................................................................32, 33, 34, 35

*Stuart v. Am. Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998)...........................................................................6

*Thea v. Kleinhandler*,
  807 F.3d 492 (2d Cir. 2015).........................................................................5, 6

*Tsirelman v. Daines*,
  794 F.3d 310 (2d Cir. 2015)...........................................................................4

*Two-Way Media Ltd v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017).....................................................................33, 34

*Vincent v. Money Store*,
  915 F. Supp. 2d 553 (S.D.N.Y. 2013)............................................................6

*Whitaker v. On the Right Track Sys.*,
  No. 21-cv-840 (PKC), 2022 U.S. Dist. LEXIS 45094 (S.D.N.Y. Mar. 14,
  2022) ..................................................................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*White v. Dvorak*,
   78 Wash. App. 105 (1995) ...................................................................................16

*Willard v. Addink*,
   No. 35861-5-III, 2019 Wash. App. LEXIS 931 (Ct. App. Apr. 23, 2019) ............15

*Woori Bank v. Merrill Lynch*,
   923 F. Supp. 2d 491 (S.D.N.Y. 2013).....................................................................6

*Zhang v. Schlatter*,
   557 F. App'x 9 (2d Cir. 2014) ...............................................................................10

**Statutes**

35 U.S.C. § 100(d) ..........................................................................................................13

35 U.S.C. § 101 .........................................................................................................*passim*

35 U.S.C. § 281 ...............................................................................................................13

Wash. Rev. Code § 4.16.040(1) ........................................................................................6

Wash. Rev. Code § 23.95.300 .........................................................................................14

Wash. Rev. Code § 23.95.615(1) .....................................................................................20

Wash. Rev. Code § 23B.14.050(1) .................................................................16, 17, 18, 19

Wash. Rev. Code § 23B.14.060 .......................................................................................19

Wash. Rev. Code § 23B.14.220(1) ..................................................................................20

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)..........................................................................................1, 4, 13

Fed. R. Civ. P. 12(b)(6)......................................................................................3, 4, 5, 13

N.Y. C.P.L.R. § 202 ..........................................................................................................6

N.Y. C.P.L.R. § 205(a) ....................................................................................................11

N.Y. C.P.L.R. § 213(2) ......................................................................................................6

## I.   <u>INTRODUCTION</u>

In 2016, Plaintiff Network Apps, LLC ("Network Apps") filed a highly similar lawsuit against AT&T in the Western District of Washington with claims stemming from a contractual relationship between a company known as "Mya Number" (the alleged predecessor-in-interest to Network Apps) and AT&T.  Network Apps voluntarily dismissed that case in 2017 after AT&T moved to dismiss.  *After going silent for nearly four years*, Network Apps, along with Kyle Schei and John Wantz (the founders of Mya Number), filed the present lawsuit.  In this second bite at the apple, Plaintiffs bring very similar claims for (1) breach of contract, (2) patent infringement, and (3) correction of inventorship stemming from the same alleged events that gave rise to the prior lawsuit.  This Complaint suffers from similar shortcomings as the prior Complaint and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and/or 12(b)(6) for five reasons.

*First*, Plaintiffs' breach of contract cause of action is barred under the six-year statute of limitations.  Specifically, the statute began to run in October 2014 when AT&T terminated the relationship or at the latest in November 2014 when AT&T filed a patent application that Plaintiffs say encompasses technology covered by the agreements.  The filing of the prior case in 2016 did not toll the limitations period, and Plaintiffs' unexplained nearly four-year delay in filing this case precludes their ability to seek redress tied to alleged breach of the agreements.

*Second*, Plaintiffs lack standing to bring any of the three causes of action.  The breach of contract and correction of inventorship causes of action are tied directly to a series of agreements between AT&T and an entity—Mya Number LLC—that is not a party in this case.  The patent AT&T is accused of infringing was originally assigned to an entity—Mya Number Corp.—which is also not a party in this case.  Worse, the only Mya Number entity mentioned in the Complaint undisputedly does not and has never existed.  But Plaintiffs' standing problems are much deeper than mere erroneous pleading.  Any attempt to establish privity of contract or chain of title with

respect to the asserted patent necessarily runs through Mya Number Corp. and relies on alleged assignment agreements with that entity in December 2016.  But because Mya Number Corp. was administratively dissolved almost two years earlier, the assignment agreements were invalid as a matter of law.  In sum, Plaintiffs lack standing to bring any of their causes of action, which are based on agreements to which they were not parties, either directly or through succession, and on an asserted patent they did not and do not have the right to assert.

*Third*, Plaintiffs are barred from bringing their breach of contract claim because they failed to comply with the mandatory dispute resolution clause of the parties' agreements.

*Fourth*, Plaintiffs failed to properly allege a correction of inventorship cause of action.

*Fifth*, the asserted patent is patent ineligible under 35 U.S.C. § 101.  The patent claims are directed to the abstract idea of grouping phone numbers such that incoming calls may be "forked" to multiple devices, while outgoing calls may be masked so as to appear to originate from a designated phone number.  Virtually indistinguishable claims have been held patent-ineligible by other courts, further warranting dismissal of the patent infringement cause of action.

## II.   FACTUAL BACKGROUND

Between 2012 and 2014, AT&T and Mya Number LLC entered into a Limited Application Programming Interface Usage Agreement, three-way non-disclosure agreements with market-leading hardware OEMs, a Professional Services Agreement ("PSA"), and a Statement of Work ("SOW") (collectively, the "Agreements").[1]  Mya Number LLC was a Washington limited liability company in Bainbridge Island, Washington.  *See, e.g.*, Exs. 1–4.  On July 21, 2014, Mya Number LLC converted its corporate form and changed its name to Mya Number Corp.  Ex. 5.  Plaintiffs

---

[1] The Agreements and filings with the Washington Secretary of State refer to the entity variously as "MYA NUMBER LLC," "Mya Number LLC," "MYANUMBER, LLC," "MyaNumber, LLC," "Mya Number, LLC," and "mya Number, LLC."  For purposes of this motion, AT&T assumes these variations are legally insignificant and refers to the entity as "Mya Number LLC."

allege that "[o]n or about October 23, 2014, AT&T informed Mya Number that it would 'no longer be pursuing the launch of the NumberSync service.'"  Complaint ¶ 41.  *See also* Complaint Ex. 6.

On October 27, 2014, U.S. Patent Application No. 14/525,039 was filed, which issued as U.S. Patent No. 9,438,728 ("'728 Patent"), the subject of Plaintiffs' patent infringement cause of action.  The '728 Patent identified Plaintiffs Schei and Wantz as the inventors, and Mya Number Corp., Bainbridge Island, Washington as the original assignee.  On November 7, 2014, U.S. Patent Application No. 14/536,418 ("'418 Application") was filed, which issued as AT&T's U.S. Patent No. 9,723,462 ("'462 Patent"), the subject of Plaintiffs' correction of inventorship cause of action. The '462 Patent identified Edward Schmit and Jayanta Das as the inventors, and AT&T as the original assignee.  Plaintiffs allege Mr. Schmit improperly used confidential information "obtained from Mya Number in pursuit of the invention in the '462 Patent."  Complaint ¶ 45.

On February 2, 2015, the Washington Secretary of State administratively dissolved Mya Number Corp. due to its failure to file an annual list of officers and pay license renewal fees. Ex. 6. On November 17, 2016, Plaintiff Network Apps, LLC was incorporated.  Ex. 7.

On December 1, 2016, Mya Number Corp. purported to assign certain intellectual property rights to Plaintiffs Schei and Wantz.  Ex. 8 at 3.  The next day, on December 2, 2016, Plaintiffs Schei and Wantz purported to assign certain intellectual property rights to Plaintiff Network Apps, LLC for $2,000.  Ex. 9 at 3.  On December 3, 2016, Network Apps (but not Schei or Wantz) filed the prior lawsuit, *Network Apps, LLC v. AT&T Inc.*, No. 2:16-cv-01852-TSZ (W.D. Wash. Apr. 19, 2017) ("*Network Apps I*") alleging breach of contract, trade secret misappropriation, copyright infringement, and patent infringement.  On April 12, 2017, Network Apps voluntarily dismissed *Network Apps I* in response to AT&T's Rule 12(b)(6) motion to dismiss based on lack of standing and failure to comply with the dispute resolution clause in the Agreements.  Exs. 10, 11.

On April 25, 2017, Plaintiff Network Apps, LLC sent a letter purportedly invoking the mandatory dispute resolution clause. Ex. 12 at 1. On May 2, 2017, AT&T responded challenging whether Network Apps was a successor-in-interest of the Agreements, which were entered into with Mya Number, LLC. Ex. 13 at 1. Network Apps did not reply to AT&T's letter and took no further action to fulfill the clause's requirements.

On January 26, 2021, Plaintiffs filed the Complaint in the present case.

## III.  <u>LEGAL STANDARD</u>

In reviewing a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (citation omitted). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. A court may also consider extrinsic materials such as documents attached to the complaint, incorporated by reference, or integral to the complaint provided there is no dispute regarding their authenticity, accuracy, or relevance. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see Nicosia v. Amazon.com*, *Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."). For a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, "[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (citation omitted).

IV.     **ARGUMENT**

A.      **Plaintiffs' breach of contract cause of action is time-barred.**

The statute of limitations for Plaintiffs' breach of contract claim is 6 years, and more than 6 years have elapsed between the events giving rise to the alleged breach and the filing of the Complaint here.  Further, Plaintiffs' invocation of the so-called continuing violation doctrine is unavailing.  *See* Dkt. 51 at 3.  This Court has explained that "the 'continuing wrong' exception is narrow.  The doctrine distinguishes between 'a single wrong that has continuing effects and a series of independent, distinct wrongs,' and allows an exception to New York's usual accrual rules only in the latter case."  *Maloul v. New Colom. Res., Inc.*, 2017 U.S. Dist. LEXIS 108701, at *10 (S.D.N.Y. July 13, 2017) (Failla, J.).  As there is no plausible allegation of a series of independent, distinct wrongs, the continuing violation doctrine did not toll the limitations period for Plaintiffs' breach of contract claim.  That claim is therefore time-barred and should be dismissed.

1.      **Applicable Law**

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (citation omitted).  To save an untimely claim, Plaintiffs must specifically plead facts that make entitlement to a tolling theory "plausible (not merely possible)."  *Id.*

"A federal court considering state law claims under supplemental jurisdiction applies the choice of law principles of the forum state."  *Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, No. 10 CIV. 5999 GBD, 2012 WL 488257, at *2 (S.D.N.Y. Feb. 14, 2012) (citation omitted).  Under New York's borrowing statute, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued."

*Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998) (citing N.Y. C.P.L.R. § 202).  Put differently, Plaintiffs' breach of contract claim must be "timely under both the statute of limitations of New York and of the jurisdiction in which the cause of action accrued."  *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 494 (S.D.N.Y. 2013).  "'[A] cause of action accrues at the time and in the place of the injury.'  Where the 'injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.'"  *Thea*, 807 F.3d at 498 (citation omitted).  Here, the Agreements were between AT&T and Mya Number LLC, a Washington limited liability company in Bainbridge Island, Washington.  *See, e.g.*, Exs. 1, 3.

Both New York and Washington have six-year statutes of limitations for breach of contract claims.  *See* N.Y. C.P.L.R. § 213(2); Wash. Rev. Code § 4.16.040(1).  However, any tolling argued by Plaintiffs would need to apply under *both* New York *and* Washington law.  *See Vincent v. Money Store*, 915 F. Supp. 2d 553, 567 (S.D.N.Y. 2013).[2]

### 2.    The alleged breach of contract took place in October–November 2014, more than six years before the filing of the Complaint.

The Complaint alleges that "[o]n or about October 23, 2014, AT&T informed Mya Number that it would 'no longer be pursuing the launch of the NumberSync service.'"  Complaint ¶ 41.  Plaintiffs attach an AT&T e-mail dated October 23, 2014 explaining that "[y]ou may have heard already from Kyle that a decision was made late yesterday to remove NumberSync from the Puls watch. With this decision we will no longer be pursuing the launch of the NumberSync service."  Complaint Ex. 6.  This e-mail shows Mya Number LLC had actual notice of AT&T's repudiation of the Agreements as of that date.  Plaintiffs also point to AT&T's filing of the '418 Application

---

[2] This is true regardless of any choice of law clause, which "does not impact the Court's analysis as to which state's statute of limitations applies. . . ."  *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 202 n.8 (S.D.N.Y. 2015).  Nor does language such as "without giving effect to the principles of conflict of laws" change the analysis or result.  *Arcadia Bioscis., Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 397 (S.D.N.Y. 2019).

(which led to the '462 Patent) on November 7, 2014 as a basis for their breach of contract claim. Complaint ¶ 45. Plaintiffs thus allege a single complete breach triggering the statute of limitations to begin running by November 7, 2014 at the latest. As the Complaint was not filed until over six years later, on January 26, 2021, the breach of contract cause of action is time-barred.

### 3. The continuing violation doctrine did not toll the limitations period.

Plaintiffs argue that "[b]ecause royalties continue to accrue, AT&T's breaches are continuing, and they remain timely now." Dkt. 51 at 3. Similar arguments have been rejected by this Court and by the Second Circuit. In *Miller v. Metropolitan Life Insurance Co.*, 979 F.3d 118, 122 (2d Cir. 2020), the plaintiffs enrolled in a life insurance policy over 20 years ago and declined to answer whether they had ever used tobacco. The defendant designated them as smokers, triggering higher premiums. *Id.* When the plaintiffs learned of this 16 years later, they sued for breach of contract. *Id.* This Court dismissed their claims as time barred, and the Second Circuit affirmed. *Id.* at 124. The Second Circuit rejected the plaintiffs' continuing violation argument:

> But the continuing-violation doctrine does not toll the statute of limitations in this case. New York courts have explained that tolling based on the doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." Even when viewed in the light most favorable to [the plaintiffs], the breach-of-contract claim at issue in this case rests on a single allegedly unlawful act in 2000, namely, [defendant's] initial designation of both plaintiffs as smokers.

*Id.* (internal citation and formatting omitted). The court explained that later overcharging of premiums "represented the consequences of that allegedly wrongful act in the form of continuing damages, and was not an independent wrong in itself." *Id.* (citation and formatting omitted). Plaintiffs' offer the same continuing violation argument here that was rejected in *Miller*. Plaintiffs' allege breach of contract based on events that took place in October–November 2014, and the allegedly accruing royalties amount to continuing damages and not independent wrongs.

There is nothing different about agreements involving intellectual property or royalties. In

*Bryant v. Broadcast Music Inc.*, 721 F. App'x 78, 80 (2d Cir. 2018), the plaintiff invoked the continuing wrong doctrine "arguing that she *continued to be denied royalties* for the misattributed works." *Id.* (emphasis added). The Second Circuit disagreed: "The doctrine is 'inapplicable where there is one tortious act complained of since the cause of action accrues in those cases at the time that the wrongful act first injured plaintiff and it does not change as a result of "continuing consequential damages."'" *Id.* (citing *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (N.Y. App. Div. 2017)). Similarly, in *Myers Industries, Inc. v. Schoeller Arca Systems, Inc.*, 171 F. Supp. 3d 107, 112 (S.D.N.Y. 2016), the parties entered into patent assignment and licensing agreements in 2007, but plaintiffs did not sue for breach of contract until 2014. *See id.* at 114. The Court dismissed those claims with prejudice explaining: "While the Plaintiffs may have continued to feel the loss of the value of the patent license agreement over time, their failure to allege that the Defendants committed any additional wrongs precludes application of the continuing wrong doctrine." *Id.* at 119, 125–26. Plaintiffs' tolling argument based on allegedly accruing damages from unpaid royalties should be rejected here as well.

Plaintiffs miss a key point. This is not a case where the parties had an ongoing contractual relationship, but rather a case where the Agreements were undisputedly terminated. *See* Apr. 28, 2021 Hrg. Tr. at 15:8–13 (Plaintiffs admitting there was no continuing relationship and that "AT&T terminated the contract, from its end."). In *Nuance Communications, Inc. v. International Business Machines Corp.*, 544 F. Supp. 3d 353, 382 (S.D.N.Y. 2021), this Court explained: "A contract that requires continuous performance may be breached partially a series of times or completely a single time, and the latter, a single complete breach, is effected by repudiation or by a failure to perform that substantially frustrates the purpose of the contract." In turn, "[r]epudiation occurs 'when a party manifests an intent not to perform, either by words or by deeds.'" *Id.* at 382–

83 (citation omitted).  This Court rejected plaintiff's continuing breach tolling argument because "IBM's breach was a single complete breach." *Id.* at 383.  Specifically, "IBM breached a material term of the agreement once—when it failed to give Nuance the set of updates that were 'blue-washed' (i.e., the process of deleting code that is not suitable for commercial use and replacing it with code that can be used in a commercial product)." *Id.*  Subsequent nonperformance by IBM was irrelevant:

> Regardless of whether IBM delivered or failed to deliver any of the other updates, the withholding of the blue-washed code materially breached the agreement and substantially frustrated its purpose. See Kwan, 441 F. Supp. 2d at 501 (quoting 4 Corbin on Contracts, ch. 53, § 956 (1951)) (citing Won's Cards, 566 N.Y.S.2d at 415) (explaining that a single complete breach is effected by either repudiation or by a failure to perform that substantially frustrates the purpose of the contract). Thus, because IBM's breach was a single complete breach, the doctrine of continuing breach does not defeat the statute of limitations defense.

*Id.* (footnotes omitted).  Here, repudiation is evident from Plaintiffs' allegation that "[o]n or about October 23, 2014, AT&T informed Mya Number that it would 'no longer be pursuing the launch of the NumberSync service.'" Complaint ¶ 41 (citing Complaint Ex. 6).  An alleged failure to perform that substantially frustrates the purpose of the contract is further evident in Plaintiffs' allegation that AT&T improperly used confidential Mya Number information for the '418 Application filed on November 7, 2014. *See* Complaint ¶¶ 45, 57–58.  As in *Nuance*, Plaintiffs' claims here are barred by the limitations period.  Moreover, the *Nuance* rule makes practical sense. A contrary rule would result in "extend[ing] the statute of limitations indefinitely" for all contracts that provide for ongoing performance. *See Maloul*, 2017 U.S. Dist. LEXIS 108701, at *16.

Plaintiffs fare no better under Washington law.  First, under Washington law, "[t]he statute of limitations on a breach of contract claim related to a contract for continuing services begins to run when the contract is terminated." *Attachmate Corp. v. Health Net, Inc.*, No. C09-1161 MJP, 2010 U.S. Dist. LEXIS 114445, at *16 (W.D. Wash. Oct. 26, 2010).  Thus, the statute began

running on October 23, 2014 at the latest.  Second, "[n]o Washington case recognizes a continuing breach as extending the time allowed to bring a suit sounding in contract.  Instead, persuasive authority suggests Washington law holds the opposite."  *Seaside Inland Transp. v. Coastal Carriers LLC*, No. 2:17-cv-00143-SMJ, 2019 U.S. Dist. LEXIS 172913, at *31 (E.D. Wash. Oct. 4, 2019) (citing *Schreiner Farms, Inc. v. Am. Tower, Inc.*, 173 Wash. App. 154, 161 (2013)).  Even if Plaintiffs could establish tolling under New York law (which they cannot), they still cannot establish tolling under Washington law, and their claim is therefore time-barred.

### 4.    Plaintiffs' knowledge of the '418 Application was not necessary to start the statute of limitations running

"In New York, the default accrual rule for breach of contract causes of action is that the cause of action accrues when the contract is breached."  *iSentium, LLC v. Bloomberg Fin. L.P.*, No. 17-cv-7601 (PKC), 2020 U.S. Dist. LEXIS 7808, at *24 (S.D.N.Y. Jan. 16, 2020) (citation omitted).  The New York Court of Appeal has "repeatedly rejected accrual dates which cannot be ascertained with any degree of certainty, in favor of a bright line approach, and for that reason, we do not apply the discovery rule to statutes of limitations in contract actions."  *Id.*  Put differently, "The plaintiff need not be aware of the breach or wrong to start the period running."  *Zhang v. Schlatter*, 557 F. App'x 9, 11 (2d Cir. 2014) (citation omitted); *see also Bryant*, 721 F. App'x at 80 ("It accrues notwithstanding a plaintiff's ignorance of or failure to discover the injury.").

Thus, Plaintiffs cannot argue that subjective ignorance of AT&T's '418 Application filing prevented the limitations period from starting.  *See Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 401 (1993) (finding the statute of limitations began to run when plaintiff real estate broker "secretly negotiated the building sale and thus deprived plaintiff of its right to negotiate and earn a commission," even though plaintiff was not aware of the sale).  In *Ely-Cruikshank* the court found that "there is no injustice on the facts of this case, since although Ely-Cruikshank may have

been unaware of the alleged secret negotiations in November 1983, it became aware of their existence at least as early as February 1984 at a time when it still had over five years left before the Statute of Limitations barred its breach of contract action." *Id*. at 404. As in *Ely-Cruikshank*, there is no injustice here—Network Apps *previously sued* AT&T within the limitation period, but voluntarily dismissed that case. *See* Exs. 10, 11.

Plaintiffs must be timely under *both* New York *and* Washington law, *see* IV.A.1 above, and fare no better under Washington law. *See Karpstein v. Allianz Life Ins. Co. of N. Am.*, No. C15-966RSL, 2016 U.S. Dist. LEXIS 150648, at *2, 5, 8 (W.D. Wash. Oct. 31, 2016) (holding that "the rule in Washington is that the statute of limitations begins to run on the date of breach, not the date of discovery," where plaintiff was unaware of a breach resulting from defendant's agent depositing plaintiff's annuity check into the agent's account). *See also Schreiner Farms*, 173 Wash. App. at 160 ("[A] general breach of contract claim accrues on the date of the breach, not discovery of the breach."). Thus, Plaintiffs' breach of contract claim is time-barred.

### 5.    Filing *Network Apps I* did not toll the statute of limitations.

Network Apps did not toll the statute of limitations by filing the prior lawsuit, *Network Apps I*. (Schei and Wantz were not parties in *Network Apps I*.) To toll the statute of limitations, New York's saving statute requires:

> First, the plaintiff must have "timely commenced" a prior action based "upon the same transaction or occurrence." N.Y. C.P.L.R. § 205(a). Second, that prior action must have been "terminated in any other manner than by a voluntary discontinuance. . . ." *Id*. If those two conditions are met, a plaintiff may "commence" a new suit within six months of the prior action's dismissal . . . .

*Dorchester Fin. Sec., Inc. v. Banco BRJ S.A.*, No. 11-CV-1529 (KMW), 2014 U.S. Dist. LEXIS 150372, at *2–3 (S.D.N.Y. Oct. 22, 2014). Network Apps cannot meet the plain language of the New York saving statute; it terminated *Network Apps I* by a voluntary discontinuance and also did not file the present case within the allotted six months. *See* Exs. 10, 11. Plaintiffs again fare no

bruk

better under Washington law.  Washington courts have explained, "When a case is dismissed involuntarily without prejudice under CR 41, refiling is permitted so long as the statute of limitations has not expired. The time limit for refiling is *computed as if the first case had never been filed and is not tolled by the commencement of the first action.*"  *Kirsch v. Cranberry Fin., LLC*, No. 69959-8-I, 2013 Wash. App. LEXIS 2871, at *21 (Ct. App. Dec. 23, 2013) (emphasis added).  Moreover, the rule treating voluntary dismissal of a lawsuit as a nullity for statute of limitations purposes is practical.  A contrary rule would allow litigants to circumvent the statute by repeatedly filing and then voluntarily dismissing cases.

*   *   *

To prevail on the statute of limitations, Plaintiffs must demonstrate timeliness under both New York and Washington law.  The continuing violation doctrine did not toll the limitations period under New York law because the allegedly accruing royalties merely amount to continuing damages and not independent wrongs.  Washington law does not recognize a continuing breach as extending the statute of limitations for breach of contract.  Under both New York and Washington law, there is no discovery rule for breach of contract and the filing of *Network Apps I* did not toll the statute of limitations.  Thus, under both New York and Washington law, Plaintiffs' breach of contract cause of action is time barred and should be dismissed with prejudice.

**B.    Plaintiffs lack standing to bring this lawsuit.**

**1.    Applicable Law**

"The plaintiff bears the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue.'"  *Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns., S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (citation omitted).  "A federal court considering state law claims under supplemental jurisdiction applies the choice of law principles of the forum state."  *Robb Evans*, 2012 WL 488257, at *2.  Under New York law, contractual selection of governing law is

-12-

generally determinative so long as the state selected has sufficient contacts with the transaction. *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996).  Here, the Agreements identify Washington law as controlling.  *See* Ex. 1 at 5.

Under Washington law, the plaintiff must have a contractual relation to the defendant to bring suit for breach of contract.  *See Collins v. Quintana*, No. C15-1619RAJ, 2016 U.S. Dist. LEXIS 11000, at *5–6 (W.D. Wash. Jan. 28, 2016) (dismissing breach of contract claim where parties did not have contractual relationship).  Absence of privity between the contracting party and the plaintiff precludes a breach of contract claim.  *See Cloanto Corp. v. Hyperion Entm't CVBA*, No. C18-381 RSM, 2019 U.S. Dist. LEXIS 83030, at *8 (W.D. Wash. May 16, 2019) (dismissing breach of contract claim under Rules 12(b)(1) and 12(b)(6) for lack of privity).  The same is true under New York law.  *See Whitaker v. On the Right Track Sys.*, No. 21-cv-840 (PKC), 2022 U.S. Dist. LEXIS 45094, at *18–19 (S.D.N.Y. Mar. 14, 2022).

"Under 35 U.S.C. § 281, a 'patentee' has standing to pursue a patent infringement action." *Alps S., LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1382 (Fed. Cir. 2015).  "The word 'patentee' is not limited to the person to whom the patent issued, but also includes 'successors in title to the patentee.' 35 U.S.C. § 100(d) . . . ."  *Id.*  "The party asserting patent infringement is 'required to have legal title to the patents on the day it filed the complaint and that requirement can not [sic] be met retroactively.'"  *Id.* at 1385 (citation omitted).  Motions to dismiss for lack of such "statutory standing" are properly brought under Rule 12(b)(6).  *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019).

### 2.    The undisputed facts warrant dismissal.

Plaintiffs do not dispute the facts raised in AT&T's pre-motion briefing: the Agreements here were entered into with Mya Number *LLC*, the '728 Patent was originally assigned to Mya Number *Corp.*, and neither "Mya Number *LLC*" nor "Mya Number *Corp.*" are parties to the action

-13-

or appear anywhere in the Complaint.  The Complaint mentions "Mya Number, *Inc*." in paragraph 21, but Mya Number, *Inc*. does not and has never existed.  Plaintiffs admit the reference to "Mya Number, *Inc*." is a scrivener's error, and explain that they meant "Mya Number *Corp*."  Dkt. 51 at 1.  But instead of recognizing that "Mya Number, Incorporated" is different from "Mya Number Corporation," Plaintiffs argue a statute regulating permitted business names for registration with the Washington Secretary of State.  *Id*.  What business names can be registered "on the records of the secretary of state," Wash. Rev. Code § 23.95.300, has nothing to do with whether Plaintiffs have properly pleaded facts to plausibly allege that they are in privity with the contracting party or are successors in title to the '728 Patent's original assignee.  They have not done so, which by itself warrants dismissal.  *See Kautsman v. Carrington Mortg. Servs., LLC*, No. C16-1940-JCC, 2018 U.S. Dist. LEXIS 10688, at *11–12 (W.D. Wash. Jan. 23, 2018) ("As a threshold matter, Plaintiffs must plausibly allege privity . . . to bring contract-based claims.").

### 3.      Plaintiffs' standing defects cannot be cured.

Plaintiffs have argued that any standing defect can be cured.  *See* Apr. 28, 2021 Hrg. Tr. at 5:23–25.  But Plaintiffs' problems run deeper than erroneously naming a non-existent entity in the Complaint.  Specifically, Plaintiffs argue they will be able to establish privity of contract/chain of title through Mya Number Corp., which allegedly "transferred its assets, including its claims against AT&T, to its founders, Plaintiffs John Wantz and Kyle Schei."  Dkt. 51 at 2.  But Plaintiffs' argument based on the December 1, 2016 Assignment runs into three insurmountable problems: (1) the December 1, 2016 Assignment is void on its face, (2) Mya Number Corp. had already assigned away its breach of contract claim, and (3) Mya Number Corp. was administratively dissolved nearly two years earlier on February 2, 2015.  *Compare* Ex. 6 *with* Ex. 8 at 3.

### 4.      The December 1, 2016 Assignment is void on its face.

The purported December 1, 2016 Assignment from Mya Number Corp. to Plaintiffs Schei

and Wantz was for *no consideration*.  Ex. 8 at 3.  In fact, the consideration paragraph makes no sense: "the Assignees [Schei and Wantz] hereby agrees [sic] to exchange and redeem with the Assignor [Mya Number Corp.] all issued and outstanding *shares of each Assignee* (the 'Payment'), . . . in exchange for all right, title and interest of the Assignor in and to . . . ." *Id.* (emphasis added). As the "Payment" for Mya Number Corp.'s intellectual property rights and assets, Schei and Wantz agreed to exchange and redeem the "shares of each Assignee."  *Id.*  But Schei and Wantz are individuals, not corporate entities, and do not have "shares" in themselves to exchange and redeem.  This alone constitutes grounds for holding the December 1, 2016 Assignment void. *See Willard v. Addink*, No. 35861-5-III, 2019 Wash. App. LEXIS 931, at *12–13 (Ct. App. Apr. 23, 2019) ("[I]f a term is so 'indefinite that a court cannot decide just what it means, and fix exactly the legal liability of the parties,' there cannot be an enforceable agreement." (quoting *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 178 (2004))); *FDIC v. Uribe, Inc.*, 171 Wash. App. 683, 689 (2012); *Herbruger v. Bellevue Coll.*, No. 82419-8-I, 2022 Wash. App. LEXIS 262, at *11 (Ct. App. Feb. 7, 2022).

### 5.   Mya Number Corp. had already assigned away its right to sue for breach of contract.

Nor could the 2016 Assignment have transferred any rights to sue for breach of contract because those rights had already been transferred to a third party.  In discovery, Plaintiffs represented that "no assignment to and/or from The Light Phone, Inc. was ever consummated." Ex. 14 at 19–21.  Plaintiffs' representation, however, is contradicted by evidence showing that █

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████



breach of contract claim fails for lack of standing for this independent reason.

> **6.      Mya Number Corp. was administratively dissolved nearly two years earlier on February 2, 2015.**

The December 1, 2016 Assignment is further invalid because Mya Number Corp. was administratively dissolved nearly two years earlier on February 2, 2015.  Ex. 6.  In Washington, a dissolved corporation "continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs . . . ."  Wash. Rev. Code § 23B.14.050(1).  "Dissolution terminates a corporation's power to enter into contracts unrelated to winding up and liquidation."  *White v. Dvorak*, 78 Wash. App. 105 (1995).  An intellectual property assignment made by a dissolved corporation is "invalid as a matter of law" if done outside of winding up and liquidation.  *See Cave Man Kitchens Inc. v. Caveman Foods LLC*, No. C18-1274 TSZ, 2020 U.S. Dist. LEXIS 219328 (W.D. Wash. Nov. 23, 2020).

In *Cave Man Kitchens*, the Washington Secretary of State administratively dissolved a

corporation in March 2011. *Id*. at *2. Seven years later, the former president of the dissolved corporation executed an agreement purportedly assigning a federal trademark to the plaintiff. *Id*. at *4. Whether the plaintiff had standing thus turned on "whether a valid assignment had actually taken place . . . ." *Id*. at *9 (citation omitted). The court held the assignment was invalid: "No dispute exists that when the former president of Dissolved Cave Man Kitchens purported to execute the written assignment, the corporation had been administratively dissolved for more than seven years." *Id*. at *11. The court further explained: "Under Washington law, '[a] dissolved corporation . . . may not carry on any business except that appropriate to wind up and liquidate its business affairs . . . .'" *Id*. at *12 (citing Wash. Rev. Code § 23B.14.050(1), (5) and *Equipto Div. Aurora Equip. Co. v. Yarmouth*, 134 Wash. 2d 356, 365 (1998)). Because the former president did not execute the assignment to "'wind up' or 'liquidate' the business affairs of the corporation" the court concluded the purported assignment was "invalid as a matter of law." *Id*. at *12. Thus, the court held that the plaintiff lacked standing and dismissed the plaintiff's claim with prejudice. *Id.* at *13. As in *Cave Man Kitchens*, the purported December 1, 2016 Assignment here is invalid as a matter of law unless Plaintiffs can show it was part of proper wind up and liquidation.

### 7.     The purported December 1, 2016 Assignment was not part of proper wind up and liquidation of Mya Number Corp.

Plaintiffs contend Mya Number Corp.'s post-dissolution activity was part of winding up and liquidating Mya Number Corp. Dkt. 51 at 2. In particular, Plaintiffs contend that Mya Number Corp. transferred its assets under Wash. Rev. Code § 23B.14.050(1)(b), which allows a dissolved corporation to engage in "Disposing of its properties . . . ." Dkt. 51 at 2. However, Plaintiffs omit key language making clear that the subsection *does not* permit property to be distributed back to shareholders: "Disposing of its properties *that will be applied toward satisfaction or making reasonable provision for satisfaction of its liabilities or will otherwise not be distributed in kind*

*to its shareholders . . . .*"  Wash. Rev. Code § 23B.14.050(1)(b) (emphasis added).   Nor can Plaintiffs argue a distribution of "remaining" property under Wash. Rev. Code § 23B.14.050(1)(d), as Plaintiffs cannot show that Mya Numbers creditors were paid in full.

> **8.  Mya Number Corp.'s creditors were not paid and did not even know about its dissolution, much less the purported December 1, 2016 Assignment.**

The December 1, 2016 Assignment was not part of winding up and liquidating Mya Number Corp. because the assignment was not applied toward satisfaction or making reasonable provision for satisfaction of its creditors.   On November 30, 2016—the day before the purported December 1, 2016 Assignment—Mya Number Corp.'s shareholders signed a release agreement providing that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████  Ex. 17 at 1.   The release agreement identified four Mya Number Corp. creditors in order of priority: ████████████████████████████████████ ████████████████████████████████████████████████████  *Id*. at 1–2.   The agreement identified senior creditor ██████████████ ("Senior Creditor") as holding ████████████ ████████████████████████████████████████  *Id*. at 1.   A month after filing this lawsuit, on March 1, 2021, Plaintiffs received a letter from the Senior Creditor's counsel explaining that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████  Ex. 18 at 2.   ████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████  *Id*. ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████  In fact, all the available evidence

points to the contrary.  *See* Ex. 19 at 2 ████████████████████████████████

████████████████████████████████████████████████████████████████████

(emphasis added)), 2 ██████████████████████████████████████████████████

██████████████████████████████    ██████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████   Ex. 18 at 2–3.  ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████   Ex. 19 at 2.  ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████.

Given that the Senior Creditor was not paid, the same must be true for the junior creditors.

*See* Ex. 17 at 1–2 (setting forth the priority of claims).  *See also* IV.B.10 below.  Thus, Plaintiffs

have not only failed to plead facts to support a plausible argument that creditors were paid as part

of liquidation and wind-up, but they cannot do so.  And even if all creditors had been paid, the

December 1, 2016 Assignment cannot be a proper distribution under Wash. Rev. Code

§ 23B.14.050(1)(d) because Washington law prohibits a shareholder distribution that would cause

insolvency.  *See* Wash. Rev. Code §§ 23B.14.050(1)(d); 23B.06.400(2)(b).  ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████   Ex. 20   ████████████████████████████████████

███████████████████

### 9. Plaintiffs cannot cure defective standing retroactively.

Plaintiffs cannot point to any agreements entered into with Mya Number Corp.'s creditors *after the filing of the Complaint* to cure standing defects. In *Alps South*, the plaintiff, a licensee, filed a patent infringement suit without naming the patent owner as a co-plaintiff. 787 F.3d at 1381. Sixteen months after the filing of the complaint, the plaintiff and the patent owner reached a *nunc pro tunc* agreement to retroactively confer the plaintiff with standing. *Id.* The district court found the plaintiff lacked standing when it filed the action, but this defect had been cured through the post-filing agreement, and hence denied the defendant's motion to dismiss. *Id.* at 1382. The Federal Circuit reversed, explaining: "[N]unc pro tunc assignments are not sufficient to confer retroactive standing." *Id.* at 1384 (citation omitted). "The party asserting patent infringement is 'required to have legal title to the patents on the day it filed the complaint and that requirement can not be met retroactively.'" *Id.* at 1385 (citing *Abraxis Biosci., Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010)). The Federal Circuit distinguished between defective *pleading* of facts for standing and defects in the facts themselves. *Id.* at 1385–86. Similarly here, any post-Complaint attempt by Plaintiffs to change the facts as to standing would be wholly ineffective.[3] *See also Riverfront Landing Phase II Owners' Ass'n v. Assurance Co. of Am.*, No. C08-0656RSL, 2009 U.S. Dist. LEXIS 57089, at *8 (W.D. Wash. July 6, 2009) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." (quoting *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007))).

---

[3] Nor could Plaintiffs cure standing defects by reinstating Mya Number Corp. Once an entity is administratively dissolved, it may petition the Secretary of State for reinstatement within a five-year period. Wash. Rev. Code §§ 23B.14.220(1); 23.95.615(1). Here, Mya Number Corp. never petitioned for reinstatement and the time for it to do so expired on February 2, 2020. Ex. 25.

### 10. Plaintiffs cannot cure standing defects by identifying additional documents.

Plaintiffs have produced evidence identifying Mya Number Corp.'s creditors.  However, Plaintiffs *have not produced any evidence* that creditors were paid or that the December 1, 2016 Assignment was for paying creditors.  Plaintiffs' failure to do so in discovery precludes them from relying on previously undisclosed documents.

On April 22, 2022, the Court opened targeted discovery on the issue of standing.  Dkt. 126 at 5.  AT&T has served requests for production of documents related to a financial interest in this litigation (RFP No. 7), dissolution and wind-up of Mya Number Corp. (RFP No. 8), and evidence that Mya Number Corp. paid or attempted to pay creditors after dissolution (RFP No. 10).  Ex. 21 at 8–11.  Plaintiffs then produced documents identifying Mya Number Corp.'s creditors, including the Senior Creditor, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████, among others.  Ex. 17 at 1–2; Ex. 22 at 2; Ex. 23 at 1.  However, Plaintiffs *did not produce any evidence* of these creditors actually being paid or holding an interest in the litigation.  AT&T emphasized that its requests encompassed documents showing "Mya Numbers' creditors were paid off as part of winding up and dissolving the business after its administrative dissolution" and showing any "Mya Number creditor has a financial interest in the outcome of the litigation."  Ex. 24 at 1, 3.  In other words, AT&T specifically asked for evidence that creditors were or would be paid.  Nonetheless, Plaintiffs made clear they "will not produce documents responsive to this Request . . . ."  Ex. 21 at 11.  The law is clear that refusing to produce documents in discovery forecloses a litigant from later relying on those documents.  *See Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11 Civ. 2767 (LAP), 2015 U.S. Dist. LEXIS 122418, at *17–21 (S.D.N.Y. Sept. 14, 2015) (striking documents that litigant previously refused to produce).  Thus, even if Plaintiffs could identify previously

undisclosed documents showing that creditors were or would be paid, Plaintiffs cannot rely on those documents.

\* \* \*

The Complaint fails to plead any factual allegations showing why Plaintiffs have standing. The only Mya Number entity mentioned—Mya Number, Inc.—does not and has never existed, which Plaintiffs admit was erroneously pleaded.  Dismissal with prejudice is warranted because Plaintiffs cannot cure the standing defects.  Specifically, any potential standing allegations based on the December 1, 2016 Assignment are ineffective as a matter of law because they were after Mya Number Corp.'s administrative dissolution and not for paying creditors.  The standing defects cannot be cured retroactively and Plaintiffs cannot identify additional documents to show standing having refused to produce them in discovery.  Dismissal with prejudice is warranted.

### C.   The breach of contract claim should be dismissed because Plaintiffs failed to abide by the mandatory dispute resolution clause.

In *Merchant House v. American Steamship Owners Mutual Protection & Indemnity Ass'n*, this Court granted a motion to dismiss a breach of contract action upon concluding that the plaintiff failed to plead that it complied with a mandatory dispute resolution clause:

> Plaintiff simply cannot escape the fact that it "chose, with its business eyes open, to accept the terms, specifications and risk of the . . . contract, including the [dispute resolution] clause," and the Court will not "allow [Plaintiff], after the fact, to secure the [Court's] assistance and power . . . to relieve it of a particular procedural provision" that it now finds inconvenient.

No. 12 Civ. 6982 (RJS), 2013 U.S. Dist. LEXIS 91259, at \*12 (S.D.N.Y. May 31, 2013).  The same issue was also presented in *ISS Facility Services, Inc. v. Fedcap Rehabilitation Services, Inc.*, No. 20-CV-6591 (RA), 2021 U.S. Dist. LEXIS 124400 (S.D.N.Y. July 2, 2021), where the contracts contained mandatory dispute resolution clauses.  *Id.* at \*11.  When the plaintiff sued for breach of contract, the defendant moved to dismiss arguing "that because [the plaintiff] did not

comply with the dispute resolution provisions of the Subcontracts, it cannot maintain its suit for breach of the Subcontracts." *Id.* at *9. This Court again agreed with the defendant, explaining that the plaintiff had not plausibly alleged compliance with the dispute resolution provisions, and "this matter must therefore be dismissed for failure to comply with a contractual condition precedent." *Id.* at *11. *See also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294–95 (S.D.N.Y. 2003) (dismissal where plaintiff failed to comply with provision requiring proof of loss before bringing suit).

The present case is no different from *Merchant House*, *ISS Facility Services*, and *Duane Reade*. Plaintiffs failed to comply with the Agreements' dispute resolution provisions, and this case must be dismissed for failure to comply with a contractual condition precedent. Specifically, the PSA provides for a written "Dispute Notice" followed by 30 days of working to resolve the dispute followed by escalation to designated representatives. Ex. 1 at 14. Next, "[t]he designated representatives shall meet to discuss and negotiate in good faith a resolution to such dispute." *Id.* The clause states: "This section does not apply to (a) the right of a party to seek a temporary restraining order or other provisional remedy to preserve the status quo or to prevent irreparable harm; or (b) disputes involving breaches of confidentiality or violation of a party's intellectual property rights." *Id.* (emphasis added). Plaintiffs claim to have satisfied this clause based on three arguments. First, Plaintiffs argue the meaning of "[t]his section does not apply to . . . disputes involving breaches of confidentiality or violation of a party's intellectual property rights." *Id.* Second, Plaintiffs argue that "AT&T refused to engage in an informal dispute resolution process." Dkt. 51 at 3. Third, Plaintiffs argue that "[e]ither way, any breach was immaterial." *Id.* None of these arguments have merit.

As to Plaintiffs' first argument, the Complaint alleges that AT&T failed to pay support,

maintenance, and license fees.  *See* Complaint ¶¶ 33, 56.  Alleged non-payment of fees, however, is not a dispute "involving breaches of confidentiality or violation of a party's intellectual property rights."  *See* Ex. 1 at 14.  Construing a "violation of a party's intellectual property rights" to encompass violations of non-IP aspects of the Agreements like payment of fees would render the clause so broad as to encompass virtually any dispute that could be raised, effectively rendering the clause meaningless.  Under Washington law, "courts favor the interpretation of a writing which gives effect to all of its provisions over an interpretation which renders some of the language meaningless or ineffective."  *Mayer v. Pierce Cty. Med. Bureau, Inc.*, 80 Wash. App. 416, 423 (1995).  Nor does simply alleging a breach of confidentiality or violation of IP rights eliminate the obligation to meet to discuss and negotiate in good faith regarding the dispute over non-IP rights. Again, this would essentially render the clause meaningless, as a party could simply allege breach of confidentiality or violation of IP rights to evade dispute resolution requirements.

Next, Plaintiffs' second argument that "AT&T refused to engage in an informal dispute resolution process" is inaccurate.  Dkt. 51 at 3.  On April 25, 2017, Network Apps sent a letter purportedly invoking the dispute resolution clause.  Ex. 12 at 1.  On May 2, 2017, AT&T responded challenging whether Network Apps was in fact a successor-in-interest of the Agreements, which were entered into with Mya Number, LLC.  Ex. 13 at 1–2.  AT&T explained that "until Network Apps can fairly demonstrate that it is the actual assignee of the PSA and Initial SOW, AT&T does not agree that Network Apps has invoked the dispute resolution clause of the PSA, Section 28." *Id*. at 2.  Rather than producing the December 2016 assignment agreements (which had not yet been recorded with the USPTO), or making any effort to explain, reply, or follow up, Network Apps simply went silent.  Two further points are not in dispute.  First, the parties' designated representatives have never met to discuss and negotiate in good faith after the April 25, 2017 letter.

Second, Plaintiffs Schei and Wantz have never even taken the first step of providing a Dispute Notice.

Finally, Plaintiffs' third argument that "any breach was immaterial" runs contrary to the law.  Plaintiffs cannot escape the mandatory dispute resolution provision because they now find it inconvenient.  As in *Merchant House*, *ISS Facility Services*, and *Duane Reade*, the breach of contract cause of action should be dismissed on this additional and independent basis.

> **D.**     **The correction of inventorship cause of action should be dismissed.**

As a starting point, Plaintiffs have explained that "Plaintiffs Wantz and Schei bring the claim for correction of inventorship, not Network Apps."  Dkt. 51.  But Schei and Wantz failed to even plead the bare conclusion of injury, which alone warrants dismissal.  *Compare* Complaint ¶ 81 (alleging injury with respect to Network Apps, but not Schei or Wantz) *with Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009) (standing for correction of inventorship requires injury, causation, and redressability).  Further, Schei and Wantz provide nothing but conclusory and vague statements regarding correction of inventorship, which are insufficient.

In *Opternative, Inc. v. JAND, Inc.*, No. 17 Civ. 6936 (JFK), 2018 U.S. Dist. LEXIS 132827, at *28 (S.D.N.Y. Aug. 7, 2018), the plaintiff alleged that the omitted inventor "conceived of the invention of the '709 Patent" and "related [it] to [the defendant's] employees during a teleconference."  *Id.* at *30.  This Court found these statements "conclusory and vague" as the complaint did "not include any specific allegations that [the omitted inventor] conceived of the total patented invention and that any contribution by the named inventors in the '709 Patent was insignificant.  Thus, [the plaintiff] has failed to state a claim for sole inventorship."  *Id.*  "[A] party may not rely solely on his own testimony or that of his purported co-inventors, but rather must offer corroborating evidence of conception."  *Id.* (citation omitted).  The plaintiff "failed to provide sufficient corroborating evidence" and specifically failed "to provide any further corroborating

details or documentation of this teleconference, including the date the teleconference took place or [the omitted inventor's] specific contribution." *Id.* at *30–31.  As a result, this Court dismissed the claim.  *Id.* at *31–32.  The allegations from Schei and Wantz here are even more conclusory and vague: (1) they co-invented the "Twinning Solution" that is described in the '462 Patent, (2) one of the named inventors of the '462 Patent had access to confidential Mya Number information, and (3) "[u]pon information and belief" the named inventor used such information in pursuit of the invention in the '462 Patent.  Complaint ¶¶ 45, 76, 78.  As in *Opternative*, Schei and Wantz fail to allege the specific contribution or corroborate that specific contribution.  Their failure is particularly notable because the Agreements recognize that AT&T was already independently working on twinning: ███████████████████████████████████████

████████████████████████████████████████████████████████████████ Ex. 3 ¶ 2.3.

Moreover, Schei's and Wantz's correction of inventorship cause of action suffers from the same defects discussed in IV.A, IV.B, and IV.C above.  That claim is based on enforceability of the Agreements, *see* Complaint ¶¶ 45, 77, but any enforcement efforts are untimely and barred for failure to abide by the mandatory dispute resolution clause.  That claim also relies upon a proper, unbroken chain of assignments from Mya Number to Network Apps.  *Compare* Complaint ¶ 78 (alleging Mya Number as the true original assignee of the '462 Patent) *with* ¶ 81 (seeking judgment that Network Apps is the lawful assignee of the '462 Patent).  As discussed in IV.B above, any purported chain of assignments is broken.  Thus, finding in AT&T's favor regarding *any of* IV.A, IV.B, and IV.C warrants dismissal of the correction of inventorship cause of action.

### E. The claims of the '728 Patent are patent ineligible under 35 U.S.C. § 101.

In the 1970s, if someone called your home phone number, the phones in the kitchen, living room, and den would all ring.  And if you picked any of them up, the line would connect and you could have a conversation.  This well-known and conventional practice of ringing multiple phones

to connect with someone is the starting point for any patent ineligibility analysis here.  The claims of the asserted '728 Patent amount to nothing more than applying this long-practiced abstract idea in the context of smartphones, tablets, and smartwatches.  *See* Complaint ¶ 1.  Plaintiffs do not claim to have invented smartphones, tablets, or smartwatches, but rather to have invented the idea of calling a single number to cause multiple such devices to ring.  *Id.*  The claims of the '728 Patent are directed to the abstract idea of telephone number grouping where incoming service activity (*e.g.*, calls and SMS text messages) may be "forked" to multiple devices, and outgoing telephone calls may be masked so as to appear to originate from a designated phone number.  This is nothing more than automating the process of calling a person's various phone numbers to increase the likelihood of them answering.  None of the claims teach any inventive concept that would add to the abstract idea, and instead only use routine telephony activities such as call forwarding and caller ID.  Thus, the claims of the '728 Patent are patent ineligible under 35 U.S.C. § 101.

### 1.    Applicable Law

"The Federal Circuit has affirmed that subject matter eligibility under Section 101 of the Patent Act, 35 U.S.C. §§ 100, et seq., is a question of law suitable for resolution at the pleading stage of a patent case."  *AuthWallet, LLC v. Block, Inc.*, No. 21-cv-5463 (LJL), 2022 U.S. Dist. LEXIS 80358, at *16–17 (S.D.N.Y. May 3, 2022).  "Patent eligibility under 35 U.S.C. § 101 is reviewed de novo."  *Reese v. Sprint Nextel Corp.*, 774 F. App'x 656, 659 (Fed. Cir. 2019).  Section 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  The statute, however, "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014).  "The Supreme Court, setting up a two-stage framework, has held that a claim falls outside § 101 where

(1) it is 'directed to' a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea, and (2), if so, the particular elements of the claim, considered 'both individually and "as an ordered combination,'" do not add enough to "transform the nature of the claim" into a patent-eligible application.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citing *Alice*, 134 S. Ct. at 2355).

      **2.**    **The '728 Patent is directed to the idea of grouping telephone numbers.**

The claims of the '728 Patent are directed to the idea of grouping telephone numbers. The '728 Patent is titled "Telephone Number Grouping Service For Telephone Service Providers," and the abstract idea of grouping telephone numbers is succinctly summarized in the specification: "incoming telephone calls may be forked to multiple devices and outgoing telephone calls may be masked so as to appear to originate from a selected and/or primary one of the grouped telephone numbers." '728 Patent at 2:54–58.

The background of the patent explains that a particular telephone number has traditionally corresponded conceptually to a particular telephone, but with the rise of mobile telephones, "the traditional association between particular telephone numbers and particular physical locations has weakened, while the association between particular telephone numbers and particular people has strengthened." '728 Patent at 1:21–24. The specification notes: "It can even feel odd to call a telephone number and have the call answered by someone other than a particular person associated with the telephone number." '728 Patent at 1:26–29. The specification describes the increase in "the variety of mobile communication devices" including "smart phones" and "wearables" such that "it is becoming more common for a person to possess and operate multiple mobile communication devices, each with features and shortcomings, and each with its own associated telephone number." '728 Patent at 1:33–36. The problem the alleged invention purports to solve is described as follows: "[T]his situation introduces the confusion of multiple telephone numbers

associated with a person, and the frustration that the person may not have all of the multiple devices in close proximity all the time." '728 Patent at 1:37–40.

The '728 Patent purports to solve this problem with the idea of telephone number grouping. The specification describes the alleged invention as having two parts. First, "numbers may be grouped such that service activity originating from a device associated with one of the grouped telephone numbers ('outgoing activity') appears to originate from a selected (and possibly different) one of the grouped telephone numbers." '728 Patent at 2:46–50. *See also id.* at Abstract. Note that "service activity" includes telephone calls and SMS text messages. *See* '728 Patent, Claim 9. To make calls from devices in the group appear to originate from a designated phone number, the specification describes modifying the call's "Caller ID" data. *See* '728 Patent at 5:42–48. Second, "service activity destined for a device associated with one of the grouped telephone numbers ('incoming activity') may be forwarded to one or more and/or each of the devices associated with the grouped telephone numbers." '728 Patent at 2:50–54. *See also id.* at Abstract. The specification explains that "[a]ssociated telephone service user devices may be activated simultaneously or in a specified order." '728 Patent at 5:38–40.

Plaintiffs have alleged infringement of Claims 1, 8, and 17. Complaint ¶ 64. Claim 8 is representative. *See* Ex. 26 (color-coded comparison of the independent claims). Although verbose and filled with generic limitations, Claim 8 at its core amounts to nothing more than the idea of grouping telephone numbers. In the "registering" step, Claim 8[a] refers to telephone numbers having been provisioned by a telephone service provider. The specification explains that provisioning means "associating particular telephone numbers with particular subscriber identity module (SIM) of a wireless cellular telephone." '728 Patent at 2:40–45. The phone numbers are then "grouped in a registration phase," which "may be facilitated with a graphical user interface

such as a smart phone 'app' or web site." '728 Patent at 2:65–3:2.

In the "receiving" step, Claim 8[b] refers to "partial service control for telephone service activity" that is received from the telephone service provider.  The specification explains that this partial delegation of telephone service control to the grouping service allows for "process[ing] intercepted telephone service activity in accordance with one or more configured service activity processing policies." '728 Patent at 3:4–8.  This leads to the "processing" step, where Claim 8[c] refers to a "grouped telephone number call policy" that governs calls to and from devices in the group.  This call policy allows for outgoing calls to appear "to originate from a single telephone number of the grouped telephone numbers" and conversely for incoming calls to be "forwarded to one or more associated physical telephone service user devices . . . ." '728 Patent, Claim 8[c]. The call policy can cause multiple grouped devices to ring.  *See* '728 Patent, Claim 8 ("activation of multiple of the grouped plurality of physical telephone service user devices").

Thus, although Claim 8 recites numerous generic concepts such as "a telephone number grouping service" and "a grouped telephone number incoming call policy," at its core the claim amounts to nothing more than the idea itself—*i.e.*, that "incoming telephone calls may be forked to multiple devices and outgoing telephone calls may be masked so as to appear to originate from a selected and/or primary one of the grouped telephone numbers." '728 Patent at 2:54–58.

### 3.    Grouping telephone numbers is a patent ineligible abstract idea.

In determining whether a patent is directed to a patent ineligible abstract idea, the Federal Circuit has endorsed "examin[ing] earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) (citations omitted).

Here, a highly similar case is *BroadSoft, Inc. v. CallWave Communications, LLC*, 282 F. Supp. 3d 771 (D. Del. 2017), *aff'd*, 739 F. App'x 985 (Fed. Cir. 2018).  In *BroadSoft*, the patent

owner "characterized the claim as being directed to a call processing system 'that allows the control and management of multiple calls, multiple devices, calls to multiple devices.'" 282 F. Supp. 3d at 780.  Specifically, the alleged invention in *BroadSoft* purported to solve the problem of "receiving busy signals or getting sent to voicemail instead of successfully connecting with the called party." *Id.* at 781.  Upon receiving a call, a "subscriber instruction" would be accessed and based on that instruction, a first outgoing call ("outcall") would be placed to the subscriber's device.  *Id.* at 775.  If the first outcall was not answered, then a second outcall would be placed to a second device.  *Id.*  The alleged infringer argued that these claims were "directed to the abstract idea of sequentially dialing a list of telephone numbers."  *Id.* at 780.  Moreover, the sequential dialing claims provided "no improvement to any computer or technological process; instead, they merely 'access a list of telephone numbers [in a database] associated with the called party and sequentially dial them in the ordinary fashion, providing simple automation of a task previously performed manually.'"  *Id.* (citation omitted).  The district court agreed, explaining:

> Like the claims that "facilitate[d] the exchange of financial obligations between two parties by using a computer system as a third-party intermediary" in *Alice*, the call processing system here facilitates connecting a caller with a called party by dialing multiple numbers for the called party if necessary.  *See Alice*, 134 S.Ct. at 2352.

*Id.* at 781.  The court described the problem of getting sent to voicemail or receiving a busy signal as "a human unavailability problem, rather than a problem specific to telephony technology. The claims do not improve telephony technology, instead invoking known telephony technology 'merely as a tool' to address this human unavailability problem."  *Id.*

Additionally, *BroadSoft* addressed so-called "single number outcall claims" which were "directed to the abstract idea of identifying a caller with a single telephone number."  *Id.* at 784. Essentially, the claims were directed to "storing data in a database, looking up data from that database in response to the initiation of a phone call, and inserting at least a portion of that data in

the already-existing callerID field." *Id.* at 784–85.  The alleged infringer analogized to the long-practiced situation where "a call involving an assistant located in an office who connects an employee working from home with a third party would display a number for the office, rather than the employee's home phone number, in the callerID field." *Id.* at 784.  The district court agreed that "the asserted single number outcall claims are directed to an abstract idea." *Id.*  The court explained that "[t]he claims do not 'focus on a specific means or method that improves the relevant technology [but] are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery.'" *Id.* at 785 (citation omitted).  On appeal, the Federal Circuit affirmed under Federal Circuit Rule 36.  739 F. App'x 985 (Fed. Cir. 2018).  The patent ineligibility analysis here is virtually indistinguishable from *BroadSoft*.  The forking of incoming telephone calls to multiple devices in the '728 Patent here is highly similar to *BroadSoft*'s call processing system that facilitated "connecting a caller with a called party by dialing multiple numbers for the called party if necessary."  282 F. Supp. 3d at 781.  The masking of outgoing telephone calls so as to appear to originate from a designated telephone number in the '728 Patent is also similar to *BroadSoft*'s claims for identifying a caller with a single telephone number.  As in *BroadSoft*, the '728 Patent claims should be held patent ineligible under 35 U.S.C. § 101.

Another similar case is *Stanacard v. Rubard, LLC*, No. 12 Civ. 5176 (CM)(MHD), 2015 U.S. Dist. LEXIS 157345 (S.D.N.Y. Nov. 18, 2015).  In that case, the patent was directed to the abstract idea of "connecting two people via long distance telephony using caller ID and call forwarding." *Id.* at *19.  Specifically, the alleged invention:

> combined two activities that have long been performed, by humans and by machines—caller ID and call forwarding—such that the recipient of a local call (area code plus seven digit number) uses some type of caller ID to recognize who the incoming caller is, and then forwards the incoming call to its intended recipient by associating the assigned incoming telephone number with a particular recipient's telephone number.

*Id.* at *7.  This Court noted, "No physical aspect of this process is claimed.  What is claimed is the

idea of dialing only ten digits, at which point some unspecified intermediary will identify both the caller and the intended recipient of the call and connect them." *Id.* at *8. The Court explained:

> [The] claims recite not a single piece of technology required to put the invention into practice. Plaintiff has simply figured out a way to dial an overseas call using fewer numbers, by creating a two dimensional graph (or "look-up chart") that relies on two concepts — caller ID and call forwarding — neither of which is patentable.

*Id.* at *20. Finally, the Court analogized the patent to calling a telephone operator and asking to be connected to someone. "Nothing different happens here, except that switching machinery and computers (none of which is claimed) recognize who the incoming caller is and to whom she wishes her call forwarded." *Id.* at *21. Just as in *Stanacard*, the claims here do not recite any technology required to put the invention into practice, but rather rely on the same two concepts— call forwarding and caller ID—neither of which is patentable.

Moreover, the claims of the '728 Patent are functional and result-oriented, and the Federal Circuit has repeatedly held result-based language as directed to an abstract idea. In *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1255 (Fed. Cir. 2016) ("*DIRECTV*"), the claims were directed to "streaming regional broadcast signals to cellular telephones located outside the region served by the regional broadcaster." The Federal Circuit explained that the idea was abstract because it was "a broad and familiar concept concerning information distribution that is untethered to any specific or concrete way of implementing it." *Id.* at 1258. Similarly, in *Two-Way Media Ltd v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1334 (Fed. Cir. 2017), the claims recited a method of transmitting packets of information over a communications network comprising: converting information into streams of digital packets; routing the streams to users; controlling the routing; and monitoring the reception of packets by the users. The district court found the claims were directed to the abstract idea of "(1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records

about receipt of the sent information." *Id.* at 1337.  The Federal Circuit agreed, explaining that "Claim 1 recites a method for routing information using result-based functional language. The claim requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way." *Id.* (citing *DIRECTV*, 838 F.3d at 1258–59).  As in *Stanacard*, *DIRECTV*, and *Two-Way Media*, none of the claims of the '728 Patent specify *how* an incoming call to the grouped telephone numbers would activate one or more user devices or *how* an outgoing call would appear to originate from a designated number.  Instead, the '728 Patent claim language is purely result-oriented—claiming the *result of* "forking" incoming telephone calls to multiple devices and the *result of* masking outgoing calls so as to appear to originate from a designated phone number.

### 4. There is no saving inventive concept in the claim elements individually or as an ordered combination.

"To save a patent at step two, an inventive concept must be evident in the claims." *Two-Way Media*, 874 F.3d at 1338.  The Federal Circuit explained that the "main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept." *Id.* (emphasis in original).  The Federal Circuit rejected the plaintiff's arguments that various technical problems were solved:

> [C]laim 1 here only uses generic functional language to achieve these purported solutions. "Inquiry therefore must turn to any requirements for *how* the desired result is achieved." Nothing in the claims or their constructions, including the use of "intermediate computers," requires anything other than conventional computer and network components operating according to their ordinary functions.

*Id.* at 1339 (citations omitted).  Moreover, the purported inventive concept "must be more than 'well-understood, routine, conventional activity.'" *DIRECTV*, 838 F.3d at 1262 (citation omitted). Here, the claims merely use generic functional language and do not set forth any requirements for *how* calls may be "forked" to multiple devices or *how* calls may be masked so as to appear to

originate from a designated phone number.  Not only are the claims lacking anything other than conventional computer and network components operating according to their ordinary functions, but this is further supported by the specification.  *See* '728 Patent at 3:11–19 (grouping service can be implemented using components within the telephone provider network, outside of the network, and/or on a user's device).

\* \* \*

The '728 Patent claims are directed to the abstract idea of grouping telephone numbers such that incoming calls may be "forked" to multiple devices, while outgoing calls may be masked so as to appear to originate from the designated phone number.  These claims are no different than the sequential dialing and single number outcall claims found to be abstract in *BroadSoft*.  These claims are also similar to those found to be abstract in *Stanacard*, which relied on the same two unpatentable concepts of call forwarding and caller ID.  The Federal Circuit has repeatedly held functional and results-oriented claims, like those here, to be directed to an abstract idea.  Further, there is no saving inventive concept in the '728 Patent claim elements, whether individually or as an ordered combination.  Thus, the '728 Patent claims should be held patent ineligible.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint with prejudice based on (1) Plaintiffs' failure to timely file this lawsuit within the statute of limitations (Counts 1 and 3); (2) Plaintiffs' lack of standing to file this lawsuit (Counts 1, 2, and 3); (3) Plaintiffs' failure to abide by the mandatory dispute resolution clause of the Agreements at the core of this dispute (Counts 1 and 3); (4) Plaintiffs' failure to properly allege a correction of inventorship claim (Count 2); and (5) ineligibility of the asserted '728 Patent under 35 U.S.C. § 101 (Count 2).

Dated: June 24, 2022                          PAUL HASTINGS LLP


By: */s/ Christopher W. Kennerly*
    Christopher W. Kennerly (*pro hac vice*)
    chriskennerly@paulhastings.com
    Alexander H. Lee (*pro hac vice*)
    alexanderlee@paulhastings.com
    Joshua Yin (*pro hac vice*)
    joshuayin@paulhastings.com
    1117 S. California Avenue
    Palo Alto, California  94304-1106
    Telephone:  1(650) 320-1800
    Facsimile:  1(650) 320-1900

    Robert Laurenzi
    robertlaurenzi@paulhastings.com
    200 Park Avenue, 26th Floor
    New York, NY 10166
    Telephone: (212) 318-6000
    Facsimile: (212) 318-6100

    Attorneys for Defendants