UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NETWORK APPS, LLC, *a Washington limited liability company*, KYLE SCHEI, and JOHN WANTZ, *individuals*,

                  Plaintiffs,

                  -v.-

AT&T MOBILITY LLC, *a Delaware limited liability company* and AT&T SERVICES, INC., *a Delaware corporation*,

                  Defendants.

21 Civ. 718 (KPF)

**REDACTED OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

       Given the ubiquity of "smart" electronic devices, such as phones and tablets, it may be difficult to recall a time when people were not so interconnected.  The parties to this case were witnesses to that history.  Kyle Schei and John Wantz (together, the "Individual Plaintiffs"), along with Network Apps, LLC ("Network Apps," and collectively with Schei and Wantz, "Plaintiffs"), commenced this action against AT&T Mobility LLC ("AT&T Mobility") and AT&T Services, Inc. (collectively, "AT&T" or "Defendants"), asserting claims for breach of contract, patent infringement, and correction of inventorship arising out of AT&T's alleged misuse and infringement of Plaintiffs' patented technology to connect customers' smart devices.  Defendants have moved to dismiss the operative complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), alleging that (i) Plaintiffs lack standing to bring any of the claims in this action; (ii) Plaintiffs' breach of contract claim is time-barred; (iii) Plaintiffs were contractually required to first attempt to resolve their breach of contract

claim through alternative dispute resolution; and (iv) Plaintiffs cannot state a viable claim for patent infringement. For the reasons that follow, the Court grants Defendants' motion to dismiss as to Plaintiffs' breach of contract and patent infringement claims, and denies it as to their correction of inventorship claim.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Parties to the Suit**

Plaintiff Network Apps is a Washington limited liability company with its principal place of business in Seattle, Washington. (Compl. ¶ 6.) Its managing members are Plaintiffs Kyle Schei and John Wantz, who are residents of Washington and Texas, respectively. (*Id.* ¶¶ 6-8.) Network Apps purports to be the assignee and owner of all assets previously owned by Mya Number, Corp. ("Mya Number"), a now-defunct telecommunications technology company formerly incorporated in Washington. (*Id.* ¶¶ 6, 21).

**2.    AT&T and Mya Number's Efforts to Develop "Twinning Technology"**

In November 2012, Defendants contracted with Mya Number to integrate its myaNumber-for-Families™ technology into AT&T's telecommunications

---

[1]    This Opinion draws its facts primarily from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for the purposes of this Opinion, and the exhibits attached thereto, including U.S. Patent No. 9,438,728 (the "'728 Patent" (Dkt. #1-1)), and U.S. Patent No. 9,723,462 (the "'462 Patent" (Dkt. #1-2)). The Court draws additional facts from: (i) the Declaration of Kaiwei Tang in support of Defendants' motion to dismiss ("Tang Decl." (Dkt. #132)); (ii) the Declaration of Joshua Yin in support of Defendants' motion to dismiss ("Yin Decl." (Dkt. #133, 135)) and the exhibits attached thereto, including the Professional Services Agreement (the "PSA" (Dkt. #135-1)) between AT&T and Mya Number, LLC ("Mya Number") and the related Statement of

2

offerings through a Limited Application Programming Interface Usage Agreement (the "Interface Agreement"). (Compl. ¶ 23). Additionally, AT&T asked Mya Number to participate as a "Showcase Developer" at various marketing events, at which Mya Number would discuss how developers could successfully integrate its applications into AT&T's offerings. (*Id.* ¶¶ 23-24).

At the time, smart watches, tablets, and similar technology were on the rise. However, technology providers had difficulty syncing customer devices such that one's phone, watch, tablet, and other smart devices would ring and operate as one integrated unit. (Compl. ¶ 2). Instead, a user required separate phone numbers for each device. (*Id.* ¶ 25). Hoping to solve this issue, AT&T Mobility Executive Director Ed Schmit and AT&T employee Kari Tillman contacted Mya Number on October 7, 2013, to discuss the possibility of

---

Work ("SOW" (Dkt. #135-3, 135-4)), the Intellectual Property Acquisition Agreement between Mya Number Corp. (also "Mya Number") and Light Phone, Inc. ("Light Phone Assignment" (Dkt. #135-8)), Light Phone's Settlement Agreement and Mutual Release with Mya Number ("Light Phone Settlement" (Dkt. #135-9)), Mya Number's assignment to Schei and Wantz ("Schei and Wantz Assignment" (Dkt. #133-8)), Schei and Wantz's assignment to Network Apps ("Network Apps Assignment" (Dkt. #133-9)), the March 1, 2021 letter from Lincoln Popp to Plaintiffs ("Popp March 1, 2021 Letter" (Dkt. #135-11)), and the April 30, 2021 letter from Lincoln Popp to Plaintiffs ("Popp April 30, 2021 Letter" (Dkt. #135-12)); (iii) the Declaration of Kyle Schei in opposition to Defendants' motion to dismiss ("Schei Decl." (Dkt. #139, 142)) and the exhibits attached thereto, including the Plan of Complete Liquidation and Dissolution of Mya Number ("Plan of Dissolution" (Dkt. #142-9)) and the Unanimous Joint Consent Resolutions of the Board of Directors and Shareholders of Mya Number ("Shareholder Consent Resolution Agreement" (Dkt. #142-10)); (iv) the Declaration of John Wantz in opposition to Defendants' motion to dismiss ("Wantz Decl." (Dkt. #140, 143)); and (v) the Declaration of Joshua Yin in further support of Defendants' motion to dismiss ("Yin Reply Decl." (Dkt. #147, 149)) and the exhibits attached thereto. Other facts sourced from declarations and their accompanying exhibits are cited using the convention "[Name] Decl., Ex. [ ]."

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #131); to Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #138); and to Defendants' reply memorandum as "Def. Reply" (Dkt. #146).

developing what would become known as the "Twinning Solution,"
"NumberSync," "NDA 34," or "myaNUMBER," a technology devised to "twin" a
user's phone number and sync it to each of the user's various devices.  (*Id.*; *see
also id.*, Ex. 3).

     In November 2013, in furtherance of that effort, AT&T and Mya Number
entered into several three-way non-disclosure agreements ("NDAs") with
original equipment manufacturers, commonly referred to as "OEMs."  (Compl.
¶ 26).  Each agreement provided that the parties thereto could ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████  (*Id.*).  Pursuant to the NDAs
and the Interface Agreement, Mya Number retained the rights to all patents,
copyrights, trade secrets, and other confidential and proprietary information it
developed as part of the Twinning Solution.  (*Id.* ¶ 29).

     Under the direction of the Individual Plaintiffs, who were then Mya
Number executives, Mya Number developed the Twinning Solution at some
point between November 2013 and January 2014.  (Compl. ¶¶ 28, 30).  As
described by Plaintiffs, the Twinning Solution enabled users to receive
messages and calls seamlessly across multiple devices using the cellular
network, irrespective of their distance from each other.  (*Id.* ¶ 28).  The
Twinning Solution comprised various platforms, including NumberSync
Grouping, Call Delivery, and Messaging Services, as well as software
development kits, an Android application packaged for OEM hardware

integration, executable and non-executable code, and an end-user interface to connect the various platforms to the AT&T network and OEM hardware.  (*Id.* ¶ 29).

On January 8, 2014, Mya Number successfully demonstrated the Twinning Solution technology to senior AT&T members and OEM hardware leadership.  (Compl. ¶ 30).  Following the presentation, Mya Number, LLC (also "Mya Number") entered into a Professional Services Agreement (the "PSA") and an Initial Statement of Work (the "SOW") with AT&T on June 27, 2014.  (*Id.* ¶ 31; *see generally* PSA; SOW).  Among other things, the PSA ███████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████ (Compl. ¶ 31; PSA § 9). Furthermore, the PSA provided ██████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████ (Compl. ¶ 31; PSA § 24).

The SOW outlined the terms pursuant to which █████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ (Compl. ¶ 32).  The SOW further provided that ██████████████████████ ████████████████████████████████████████████████████



(*Id.*; SOW § 5(a)). Furthermore, the SOW provided that ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ (Compl. ¶ 33; SOW, Ex. 7 at 41). Plaintiffs further allege that AT&T agreed to pay royalty fees of $1 per user per month. (Compl. ¶ 2). Both the PSA and the SOW also included mandatory dispute resolution clauses, specifying ████████████████████████████████████ ██████████. (PSA § 28 (███████████████████████████ ████████████████████████████████████████); SOW 1 (noting that ████████████████████████████████)).

### 3. Difficulties in the Business Relationship

Plaintiffs allege that, beginning in the fall of 2014, AT&T took issue with the cost of project royalties and fees related to its licensing of the Twinning Solution. (Compl. ¶ 41). AT&T sent teams of lawyers to negotiate with Mya Number, with a view toward reducing the royalties and transferring the rights to the Twinning Solution to AT&T. (*Id.*). Mya Number was unwilling to negotiate and on October 23, 2014, AT&T informed Mya Number that it would "no longer be pursuing the launch of the [Twinning Solution] service." (*Id.*; *see also id.*, Ex. 6 ("AT&T Termination Email")). In the same email, AT&T thanked Mya Number for its work, without which AT&T "wouldn't have come as far as [it] did." (*Id.* ¶ 41; AT&T Termination Email). Four days later, on October 27,

2014, Mya Number applied for a patent for the Twinning Solution, which application was granted on September 6, 2016, by the U.S. Patent and Trademark Office as U.S. Patent No. 9,438,728 (the "'728 Patent"). (*Id.* ¶ 34; *see generally* '728 Patent).

Despite the seemingly final language of the AT&T Termination Email, the Individual Plaintiffs continued to correspond with AT&T personnel through at least January 2015. Both were copied on at least one email from AT&T personnel in November 2014 to schedule a meeting regarding "NDA 34," AT&T's internal codename for the Twinning Solution. (Schei Decl. ¶ 6; *id.*, Ex. E). Additionally, AT&T personnel emailed Schei on December 8, 2014, to ensure Mya Number's continued compliance with the terms of the SOW. (*Id.* ¶ 6; *id.*, Ex. F). And in January 2015, Schei and Schmit corresponded regarding a conversation the two parties had had earlier in the month. (*Id.* ¶ 7; *id.*, Ex. G).

### 4. The Chain of Assignments

On February 2, 2015, the Washington Secretary of State administratively dissolved Mya Number due to its failure to file an annual list of officers and pay license renewal fees. (Yin Decl., Ex. 6). In August 2015, hearing nothing from Defendants regarding their intention to move forward with the Twinning Solution, Mya Number and the Individual Plaintiffs entered into a memorandum of understanding (the "MOU") with Light Phone, Inc. ("Light Phone") for the latter's acquisition of certain intellectual property owned by Mya Number — namely, Mya Number's "call management platform." (Schei

7

Decl. ¶ 8; *id.*, Ex. H).  In September 2015, Light Phone entered into an Intellectual Property Acquisition Agreement with Mya Number for "all of [its] right, title[,] and interest in and to Mya Number Technology" (the "Light Phone Assignment"), which the Individual Plaintiffs understood to refer to the Twinning Solution, the '728 Patent, and related patent infringement and trade secret claims.  (Schei Decl. ¶ 8; Light Phone Assignment).

Light Phone and Mya Number ultimately realized that they were not a match and terminated their business relationship.  (Schei Decl. ¶ 8).  On August 31, 2016, Light Phone and Mya Number entered into a Settlement Agreement and Mutual Release (the "Light Phone Settlement"), through which Light Phone reconveyed assets back to Mya Number, including the application for the '728 Patent and any resulting patent.  (Light Phone Settlement).  Attached as Exhibit C to the Light Phone Settlement was a patent assignment, which included "all causes of action and other rights to sue for and remedies against past, present[,] and future infringements …, together with the right to collect damages therefor[.]"  (*Id.*, Ex. C).

On November 17, 2016, the Individual Plaintiffs formed Network Apps. (Yin Decl., Ex. 7).  On November 30, 2016, Mya Number and the Individual Plaintiffs executed a Plan of Complete Liquidation and Dissolution of Mya Number (the "Plan of Dissolution"), together with 9Mile Fund III, LLC, the only other shareholder in Mya Number ("9Mile," and collectively with the Individual Plaintiffs, the "Shareholders").  (Plan of Dissolution).  The Plan of Dissolution provided that Mya Number would first pay its creditors, and then assign and

transfer all remaining assets to the Individual Plaintiffs. (Plan of Dissolution § 6). On December 1, 2016, the Shareholders signed the Unanimous Joint Consent Resolutions of the Board of Directors and Shareholders of Mya Number Corp., Inc., In Lieu of Special Meetings (the "Shareholder Consent Resolution Agreement"), which recited that the Board of Directors — namely, the Individual Plaintiffs — had unanimously "determine[d] it to be in the best interests of the Corporation for the Corporation to dissolve and distribute all of its assets to the founding shareholders of the Corporation[,]" *i.e.*, the Individual Plaintiffs, as a means of executing the Plan of Dissolution. (Shareholder Consent Resolution Agreement § 1). All Shareholders approved the Resolution.

On December 1, 2016, Mya Number assigned to the Individual Plaintiffs the '728 Patent and all causes of action it previously held. (Yin Decl., Ex. 8 at 4, 9 (Schei and Wantz Assignment)). The following day, the Individual Plaintiffs assigned these rights to Network Apps, LLC (the "Network Apps Assignment"). (Compl. ¶ 51; Network Apps Assignment § 1, Ex. A).

### 5. The Conduct at Issue

In or around October 2015, AT&T announced "AT&T NumberSync," a product Plaintiffs allege to be a replica of the Twinning Solution. (Compl. ¶ 42). Worse yet, Plaintiffs allege that the product was developed, in part, by former members of the Twinning Solution team, each of whom had acquired information about Mya Number's technology and then unlawfully used such information in violation of the parties' agreements. (*Id.* ¶ 43). Undaunted, Defendants filed a patent application entitled "Cloud-Based Device Twinning"

on November 7, 2014, which application was granted on August 1, 2017, as

U.S. Patent Number 9,723,462 (the "'462 Patent").  (*Id.* ¶ 45).[2]  Jayanta Das

and Ed Schmit, the AT&T Mobility Executive Director who had initially solicited

the Individual Plaintiffs to develop the Twinning Solution, were listed as sole

inventors on the patent.  (*Id.*).  To date, AT&T has neither assigned the '462

Patent and its related family of patents to Plaintiffs, nor paid royalties, license

fees, or maintenance fees to Plaintiffs.  (*Id.* ¶¶ 47-48, 56-57; *id.* at 23 § VI

(Prayer for Relief)).

## B.    Procedural Background

On December 3, 2016, Network Apps sued Defendants in the United

States District Court for the District of Washington, alleging nearly identical

breach of contract and patent infringement claims to those in the instant suit,

as well as copyright infringement and misappropriation of trade secrets claims.

(Compl. ¶ 68; *see also* Redacted Amended Complaint, *Network Apps LLC* v.

*AT&T Inc.*, No. 2:16 Civ. 1852 (TSZ) (W.D. Wash. Dkt. #32)).[3]  Defendants filed

a motion to dismiss the Washington complaint or, alternatively, to transfer the

case to this Court on March 13, 2017; their motion echoed many of the

arguments now before the Court.  (W.D. Wash. Dkt. #25).  Network Apps then

moved to dismiss the Washington case on April 12, 2017 (W.D. Wash. Dkt.

---

[2]    The Court takes judicial notice of both the '462 and '728 Patents.  *See Kaplan, Inc.* v.
*Yun*, 16 F. Supp. 3d 341, 345 (S.D.N.Y. 2014) ("the Court may take judicial notice of
official records of the United States Patent and Trademark Office (PTO)").

[3]    Although the complaint was first filed in the Western District of Washington on
December 3, 2016, it is sealed.  (*See* W.D. Wash. Dkt. #1 (complaint), 31 (direction to
Clerk of Court to seal complaint)).  As such, the Court references Network Apps's
redacted amended complaint filed on March 20, 2017.  (W.D. Wash. Dkt. #32).

#33), which motion the court construed as a notice of voluntary dismissal without prejudice (W.D. Wash. Dkt. #34).

Nearly four years later, on January 26, 2021, Plaintiffs commenced the instant suit with the filing of a Complaint asserting claims for breach of contract under state law, patent infringement pursuant to 35 U.S.C. § 271, and correction of inventorship pursuant to 35 U.S.C. § 256. (Dkt. #1). Defendants filed three pre-motion letters on April 5, 2021, each requesting a conference to discuss an anticipated motion to dismiss, to disqualify Plaintiffs' counsel, and to obtain limited and expedited discovery. (Dkt. #46-48). Plaintiffs filed their oppositions to Defendants' pre-motion letters on April 8, 2021. (Dkt. #51-53).

On April 9, 2021, the Court converted a previously-scheduled initial pretrial conference to a pre-motion conference. (Dkt. #54). That conference was held on April 28, 2021, during and after which the Court determined that it needed first to resolve Defendants' motion to disqualify Plaintiffs' counsel before deciding the other motions; it set a briefing schedule for the motions and granted Defendants' request for limited discovery as to the disqualification issue alone. (*See* Minute Entry for April 29, 2021; Dkt. #60). The Court denied the disqualification motion on April 14, 2022. (Dkt. #124). *See Network Apps, LLC* v. *AT&T Mobility LLC, et al.*, 598 F. Supp. 3d 118 (S.D.N.Y. 2022).

On April 20, 2022, pursuant to the Court's order, the parties filed a joint letter in which Defendants again requested leave to conduct limited discovery on the antecedent issue of Plaintiffs' standing to bring this action. (Dkt. #125). The Court granted Defendants' request on April 22, 2022, and set a briefing

schedule for Defendants' motion to dismiss.  (Dkt. #126).  Following the close of

such discovery, Defendants filed their motion to dismiss and accompanying

papers on June 24, 2022.  (Dkt. #130-135).  Plaintiffs filed their opposition and

accompanying papers on July 25, 2022 (Dkt. #138-143), and Defendants filed

their reply and supporting declaration on August 8, 2022 (Dkt. #146-149).

On March 22, 2023, the Court filed and provided to the parties an

unredacted copy of this Opinion under seal and allowed the parties to propose

redactions in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d

110 (2d Cir. 2006).  On or before **April 21, 2023**, the parties shall file a joint

letter suggesting redactions to the Opinion.  Taking the parties' suggestions

into consideration, the Court will then file a redacted version of the Opinion on

the public docket.

## DISCUSSION

### A.    The Standards of Review

Defendants move to dismiss the Complaint in its entirety pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  "The standards of review

for a motion to dismiss under Rule 12(b)(1) for lack of subject matter

jurisdiction and under 12(b)(6) for failure to state a claim are substantively

identical.  In deciding both types of motions, the Court must accept all factual

allegations in the complaint as true, and draw inferences from those allegations

in the light most favorable to the plaintiff."  *O'Neill* v. *Standard Homeopathic

Co.*, 346 F. Supp. 3d 511, 520 (S.D.N.Y. 2018) (internal quotation marks and

citation omitted).  However, "[i]n contrast to the standard for a motion to

dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting

subject matter jurisdiction has the burden of proving by a preponderance of

the evidence that [jurisdiction] exists." *Sobel* v. *Prudenti*, 25 F. Supp. 3d 340,

352 (E.D.N.Y. 2014) (internal quotation marks omitted); *accord McCray* v. *Lee*,

No. 16 Civ. 1730 (KMK), 2017 WL 2275024, at *2 (S.D.N.Y. May 24, 2017).

### 1.    Federal Rule of Civil Procedure 12(b)(1)

When presented with a motion to dismiss under Rule 12(b)(1) for lack of

subject matter jurisdiction, and a motion to dismiss on other grounds, the

Court must first consider whether it has subject matter jurisdiction to consider

the merits of the action. *See Rhulen Agency, Inc.* v. *Ala. Ins. Guar. Ass'n*, 896

F.2d 674, 678 (2d Cir. 1990). "Determining the existence of subject matter

jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack

of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks

the statutory or constitutional power to adjudicate it." *Morrison* v. *Nat'l Austl.*

*Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks

omitted), *aff'd*, 561 U.S. 247 (2010).

While a district court resolving a motion to dismiss under Rule 12(b)(1)

"must take all uncontroverted facts in the complaint ... as true, and draw all

reasonable inferences in favor of the party asserting jurisdiction," "where

jurisdictional facts are placed in dispute, the court has the power and

obligation to decide issues of fact by reference to evidence outside the

pleadings, such as affidavits," in which case "the party asserting subject matter

jurisdiction has the burden of proving by a preponderance of the evidence that

13

it exists." *Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239,

243 (2d Cir. 2014) (alteration adopted and internal quotation marks

omitted); *see also Ray Legal Consulting Grp.* v. *Gray*, 37 F. Supp. 3d 689, 696

(S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested[,] a district

court is permitted to consider evidence outside the pleadings, such as affidavits

and exhibits.").

### 2.    Federal Rule of Civil Procedure 12(b)(6)

A court resolving a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6) should "draw all reasonable inferences in [a] [p]laintiff['s]

favor, assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life

Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation

omitted).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v.

*Twombly*, 550 U.S. 544, 570 (2007)).  While the plausibility requirement "is not

akin to a 'probability requirement' ... it asks for more than a sheer possibility

that a defendant has acted unlawfully." *Id.*  Toward that end, a plaintiff must

provide more than "an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Id.*  Moreover, "[w]here a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550

U.S. at 557).

14

The Second Circuit has clarified the documents that a court may consider in this procedural context:

> "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico* v. *Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). For a document to be considered integral to the complaint, the plaintiff must "rel[y] on the terms and effect of a document in drafting the complaint ... mere notice or possession is not enough." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). And "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and it must be clear that "there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco*, 622 F.3d at 111 (quoting *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

*United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).

### 3. Choice of Law as to State Law Claims

A federal court adjudicating a supplemental state law claim applies the choice of law rules of the forum state. *See N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 43 (2d Cir. 1999). "Under New York law, 'courts will generally enforce choice-of-law clauses,' ... because 'contracts should be interpreted so as to effectuate the parties' intent.'" *AEI Life LLC* v. *Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) (quoting *Ministers & Missionaries Benefit Bd.* v.

*Snow*, 26 N.Y.3d 466, 470 (2015)).  "While there is no magical incantation that parties must utter to create an effective choice-of-law provision, the clause must clearly manifest the parties' intent to be governed by the laws of a particular jurisdiction."  *Id.* (citing *Welsbach Elec. Corp.* v. *MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006)).  Here, the parties agree that the ███████████ ████████████████████████████████████████████ (PSA § 6). Furthermore, the parties agree that Washington law governs the present dispute.  (*See* Def. Br. 13; Pl. Opp. 13).

**B.      The Court Denies Defendants' Rule 12(b)(1) Motion to Dismiss Plaintiffs' Breach of Contract and Patent Infringement Claims for Lack of Standing**

Defendants advance three interrelated arguments regarding Plaintiffs' standing to sue for breach of contract and patent infringement: (i) Mya Number's assignment of the '728 Patent to the Individual Plaintiffs was void on its face; (ii) Mya Number was administratively dissolved nearly two years prior to the assignment to the Individual Plaintiffs (and the Individual Plaintiffs' subsequent assignment to Network Apps), rendering these assignments invalid under Washington law; and (iii) Mya Number previously assigned away its breach of contract claim to Light Phone.  (Def. Br. 14).  After a careful review of the record in this case and the applicable law, the Court concludes that Plaintiffs have standing to bring their breach of contract and patent infringement claims.[4]

---

[4]      Defendants also argue that Plaintiffs' scrivener's error in the Complaint in referring to Mya Number, Inc. instead of Mya Number LLC or Mya Number Corp. warrants dismissal for lack of standing.  (Def. Br. 13-14).  The Court disagrees.  Plaintiffs offered

16

### 1.    The Schei and Wantz Assignment Is Not Facially Void

To begin, Defendants argue that the Schei and Wantz Assignment — one of two assignments pursuant to which Plaintiffs bring their claims for breach of contract and patent infringement — is facially void for lack of consideration. (Def. Br. 14-15). The text of the Assignment provides that the Individual Plaintiffs agreed to "exchange and redeem with [Mya Number] all issued and outstanding shares of each Assignee [(Shei and Wantz)] ... in exchange for all right, title[,] and interest of [Mya Number] in and to [the Twinning Solution and related '728 Patent]." (Schei and Wantz Assignment § 1). Defendants deem this language to be nonsensical, inasmuch as the Individual Plaintiffs are not corporate entities and "do not have 'shares' in themselves to exchange and redeem." (Def. Br. 15). But Defendants' overly literal interpretation is just as nonsensical. As Plaintiffs explain, and as this Court sees no basis to dispute, the Individual Plaintiffs agreed to redeem their issued and outstanding shares of stock in Mya Number in exchange for the patent assignment, not to somehow redeem their shares in themselves. (*See* Pl. Opp. 15). Despite Defendants' arguments to the contrary, there is no term in the Schei and Wantz Assignment that is "so indefinite that [this] Court cannot decide just what it means[.]" (Def. Br. 15 (citing *Willard* v. *Addink*, No. 35861-5-III (LB),

---

to amend their complaint to fix this error during the Court's April 29, 2021 pre-motion conference, at which time Defendants noted that, while amending would "eliminate one initial head-scratcher regarding Inc. versus Corp., ... the problems with the chain of title and other reasons why there's no standing are really deeper than that and would not be resolved by ... amendments[.]" (Dkt. #61 at 7-8). Because Plaintiffs offered to cure this defect and Defendants demurred, the Court is unwilling to penalize Plaintiffs on that ground.

2019 WL 1786091, at *5 (Wash. Ct. App. Apr. 23, 2019) (internal quotation marks omitted))).  As such, the Court finds the Schei and Wantz Assignment to be facially valid.

### 2. The Schei and Wantz Assignment and Network Apps Assignments Were Valid When Issued

As a second line of attack, Defendants allege that both the Schei and Wantz Assignment and the ensuing Network Apps Assignment are void because Mya Number's administrative dissolution nearly two years earlier rendered both assignments nugatory.  Here, too, the Court disagrees.[5]

To review, Mya Number was administratively dissolved by the Washington Secretary of State on February 2, 2015, due to its failure to file an

---

[5]     Perhaps theorizing that the best defense is a good offense, Plaintiffs contend that *Defendants* lack standing to challenge Plaintiffs' standing on this basis, noting that only a creditor or shareholder may challenge the validity of an assignment.  (Pl. Opp. 18-21).  On this point, Plaintiffs are incorrect.  *See, e.g.*, *Pelican Equity, LLC* v. *Brazell*, No. 09 Civ. 5927 (NRB), 2010 WL 3377452, at *1 (S.D.N.Y. Aug. 17, 2010) (holding that all defendants, irrespective of their relation to the assignment, had standing to challenge plaintiff's standing); *see also Fund Liquidation Holdings LLC* v. *Citibank, N.A.*, 399 F. Supp. 3d 94, 99 (S.D.N.Y. 2019) ("Although defendants are not parties to the [assignment], such a challenge is clearly appropriate, where, as here, defendants face legal liability based on claims asserted pursuant to the assignment." (citing *DNAML Pty, Ltd.* v. *Apple Inc.*, No. 13 Civ. 6516 (DLC), 2015 WL 9077075, at *5 (S.D.N.Y. Dec. 16, 2015))), *vacated on other grounds*, 991 F.3d 370 (2d Cir. 2021).  Plaintiffs also cite to various cases and to provisions of the Washington Business Corporation Act, but none of their cites applies to standing challenges under Washington Revised Code ("RCW") § 23B.14.050.  (*See* Pl. Opp. 18-21 (citing, *e.g.*, *Spokane Concrete* v. *U.S. Bank*, 126 Wash. 2d 269 (1995) (describing trustee's attempt to avoid note related to leveraged buyout as having been executed *ultra vires*); RCW § 23B.03.040(2) (discussing defense of *ultra vires*); *Granite Equip. Leasing Corp.* v. *Hutton*, 84 Wash. 2d 320, 327 (1974) (same))).

Plaintiffs' assertion that this Court must apply the business judgment rule is similarly misplaced.  (Pl. Opp. 20).  "Under the business judgment rule, corporate management is immunized from liability in a corporate transaction where ([i]) the decision to undertake the transaction is within the power of the corporation and the authority of management, and ([ii]) there is a reasonable basis to indicate that the transaction was made in good faith."  *McCormick* v. *Dunn & Black, P.S.*, 140 Wash. App. 873, 887 (Ct. App. 2007).  Here, Defendants are merely arguing that Plaintiffs do not have standing based on an

annual list of officers and pay license renewal fees.  (Yin Decl., Ex. 6).

Washington law provides that:

> A dissolved corporation ... may not carry on any business *except that appropriate to wind up and liquidate its business and affairs*, including ... [d]isposing of its properties that will be applied toward satisfaction or making reasonable provision for satisfaction of its liabilities .... [and] [s]atisfying or making reasonable provision for satisfying its liabilities, in accordance with their priorities as established by law.

Wash. Rev. Code ("RCW") § 23B.14.050 (1)(b)-(c) (emphasis added).  "Generally, 'winding' up includes the collection of assets, disposing of assets, satisfaction of liabilities, and distribution of property to shareholders."  *Burke* v. *Hill*, 190 Wash. App. 897, 903 (Ct. App. 2015) (citing RCW § 23B.15.050(1)(a)-(e)).  As part of the winding-up process, Washington law allows for the following:

> (3) A dissolved corporation's board of directors may make a determination that reasonable provision for the satisfaction of any liability, ... has been made by means of ... contractual assumption thereof by a solvent person, or any other means, that the board of directors determines is reasonably calculated to provide for satisfaction of the reasonably estimated amount of such liability[;]
>
> ***
>
> (5) Corporate actions to be approved by a[n administratively dissolved] corporation ... may be approved by the corporation's board of directors and, if required, by its shareholders .... [and a] special meeting of the shareholders for purposes of approving any corporate action required or permitted to be approved by shareholders ... may be called by any person who

---

invalid assignment.  As such, there is no liability through which Plaintiffs must be immunized, and the business judgment rule does not apply.

> was an officer, director, or shareholder at the effective
> date of the dissolution.

RCW § 23B.14.050(1), (3), (5); *see Equipto Div. Aurora Equip. Co.* v. *Yarmouth*,
134 Wash. 2d 356, 365 (1998) (noting that "a corporation's existence does
continue after dissolution, albeit in a very narrow, restricted sense").  Actions
by a dissolved corporation that do not constitute winding-up are invalid.  *See*
RCW § 23B.14.050.

Defendants' challenge to Plaintiffs' standing depends on whether this
Court can conclude, as a matter of law, that the two assignments were not part
of the winding-up process.  It cannot.  On November 30, 2016 — approximately
a year and a half after Mya Number was administratively dissolved — its
Shareholders executed a Plan of Dissolution, which provided that Mya Number
would first pay its creditors, and then assign and transfer all remaining assets
to the Individual Plaintiffs, subject to all liabilities of Mya Number.  (Pl. Opp. 5;
Plan of Dissolution § 6).  The next day, the Shareholders signed the
Shareholder Consent Resolution Agreement, which distributed Mya Number's
assets to the Individual Plaintiffs as a means of executing the Plan of
Dissolution.  (Shareholder Consent Resolution Agreement).  Furthermore, and
as relevant to the Court's analysis, the Shareholders executed a release
agreement, which outlined the process and priorities through which creditors
and shareholders would receive proceeds from the sale or disposal of Mya
Number assets, including the '728 Patent.  (Yin Decl., Ex. 17).  The agreement,
as with the other agreements executed by the Shareholders at this time,

provides that the creditors were to be paid first, and any remaining proceeds were to be distributed among the Shareholders.  (*Id.* at 1-2).

Defendants argue that Mya Number's assignment to the Individual Plaintiffs was void because it was not done as a means of satisfying outstanding debts to creditors, and did not otherwise qualify as a "winding up" of Mya Number's affairs.  (Def. Br. 16-19).  In addition to the agreements just discussed, Defendants cite to two 2021 letters to Plaintiffs from Lincoln Popp, the seniormost creditor of Mya Number, in which Popp notes that he has yet to be paid.  (*Id.* at 18 (citing Popp March 1, 2021 Letter; Popp April 30, 2021 Letter)).  Separately, Defendants note that Washington law prohibits a shareholder distribution that would result in insolvency, and argue that the Schei and Wantz Assignment contravened that law.  (*Id.* at 19-20 (citing RCW §§ 23B.14.050(1)(d), 23B.06.400([3])(b))).  On this point, Defendants cite to an email from Schei to 9Mile on November 23, 2016, wherein Schei notes that (i) "[Mya Number's] liabilities are greater" than its assets; (ii) neither Light Phone nor anyone else was interested in buying Mya Number's intellectual property; (iii) Mya Number's assets "have sat on a shelf for a long time and [the Individual Plaintiffs] have not been successful commercializing them with a carrier nor a startup"; and (iv) "[the Individual Plaintiffs] are going to have to deal with outstanding creditors on our own."  (*Id.* at 19-20; Yin Decl., Ex. 20)).

Defendants misperceive both the relevant law and the record.  To be sure, Washington law provides that a shareholder distribution cannot be made if:

> after giving it effect … [t]he corporation's total assets
> would be less than the sum of its total liabilities …
> the amount that would be needed, if the corporation
> were to be dissolved at the time of the distribution, to
> satisfy the preferential rights upon dissolution of
> shareholders whose preferential rights are superior to
> those receiving the distribution.

RCW § 23B.06.400(3)(b).  However, subsection eight of the same provision

provides that "[a] transfer of the assets of a dissolved corporation to a trust or

other successor entity of the type described in RCW § 23B.14.030(4)

constitutes a distribution subject to subsection (3) of this section *only when*

*and to the extent that the trust or successor entity distributes assets to*

*shareholders.*"  *Id.* § 23B.06.400(8) (emphasis added); *see also id.*

§ 23B.14.030(4) (describing the applicable successor entity as one to which the

remaining assets of a dissolved corporation are transferred subject to that

corporation's liabilities for purposes of liquidation).  In other words, a

corporation may assign its assets to a successor entity if that entity uses the

proceeds to clear all liabilities, as opposed to simply distributing assets to

shareholders at the expense of such liabilities.

It is clear from the terms of the Plan of Dissolution and the Shareholder

Consent Resolution Agreement that Plaintiffs assigned the '728 Patent and all

related rights to the Individual Plaintiffs as a means of ensuring that all

creditors were paid.  As Schei noted in his November 23, 2016 email, there

were no buyers at the time for the '728 Patent and the Individual Plaintiffs were

likely to have to pay creditors out of pocket.  Taking this assertion as true, as it

must at this stage of the litigation, the Court reasonably infers that each

22

assignment was done as part of the "winding up" of Mya Number in accordance with Washington state law.

Defendants rely heavily on *Cave Man Kitchens Inc.* v. *Caveman Foods LLC* for support, but that case is plainly inapposite. No. 18 Civ. 1274 (TSZ), 2020 WL 6874238 (W.D. Wash. Nov. 23, 2020). There, a company was administratively dissolved in 2011; seven years later, the former president signed a *nunc pro tunc* assignment, transferring the company's interest in a registered mark to plaintiff, who then filed suit against the defendant. *Id.* at *2. The *Cave Man* court dismissed the relevant claims, finding that plaintiff lacked standing because the assignment was invalid as a matter of Washington state law. *Id.* at *5. Unsurprisingly, the court found that "[n]o evidence indicate[d] that the former president assigned [p]laintiff the mark in order to 'wind up' or 'liquidate' the business affairs of the corporation seven years after its dissolution, or that the former president was authorized to do so." *Id.* Here, by contrast, the Board of Directors of Mya Number jointly agreed to the relevant assignment pursuant to RCW §§ 23B.14.050(1), (3), (5); devised a plan for winding up Mya Number's assets and paying creditors their due; and executed documentation indicating as such. Furthermore, these documents are not mere *post hoc* rationalizations like the assignment in *Caveman*, but rather were executed close in time to Mya Number's dissolution. The Court finds the two assignments to have been validly issued.

### 3.  Mya Number Did Not Transfer for All Time Its Rights to Bring a Breach of Contract Claim Against AT&T

In their third standing challenge, Defendants allege that Mya Number could not possibly have assigned its rights to bring a breach of contract claim to the Individual Plaintiffs, because it had already assigned those rights to third party Light Phone.  (Def. Br. 15-16).  At this stage in the litigation, however, the Court finds that the Individual Plaintiffs have standing to proceed with a breach of contract claim.

By way of background, on September 28, 2015, Mya Number entered into the Light Phone Assignment, but which it agreed to:

> irrevocably grant[], sell[], transfer[], convey[], assign[] and deliver[] to Light Phone all of Mya Number's right, title and interest in and to Mya Number Technology, together with all causes of action and other rights to sue for and remedies against past, present and future infringements thereof, together with the right to collect damages therefore, ... and all rights to seek protection of interest therein under the laws of any jurisdiction worldwide[.]

(Light Phone Assignment ¶ 2.1).  "Mya Number Technology" is defined as "Mya Number Patents, In-Licenses, Mya Number Other IP and Mya Number Know-How" (*id.* ¶ 1.7), and includes:

- All "techniques, technology, trade secrets, inventions (whether patentable or not), methods, know-how, data and results, analytical and quality control data and results, regulatory documents, and other information" controlled by Mya Number (*id.* ¶¶ 1.3, 1.4 (defining "Know-How" and "Mya Number Know-How"));

- All provisional and non-provisional patents and patent applications controlled by Mya Number as of September 28, 2015 and thereafter (*see id.* ¶¶ 1.6, 1.9 (defining "Mya Number Patents" and "Patent Rights"));

- ▪ "[E]ach contract or agreement under which Mya Number is bound or to which Mya Number is a party, as of [September 28, 2015,] and thereafter, and under which Mya Number licenses any Know-How or Patent Rights from a third party[,]" which includes those contracts and agreements listed on Exhibit A to the Light Phone Assignment, each of which comprised "[a]ll In-Licenses in effect as of [September 28, 2015]" (*id.* ¶ 1.2 (defining "In-License")); and

- ▪ All "original works of authorship in any medium of expression, whether or not published," and related intellectual property not covered by Mya Number Patents, In-Licenses, or Know-How (*id.* ¶ 1.8 (defining "Other IP")).

The parties agree that Exhibit A of the Light Phone Assignment does not include "*any* contracts or licenses" (Def. Reply 7), let alone the PSA or other contracts related to the development of the Twinning Solution (*id.*; *see also* Pl. Opp. 16 (noting that Exhibit A "did not include or reference [the PSA or other agreements related to the Twinning Solution]")).  However, Defendants assert that the Light Phone Assignment "did not limit the transferred contracts to those listed on Exhibit A" (Def. Reply 7), and that "[d]iscovery showed that Mya Number assigned away its breach of contract claim to Light Phone and never got it back" (*id.* at 5; *see also* Def. Br. 16 (noting that Mya Number assigned its breach of contract rights to Light Phone)).  At this stage in the litigation, the Court cannot find that Mya Number assigned for all time the right to sue for breach of contract to Light Phone.

To begin, the language of the Light Phone Assignment unambiguously states that "[a]ll In-Licenses in effect as of [September 28, 2015,] are listed on Exhibit A." (Light Phone Assignment ¶ 1.2).  Thus, to the extent that the PSA,

NDAs, SOW, and related agreements arising out of Mya Number's dealings with AT&T regarding the Twinning Solution were not included in Exhibit A, they did not constitute "In-License[s]" subject to the assignment to Light Phone. For this reason alone, the Court finds that Mya Number never assigned away its right to bring the instant breach of contract claim.

However, even if the Light Phone Assignment were read to include the right to sue under the relevant agreements, the Court finds the Assignment's language defining "In-Licenses" to be sufficiently ambiguous to foreclose dismissal of the claim on standing grounds at this time. As to this particular issue, Defendants argue that the PSA between Mya Number and AT&T constitutes a "contract or agreement under which Mya Number is bound or to which Mya Number is a party … [in] which Mya Number licenses … Know-How," including, as relevant here, AT&T data. (Light Phone Assignment § 1.2 (defining "In-License[s]")). Indeed, the PSA specifically states that ██████████ ████████████████████████████████████████████████████████ (PSA § 4(B)(2)). Setting the Exhibit A issue aside, Defendants maintain that Mya Number assigned its right to sue for breach of contract arising under the PSA in the Light Phone Assignment, and that Light Phone never transferred the right back to Mya Number. (Def. Br. 16). After all, in the Light Phone Settlement, Light Phone transferred, conveyed, assigned, and delivered to Mya "all right, title and interest in and to [the '728 Patent application]" (Light Phone Settlement ¶ 2), but did *not* expressly assign back any right to sue for breach of contract (*id.*).

Plaintiffs respond that this multi-step analysis reads far too much into the three agreements. As Plaintiffs construe these agreements, (i) Mya Number never assigned to Light Phone any right to sue for breach of contract under the PSA as part of the Light Phone Assignment, but (ii) even if it had, the Light Phone Settlement and its attendant patent assignment would have clearly reconveyed the right back to Mya Number. (Pl. Opp. 16-18; Light Phone Settlement, Ex. C at 1). Plaintiffs also note that Defendants' construction of the agreements omits the Light Phone Assignment's reference to "data *and results*" as part of its definition of "Know-How." (Pl. Opp. 16 (emphasis added); Light Phone Assignment ¶ 1.3). "Pairing the term 'data' with 'results,'" Plaintiffs argue,

> means — as a matter of common sense — the kinds of data yielded by some form of trial and error, which more clearly aligns with the concept of "Know-How," which in turn is what the [Light Phone Assignment] was purporting to define. It does not encompass licensure merely of raw data for purposes of the PSA or SOW. AT&T did not license to Mya[] Number any form of "Know-How" or "data and results" in any relevant agreement.

(Pl. Opp. 16).

In interpreting a contract, courts "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc.* v. *Seattle Times Co.*, 154 Wash. 2d 493, 503 (2005). Courts "impute an intention corresponding to the reasonable meaning of the words used ... [and] give words in a contract their ordinary, usual, and popular meaning unless the

entirety of the agreement clearly demonstrates a contrary intent." *Id.* "If a contract has two or more reasonable meanings when viewed in context, a question of fact is presented." *Bort* v. *Parker*, 110 Wash. App. 561, 575 (Ct. App. 2002). A factual determination of what the parties intended in an ambiguous contract cannot be adjudicated on a motion to dismiss. *See SARCO, LLC* v. *Union Pac. R. Co.*, 765 F.3d 999, 1008-09 (9th Cir. 2014); *Consul Ltd.* v. *Solide Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986) (concluding that a court may not dismiss a case for failure to state a claim where the language "leaves doubt as to the parties' intent").

Separate from the Exhibit A issue, the parties offer two reasonable constructions of the relevant agreements with Light Phone. If proven, Plaintiffs' interpretation of "data and results" would support its claims that Mya Number never assigned its breach of contract right to Light Phone, or that it received the right back as part of the Light Phone Settlement, and thus that Mya Number had the ability to convey that right to the Individual Plaintiffs. Because the Court may not choose between these competing interpretations at this stage, it denies Defendants' motion to dismiss for lack of standing on this ground. *See SARCO, LLC*, 765 F.3d at 1008-09. More broadly, and for all of the reasons set forth in this section, the Court finds that Plaintiffs have standing to pursue their breach of contract and patent infringement claims.

## C. The Court Denies Defendants' Rule 12(b)(1) and Rule 12(b)(6) Motions to Dismiss Plaintiffs' Claim for Correction of Inventorship

Defendants pursue a different Rule 12(b)(1) argument with respect to Plaintiffs' correction of inventorship claim, arguing that Network Apps cannot

bring such a claim, and that the Individual Plaintiffs have failed to plead a cognizable injury.  (Def. Br. 1-2, 25-26; Def. Reply 11).[6]  To this, Defendants add a claim under Rule 12(b)(6), arguing that the allegations in the Complaint are impermissibly conclusory and vague.  (Def. Br. 25-26).  The Court rejects both arguments, and allows Plaintiffs' claim to go forward.

### 1. Applicable Law

#### a. Correction of Inventorship Claims Generally

Section 256 of the Patent Act, 35 U.S.C. § 256, "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent."  *CODA Dev. S.R.O.* v. *Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019) (quoting *Fina Oil & Chem. Co.* v. *Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997) (internal quotation marks omitted)).  An action brought under Section 256 "aris[es] under" federal patent law for jurisdictional purposes.  *See MCV, Inc.* v. *King-Seeley Thermos Co.*, 870 F.2d 1568, 1570 (Fed. Cir. 1989).

"[A] plaintiff seeking correction of inventorship under § 256 can pursue that claim in federal court only if the requirements for constitutional standing — namely injury, causation, and redressability — are satisfied."  *Larson* v. *Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009); *see also Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan* v. *Defs. of*

---

[6]  Plaintiffs allege in the Complaint that "[a]s a result of AT&T's unlawful and erroneous claim of inventorship of the '462 Patent, Network Apps has suffered and will continue to suffer damage."  (Compl. ¶ 81).  However, in their pre-motion letter in opposition to Defendants' proposed motion to dismiss, Plaintiffs clarified that only "Plaintiffs Wantz and Schei bring the claim for correction of inventorship, not Network Apps."  (Dkt. #51).

*Wildlife*, 504 U.S. 555, 560-61 (1992)).  More specifically, the benefit of the suit to the plaintiff must relate to the alleged injury, *see Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-73, (2000), and the alleged injury must consist of "'an invasion of a legally protected interest' that is "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  This holds regardless of whether the alleged injury is tangible or intangible.  *See Id.* at 340-42.  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing.  *Id.* at 338 (quoting *Warth* v. *Seldin*, 422 U.S. 490, 518 (1975)).

### b.    Misjoinder and Nonjoinder

To determine whether Plaintiffs have adequately alleged a cognizable injury, the Court must also consider the statutory scheme governing inventorship and the interests that the scheme seeks to protect.  The grant of a patent pursuant to Section 101 gives rise to a presumption that the patent is "valid," 35 U.S.C. § 282, including the presumption that "the named inventors are the true and only inventors," *Bd. of Educ. ex rel. Bd. of Trs. of Fla. State Univ.* v. *Am. Bioscience, Inc.*, 333 F.3d 1330, 1337 (Fed. Cir. 2003).  "Section 256 addresses two types of inventorship errors — misjoinder and nonjoinder." *CODA Dev. S.R.O.*, 916 F.3d at 1358 (citing *Stark* v. *Advanced Magnetics, Inc.,* 119 F.3d 1551, 1553 (Fed. Cir. 1997)).  Misjoinder occurs when a person who is not an inventor is listed as an inventor in error.  *Id.*  Section 256 provides for the deletion of a misjoined inventor "whether that error occurred

30

by deception or by innocent mistake." *Stark*, 119 F.3d at 1555.  Nonjoinder

occurs when, in error, a person who is an inventor has not been listed as

such.  *Id.* at 1553.  With respect to nonjoinder, however, "the error cannot

involve any deceptive intention by the nonjoined inventor."  *Id.*  In short,

subject matter jurisdiction exists "in all misjoinder cases featuring an error and

in those nonjoinder cases where the unnamed inventor is free of deceptive

intent."  *Id.* at 1555.

A party who seeks to show misjoinder or nonjoinder shoulders a "heavy"

burden, which she may discharge only "by clear and convincing evidence."

*Hess* v. *Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997);

*accord Am. Bioscience*, 333 F.3d at 1337; 2 DONALD S. CHISUM, CHISUM ON

PATENTS § 2.03[4][c] (Matthew Bender) ("After the patent issues, the patent is

presumed valid, and the burden is on one attacking the validity of the patent to

establish by clear and convincing evidence that the inventorship determination

is incorrect.").  That said, "the interest of both inventors and the public are …

served by a broad interpretation of the statute," *Chou* v. *Univ. of Chi.*, 254 F.3d

1347, 1358 (Fed. Cir. 2001).  Within a claim for nonjoinder, a plaintiff may

assert sole or joint inventor status.  *See Opternative, Inc.* v. *JAND, Inc.*, No. 17

Civ. 6936 (JFK), 2019 WL 624853, at *9 (S.D.N.Y. Feb. 13, 2019).  Generally,

"one who asserts 'inventor' status must provide clear and convincing evidence

of supporting facts, including corroborating evidence."  *C.R. Bard, Inc.* v. *M3

Sys., Inc.*, 157 F.3d 1340, 1353 (Fed. Cir. 1998).

31

### 2.    Analysis

The Individual Plaintiffs bring a correction of inventorship claim regarding the '462 Patent, which lists AT&T employees Jayanta Das and Ed Schmit as sole inventors. (Compl. ¶ 45; '462 Patent). They contend that they both should be named as inventors in the '462 Patent because the patented solution is nearly identical to the Twinning Solution they co-invented and had patented under the '728 Patent. (Compl. ¶¶ 76-79). Plaintiffs further allege that the omission of the Individual Plaintiffs from the '462 Patent was not due to any deceptive conduct on their part. (*Id.* ¶ 80). Instead, Plaintiffs allege that Ed Schmit, the AT&T Mobility Executive Director who initially reached out to the Individual Plaintiffs, unlawfully used confidential information he learned as part of Mya Number's development of the Twinning Solution in pursuit of the '462 Patent. (*Id.* ¶¶ 45, 79). In consequence, Plaintiffs allege that the Individual Plaintiffs "are the true inventors, and Mya Number is the true owner of the '462 Patent." (*Id.* ¶¶ 46, 79).

As an initial matter, the Court understands the Individual Plaintiffs to be asserting a claim for nonjoinder, as opposed to misjoinder. (*See* Compl. ¶ 78 (noting that Schei and Wantz are the true inventors of the patent); *id.* ¶ 80 (noting that the omission of Schei and Wantz as inventors of the '462 Patent was done without their deceptive intent)). And while not perfectly clear, the Court reads the Complaint as setting forth a claim for joint, and in the alternative sole, inventorship.

Among other facts, the Individual Plaintiffs allege that Schmit affirmatively reached out to them to develop the Twinning Solution (Compl. ¶ 25); Defendants entered into several NDAs with the Individual Plaintiffs (*id.* ¶ 26); Schmit was repeatedly apprised of developments in the Twinning Solution technology (*id.* ¶ 27); and Defendants filed the '462 Patent application listing Schmit and Das as inventors just one month after sending the AT&T Termination Email to the Individual Plaintiffs (*id.* ¶ 45; *see also* AT&T Termination Email; '462 Patent). Furthermore, the Complaint alleges that Schei and Wantz are the "true inventors" of the '462 Patent (Compl. ¶ 78); that Schmit noted in an email that the Individual Plaintiffs "built [the Twinning Solution] for AT&T," and that Defendants were "paying [the Individual Plaintiffs] to build up unique expertise" (*id.* ¶ 38; *id.*, Ex. 5); that AT&T "is claiming credit for Mya Number's work[,]" as conceived of by Schei and Wantz (*id.* ¶ 49); and that "AT&T … has taken credit for Mya Number's work, depriving Schei and Wantz of the recognition they deserve" (Pl. Opp. 25 (citing Compl. ¶¶ 49-50)).

Defendants move to dismiss the Individual Plaintiffs' correction of inventorship claim pursuant to Rules 12(b)(1) and 12(b)(6) on the bases that the Individual Plaintiffs have failed to plead even a bare allegation of injury, and in fact only reference Network Apps as the injured party. (Def. Br. 25 (comparing Compl. ¶ 81 (alleging injury with respect to Network Apps, but not the Individual Plaintiffs), *with Larson* v. *Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009) (noting that standing for correction of inventorship requires

injury, causation, and redressability))).  The Individual Plaintiffs rejoin that they have adequately pleaded three forms of injury that give rise to Article III standing — (i) ownership interest, *see Chou*, 254 F.3d at 1358; (ii) financial interest, *see id.* at 1359; and (iii) reputational interest, *see Shukh* v. *Seagate Tech., LLC*, 803 F.3d 659, 662-63 (Fed. Cir. 2015) — and that they have sufficiently pleaded facts to support a claim on behalf of the Individual Defendants for correction of inventorship.  The Court agrees that the Individual Plaintiffs have adequately pleaded two of the three forms of injury sufficient to confer standing and facts sufficient to support a claim for joint, but not sole, inventorship.

### a.    The Individual Plaintiffs Have Sufficiently Alleged an Injury

A plaintiff alleging a correction of inventorship claim must allege an ownership interest, concrete financial interest, or reputational harm sufficient to confer Article III standing.  *See, e.g.*, *Larson*, 569 F.3d at 1325-27; *Shukh*, 803 F.3d at 664.  The Individual Plaintiffs have sufficiently alleged ownership and financial interests in the '462 Patent and, as such, have sufficiently alleged injury under Article III.

*First*, the Complaint alleges that "[b]ecause the solution described in the '462 Patent restates the Twinning Solution invented by Mr. Schei and Mr. Wantz and assigned to [Network Apps], as embodied in the '728 Patent, Mr. Schei and Mr. Wantz are the true inventors, and [Network Apps] is the true owner of the '462 Patent."  (Compl. ¶ 46).  As such, the Individual Plaintiffs assert that they have, or should have, an ownership interest in the '462 Patent.

34

The Court finds that Plaintiffs have plausibly alleged such an interest. *Cf. Larson*, 569 F.3d at 1325-27 (noting that for a plaintiff to have standing to correct inventorship, the plaintiff must allege facts sufficient to show an "ownership interest" or a "concrete financial interest" in the patent at issue, and finding no standing where plaintiff "affirmatively transferred title to the patents to [defendant]" and thus could not stand to gain from them unless he "obtain[ed] rescission of the patent assignments" (internal quotation marks omitted)); *see also Jim Arnold Corp.* v. *Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571-72 (Fed. Cir. 1997) ("it is necessary that plaintiff allege facts that demonstrate that he, and not the defendant, owns the patent rights on which the infringement suit is premised").

*Second*, because Plaintiffs allege that the '462 Patent should have been assigned to Mya Number pursuant to the terms of the PSA, and that AT&T was required to pay royalties and licensing fees for using the Twinning Solution, the Court also recognizes that the Individual Plaintiffs, as inventors, shareholders, and assignees of the '728 Patent, have a sufficient financial interest in the outcome of this claim. *See Chou*, 254 F.3d at 1359 (finding that a non-owner of a patent had sufficiently alleged a financial interest because she was entitled to a portion of gross royalties and licensing fees).

*Third*, and less successfully, Plaintiffs allege what the Court understands to be a claim for reputational harm. Specifically, Plaintiffs claim that "AT&T is claiming credit for Mya Number's work" (Compl. ¶ 49), such that the Individual Plaintiffs have been deprived "of the recognition they deserve" (Pl. Opp. 25).

The Court finds these allegations to be insufficient to confer reputational interest. It is true that a "concrete and particularized reputational injury can give rise to Article III standing." *Shukh*, 803 F.3d at 663. But mere allegations that AT&T is claiming credit for Mya Number's work and thereby depriving the Individual Plaintiffs of recognition — without more — are insufficient to constitute the requisite concrete and particularized reputational interest. *See VariBlend Dual Dispensing Sys. LLC* v. *Crystal Int'l (Grp.) Inc.*, No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *15 (S.D.N.Y. Sept. 30, 2019) (finding that plaintiff failed to show reputational harm where he merely asserted that a "cloud" was placed over his business activities and reputation).

The Federal Circuit has held that "'being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper.'" *Shukh*, 803 F.3d at 663 (quoting *Chou*, 254 F.3d at 1359). Indeed, both the Federal Circuit and this Court have recognized that "[p]ecuniary consequences may well flow from being designated as an inventor[,]" particularly when the claimed inventor is employed in the field of his claimed invention. *Id.* (internal quotation marks and citation omitted). "For example, if the claimed inventor can show that being named as an inventor on a patent would affect his employment, the alleged reputational injury likely has an economic component sufficient to demonstrate Article III standing." *Id.* Without such allegations, this Court cannot find that the Individual Plaintiffs have pleaded reputational injury sufficient to confer standing. However, based on Plaintiffs' adequate pleading

36

of the two other bases for standing, the Court finds that the Individual

Plaintiffs have alleged an injury sufficient to confer Article III standing, and

denies Defendants' motion to dismiss the correction of inventorship claim

under Rule 12(b)(1).

> **b.    The Individual Plaintiffs Have Sufficiently Pleaded a Claim for Joint Inventorship**

Joint inventorship under 35 U.S.C. § 116 "can only arise when

collaboration or concerted effort occurs — that is, when the inventors have

some open line of communication during or in temporal proximity to their

inventive efforts[.]" *Eli Lilly & Co.* v. *Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed.

Cir. 2004); *see also Town & Country Linen Corp.* v. *Ingenious Designs LLC*, 556

F. Supp. 3d 222, 250 (S.D.N.Y. 2021).   Furthermore, for a person to be a joint

inventor, he or she must

> [i] contribute in some significant manner to the conception or reduction to practice of the invention, [ii] make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and [iii] do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*Yeda Rsch. & Dev't Co.* v. *Imclone Sys. Inc.*, 443 F. Supp. 2d 570, 617 (S.D.N.Y.

2006) (quoting *Pannu* v. *Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)

(internal quotation marks omitted)).   However, "each of the joint inventors need

not 'make the same type or amount of contribution' to the invention" (*id.*

(internal quotation marks and citation omitted)), and there is "no explicit lower

limit on the quantum or quality of inventive contribution required for a person

to qualify as a joint inventor," *Eli Lilly*, 376 F.3d at 1358 (quoting *Fina Oil &
Chem. Co.* v. *Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) (internal quotation
marks omitted)).  *See also Kimberly-Clark Corp.* v. *Procter & Gamble Distrib. Co.*,
973 F.2d 911, 917 (Fed. Cir. 1992) (noting that an inventor must allege "some
element of joint behavior, such as … one inventor seeing a relevant report and
building upon it or hearing another's suggestion at a meeting")

By comparison, "a claim of sole inventorship necessitates that the
proposed inventor conceived of the total patented invention." *Opternative, Inc.*,
2018 WL 3747171, at *8 (quoting *Ferring B.V.* v. *Allergan, Inc.*, 166 F. Supp. 3d
415, 424 (S.D.N.Y. 2016) (internal quotation marks omitted), and citing *Univ. of
Pittsburgh of Commonwealth Sys. of Higher Educ.* v. *Hedrick*, No. 04 Civ. 9014
(CBM), 2008 WL 8627085, at *7 (C.D. Cal. June 9, 2008) ("Plaintiffs must show
that they conceived of every claim of the patent and that any contribution by
[the named inventors] to the conception of each and every claim was
insignificant.").  The Individual Plaintiffs have not alleged that they conceived of
the entire '462 Patent, nor have they alleged that Schmit and Das provided no
or "insignificant" contributions.

As to joint inventorship, the Individual Plaintiffs have sufficiently pleaded
facts that could prove, by clear and convincing evidence, that they jointly
invented the '462 Patent.  Plaintiffs cite to *CODA Development S.R.O.* v.
*Goodyear Tire & Rubber Co.* in support of their claim, and the Court agrees that
that case involved similar circumstances.  (Pl. Opp. 24-25 (citing *CODA*, 916
F.3d at 1359-60)).  In *CODA*, the Federal Circuit reversed the lower court's

dismissal of a correction of inventorship claim where the plaintiffs alleged that the defendant (i) previously failed to make a certain technology on its own; (ii) initiated meetings with the plaintiffs to assist with such technology; (iii) entered into NDAs with the plaintiffs regarding same; (iv) cut off communication with the plaintiffs following their creation of a prototype; (v) filed a patent shortly thereafter; and (vi) photographed the prototype without permission. 916 F.3d at 1359. Furthermore, one of the defendant's employees later reached out to the plaintiffs to accuse the defendant of copying the prototype. *Id.*

While not every allegation in *CODA* finds its analogue in this case, the Court notes that the Individual Plaintiffs' allegations that Schmit (i) reached out to Mya Number to create the Twinning Solution (Compl. ¶ 25); (ii) entered into various NDAs with the Individual Plaintiffs regarding same (*id.* ¶ 27); (iii) acknowledged the good work the Individual Plaintiffs had done on the Twinning Solution (*id.* ¶ 38); and (iv) filed a patent application shortly after sending the AT&T Termination Email (*id.* ¶ 45), are sufficiently similar to survive a motion to dismiss. *See CODA*, 916 F.3d at 1359 ("The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case." (quoting *Fina Oil*, 123 F.3d at 1473)).

Defendants do not seek to distinguish the *CODA* case in their reply, with good reason. (*See* Def. Reply 11 (solely stating that "[the Individual Plaintiffs] do not plead *any* injury — economic or otherwise")). Instead, Defendants rely on *Opternative, Inc.* for their Rule 12(b)(6) motion, but in that case, the omitted

inventor alleged only that its employee had "conceived of the invention and relayed the idea to [the defendant's] employees during a teleconference." 2019 WL 624853, at *2. Furthermore, the *Operative* plaintiff failed to allege that it had ever interacted with the two named inventors. *Id.* at *9 (citing *Vanderbilt Univ.* v. *ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010) ("The interplay between conception and collaboration requires that each co-inventor engage with the other co-inventors to contribute to a joint conception.")). While here, the Individual Plaintiffs make no claims that they ever interacted with Das, it is sufficient that they allege jointly conceiving of the Twinning Solution with Schmit, who is alleged to have communicated such information to Das. *See Kimberly-Clark Corp.*, 973 F.2d at 917. In sum, finding that the Individual Plaintiffs have sufficiently pleaded injury under Article III and facts to support a claim for joint inventorship, the Court denies Defendants' motion to dismiss the claim under Rules 12(b)(1) and 12(b)(6).

## D.    The Court Grants Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Breach of Contract Claim as Time-Barred

Defendants next move under Rule 12(b)(6) to dismiss Plaintiffs' breach of contract claim as time-barred, reasoning that the cause of action accrued no later than November 7, 2014, when AT&T filed the application for the '462 Patent, and thus the statute of limitations expired on November 7, 2020,

almost three months prior to filing of the Complaint.  (Def. Br. 6-7).[7]  As set

forth in the remainder of this section, the Court grants Defendants' motion.[8]

### 1.    Applicable Law

"A motion to dismiss on statute of limitations grounds generally is

treated as a motion to dismiss for failure to state a claim upon which relief can

be granted pursuant to Rule 12(b)(6)."  *2002 Lawrence R. Buchalter Alaska Tr.*

v. *Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 200 (S.D.N.Y. 2015) (internal

quotation marks and citation omitted).  "Although the statute of limitations is

ordinarily an affirmative defense that must be raised in the answer, a statute of

limitations defense may be decided on a Rule 12(b)(6) motion if the defense

---

[7]     Defendants alternatively argue that the claim accrued when Defendants sent the AT&T Termination Email on October 23, 2014, which Defendants claim constituted an anticipatory repudiation of their contractual obligations to Plaintiffs regarding the technology.  (Def. Br. 6-7).  As it happens, Plaintiffs do not allege that the AT&T Termination Email was a breach.  Even if they had, anticipatory repudiation requires a "positive statement or action indicating distinctly and unequivocally that a party cannot or will not perform its obligations."  *Wallace* v. *Kuehner*, 111 Wash. App. 809, 817 (Ct. App. 2002) (internal citation omitted).  Here, Plaintiffs allege, and provide evidence to support, that even after Defendants sent the AT&T Termination Email, they continued to correspond with the Individual Plaintiffs, including their sending of a reminder that Mya Number had to abide by the exclusivity period set forth in the SOW.  (Pl. Opp. 8 n.6 (citing Schei Decl. ¶ 6); *see also* Schei Decl., Ex. E (November 2014 email to schedule a meeting regarding "NDA 34," AT&T's internal codename for the Twinning Solution)).  Viewing these allegations in the light most favorable to Plaintiffs, the Court finds no anticipatory repudiation.

[8]     Defendants separately move to dismiss Plaintiffs' breach of contract claim for failure to abide by the mandatory dispute resolution provision set forth in the PSA and incorporated into the SOW.  (Def. Br. 4, 22-25; PSA § 28; SOW 1 (noting that the SOW is ███████████████████████████)).  The PSA's dispute resolution clause expressly carves out █████████████████████████████████████████████ (PSA § 28).  In an attempt to defend their breach of contract claim from statute of limitations and other challenges, Plaintiffs carefully contend that their claim "involve[ed] … [a] violation of [their] intellectual property rights."  (*See* Pl. Opp. 21-22).  While the Court views this contention with skepticism, it need not delve into the issue, finding the breach of contract claim to be time-barred.

appears on the face of the complaint." *Ellul* v. *Congregation of Christian Bros.,* 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted).

Where the complaint "clearly shows the claim is out of time," it should be dismissed with prejudice. *See Troni* v. *Holzer,* No. 09 Civ. 10239 (WHP), 2010 WL 3154852, at *2-5 (S.D.N.Y. July 29, 2010) (dismissing claims on statute of limitations grounds in light of *Harris* v. *City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999)); *see also Gonzales* v. *Nat'l Westminster Bank PLC,* 847 F. Supp. 2d 567, 570 (S.D.N.Y. 2012) ("Where the facts needed can be gleaned from the complaint, papers integral to the complaint, and publicly disclosed documents, resolution of the limitations issue on a motion to dismiss is appropriate." (dismissing claims on statute of limitations grounds) (quoting *In re Salomon Analyst Winstar Litig.,* 373 F. Supp. 2d 241, 245 (S.D.N.Y. 2005) (internal quotation marks and brackets omitted))).

In cases in which a federal court exercises supplemental jurisdiction over a state law claim, it must first determine which state's law will govern. *See Carroll* v. *LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 509 (S.D.N.Y. 2009). Because statutes of limitations are procedural, New York courts generally apply New York's statutes of limitations, even if the substantive law of another state governs the underlying claims. *See Stuart* v. *Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998); *see generally Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). This general rule, however, is subject to a traditional statutory exception, known as New York's "borrowing" statute, N.Y. C.P.L.R. § 202. *In re Coudert Bros. LLP*, 673 F.3d 180, 190 (2d

Cir. 2012). Where a cause of action accrues outside of New York to a non-New York resident, the borrowing statute requires the court to apply the shorter limitations period, including all relevant tolling provisions, of either New York or the state where the cause of action accrued. *See, e.g., Stuart*, 158 F.3d at 627 (citing N.Y. C.P.L.R. § 202); *Antone* v. *Gen. Motors Corp.*, 484 N.Y.S.2d 514, 519 (1984) ("in borrowing a [s]tatute of [l]imitations of another [s]tate, a New York court will also borrow the other [s]tate's rules as to tolling" (internal quotation marks and citation omitted)); *Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 494 (S.D.N.Y. 2013) (noting that, under the borrowing statute, a plaintiff's claim is not barred if it is timely under both the statute of limitations of New York and of the jurisdiction in which the cause of action accrued). The purpose of Section 202 is to prevent forum shopping by time-barred claimants by "mandating the use of the *shortest* statute of limitations available." *In re Coudert Bros. LLP*, 673 F.3d at 190; *see also Deutsche Zentral-Genossenschaftsbank AG* v. *HSBC N. Am. Holdings, Inc.,* No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *5 (S.D.N.Y. Dec. 17, 2013).

"In using the word 'accrued' in CPLR § 202 there is no indication that the Legislature intended the term to mean anything other than ... the time when, and the place where, the plaintiff first had the right to bring the cause of action." *Glob. Fin. Corp.* v. *Triarc Corp.*, 93 N.Y.2d 525, 528 (1999). Where, as here, "an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Basso* v.

*N.Y. Univ.*, No. 16 Civ. 7295 (VM), 2020 WL 7027589, at *11 (S.D.N.Y. Nov. 30, 2020) (citing *Glob. Fin. Corp.*, 93 N.Y.2d at 529-30).

### 2.   Analysis

Each of the agreements giving rise to the breach of contract claim in this action was entered into between AT&T and Mya Number, a Washington company, and it is undisputed that the alleged injury occurred in Washington. (Yin Decl., Ex. 2-4; Compl. ¶ 6).  Accordingly, the Court must consider the statute of limitations periods and any relevant tolling provisions under both New York and Washington law.  *See Vincent* v. *Money Store*, 915 F. Supp. 2d 553, 567-68 (S.D.N.Y. 2013).  Here, both New York and Washington specify six-year statutes of limitation for breach of contract claims, both of which run from the date the contract was breached.  *See* N.Y. C.P.L.R. §§ 203(a), 213(2); RCW § 4.16.040(1).  Critical to the Court's inquiry, then, is when precisely Defendants breached the relevant contracts (and thus when Plaintiffs' claim accrued).

Plaintiffs argue that the breach arose solely from (i) Defendants' alleged failure to pay Plaintiffs licensing and royalty fees for its use of the proprietary Twinning Solution; and (ii) Defendants' alleged failure to assign to Plaintiffs the '462 Patent and related patents.  (Pl. Opp. 6).  From this, Plaintiffs reason that their claim could not have accrued until Defendants *obtained* rights in the '462 Patent — namely, August 1, 2017, the day the '462 Patent issued — not the

day Defendants applied for the '462 Patent.  (*Id.* at 9-10).[9]  The Court is not convinced.

It bears noting that the theory advanced in Plaintiffs' opposition brief is wholly inconsistent with the facts alleged in the Complaint.  There, the thrust of Plaintiffs' breach claim is that (i) "AT&T used intellectual property and proprietary information obtained from Mya Number under the PSA, NDAs[,] and Interface Agreement to pursue AT&T's own patent related to 'twinning,'" and (ii) Ed Schmit, listed as an inventor on the '462 Patent, worked with Mya Number on the Twinning Solution, "had access to and knowledge of Mya Number's confidential information and innovative technology under the provisions of the PSA, NDAs and Interface Agreement[,] … and improperly used such information obtained from Mya Number in pursuit of the invention in the '462 Patent."  (Compl. ¶ 45).  The Court discerns the relevant accrual date from those allegations, and not from Plaintiffs' arguments in opposition to the motion.

The Supreme Court has made clear that, to survive a motion to dismiss, a complaint must set forth a claim for relief which is "plausible," not merely possible.  *Twombly*, 550 U.S. at 556.  Given the allegations in the Complaint, the Court finds it implausible for Plaintiffs to argue that Defendants did not

---

[9]      While Plaintiffs now allege that the breach could not have accrued until August 1, 2017, they themselves sent Defendants a pre-litigation letter on April 25, 2017 — nearly four months earlier — pursuant to the PSA's and SOW's dispute resolution clauses, indicating that "Network Apps [was] invoking its rights as successor in interest to the contract and intellectual property rights of Mya Number[,]" and that "AT&T has been making the [Twinning Solution] available to its entire subscriber base *since at least October 2015*."  (Yin Decl., Ex. 12 (emphasis added)).

violate the terms of the PSA, SOW, and related agreements until their first failure to pay licensing and royalty fees. For starters, the claimed need for licensing and royalty fees would never have arisen absent Defendants' misuse of confidential information learned through the Twinning Solution development process and the '462 Patent application filed in connection therewith. Plaintiffs do not dispute this. (*See, e.g.*, Compl. ¶ 23 ("The Interface Agreement provides, among other things, that each party's use of the other's confidential information was strictly limited to fulfilling the purposes of the project."); *id.* ¶ 26 ("The NDAs each provide that a party receiving confidential information could 'use the Information only as needed for the purposes of the Project.'"); *id.* ¶ 31 ("The PSA contemplates that both parties would exchange confidential information, but that each party's use of such information would be restricted and permitted only as needed for the purpose of further development of the Twinning Solution."); *id.* ¶ 43 ("AT&T assigned employees, who had access to Mya Number's intellectual property and confidential information, to replicate Mya Number's Twinning Solution and launch AT&T's own NumberSync service."); *id.* (noting that Kari Tillman, who worked with Mya Number on behalf of AT&T during the development of the Twinning Solution, "had access to Mya Number's trade secrets, confidential information, hardware designs, software code, and innovative solution during the project and was subject to the provisions of the PSA, SOW, NDAs, and Interface Solution"); *id.* ("Upon information and belief, other individuals at AT&T, who had access to Mya Number's confidential and proprietary information, also worked to develop and

launch AT&T NumberSync."); *id.* ¶ 44 ("AT&T used without permission Mya Number's proprietary intellectual property and information, disclosed to AT&T pursuant to the Interface Agreement, NDAs, and PSA, in connection with the development of its NumberSync.")).  But even absent these allegations, the Complaint sets forth, in no uncertain terms, Plaintiffs' contention that "AT&T used intellectual property and proprietary information obtained from Mya Number under the PSA, NDAs and Interface Agreement to pursue AT&T's own patent related to 'twinning.'  *In this respect, AT&T filed U.S. Patent Application number 14/536,418 on November 7, 2014, which issued as [the '462 Patent], entitled Cloud-Based Device Twinning."*  (*Id.* ¶ 45 (emphasis added)).[10]

Under Washington law, "a general breach of contract claim accrues on the date of the breach, not discovery of the breach."  *Schreiner Farms, Inc.* v. *Am. Tower, Inc.*, 173 Wash. App. 154, 160 (Ct. App. 2013) (citing *1000 Virginia Ltd. P'ship* v. *Vertecs Corp.*, 158 Wash. 2d 566, 576-78 (Wash. 2006), *as corrected* (Nov. 15, 2006) (recognizing limited exception for latent defects in construction)).  Similarly, "New York does not apply the 'discovery' rule to statutes of limitations in contract actions."  *ACE Sec. Corp.* v. *DB Structured Prod., Inc.*, 25 N.Y.3d 581, 594 (2015) (citing *Ely-Cruikshank Co.* v. *Bank of Montreal*, 81 N.Y.2d 399, 403-04 (1993)).  "Rather, the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or

---

[10]    While none of the above allegations is explicitly contained in Count 1, the breach of contract section of the Complaint, paragraph 52 notes that each of the preceding paragraphs was "incorporated by reference as if fully set forth herein."  (Compl. ¶ 52).

injury ....  This is so even though the result may at times be harsh and manifestly unfair, and creates an obvious injustice."  *Id.* (internal quotation marks and citations omitted).  Plaintiffs' allegations make clear that their breach of contract claim accrued, at the latest, on November 7, 2014, the day the '462 Patent Application was filed.  As such, Plaintiffs' filing of the Complaint on January 26, 2021, renders the breach claim untimely under Washington and New York law, and it must be dismissed.[11]

### E.    The Court Grants Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Patent Infringement Claim

Finally, Defendants move to dismiss Plaintiffs' patent infringement claim on the basis of patent ineligibility under 35 U.S.C. § 101.  (Def. Br. 26-35).  Specifically, Defendants allege that the '728 Patent claims are directed to the abstract idea of phone number grouping, which Defendants claim is patent-ineligible.  (*Id.* at 30-34).  The Court agrees and dismisses Plaintiffs' patent infringement claim.

#### 1.    Applicable Law

Section 101 of the Patent Act defines patent-eligible subject matter, and provides that "[w]hoever invents or discovers any new and useful process,

---

[11]    Plaintiffs note that even if their breach of contract claim were otherwise time-barred, it would be subject to tolling under the continuing violation doctrine, wherein each individual breach — here, Defendants' failure to pay royalties — restarted the clock. (Pl. Opp. 10-12).  Not so, in light of New York's borrowing statute.  The continuing violation doctrine arises only under New York law, not Washington law, and Plaintiffs do not argue otherwise.  *Schreiner Farms, Inc.* v. *Am. Tower, Inc.*, 173 Wash. App. 154, 161 (Ct. App. 2013) (observing that "[n]o Washington case recognizes a continuing breach as extending the time allowed to bring a suit sounding in contract.  Instead, persuasive authority suggests Washington law holds the opposite." (citing *Ford* v. *Int'l Harvester Co.*, 399 F.2d 749 (9th Cir. 1968))).

machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. That provision, however, "contains an important implicit exception: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp.* v. *CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks and citations omitted). A claim falls outside Section 101 where (i) the patent is "directed to" a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea, and (ii), if so, the particular elements of the claim, considered "both individually and 'as an ordered combination,'" do not add enough to "'transform the nature of the claim' into a patent-eligible application." *Id.* at 217 (quoting *Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 566 U.S. 66, 78 (2012)).

Subject matter eligibility under Section 101 is a question of law suitable for resolution at the pleading stage of a patent case. *SAP Am., Inc.* v. *InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) ("Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law."). The focus of a Section 101 inquiry is on the asserted claims. *See Dealertrack, Inc.* v. *Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012).

When a defendant challenges patent eligibility through a Rule 12(b)(6) motion, courts "must apply the well-settled Rule 12(b)(6) standard which is consistently applied in every area of law." *Berkheimer* v. *HP Inc.*, 890 F.3d 1369, 1372 (Fed. Cir. 2018) (concurring in denial of rehearing en banc) ("*Berkheimer II*"). If a motion "'raise[s] factual disputes underlying the [Section] 101 analysis,'" the complaint should not be dismissed. *Id.* at 1373 (quoting *Aatrix Software, Inc.* v. *Green Shades Software, Inc.*, 882 F.3d 1121, 1124 (Fed. Cir. 2018)). A patent is presumed to be valid, and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a); *cf. Tranxition, Inc.* v. *Lenovo (United States) Inc.*, 664 F. App'x 968, 972 n.1 (Fed Cir. 2016) (summary order) (finding that district court erred by not applying presumption of validity in deciding Section 101 eligibility).

However, "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry," and statements in the pleadings may provide a basis to conclude that a claimed invention is ineligible for patent protection. *Berkheimer* v. *HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("*Berkheimer I*"). "Patent eligibility can be determined at the Rule 12(b)(6) stage 'when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *Voter Verified, Inc.* v. *Election Sys. & Software LLC*, 887 F.3d 1376, 1384 (Fed. Cir. 2018) (quoting *Aatrix*, 882 F.3d at 1125).

A district court is not required to address individual claims not asserted or identified by the non-moving party, so long as it identifies a representative claim and all the claims are substantially similar and linked to the same abstract idea. *See Bilski* v. *Kappos*, 561 U.S. 593, 611-12 (2010).

### 2.    Analysis

Plaintiffs allege that Defendants' '462 Patent "directly infringes, either literally or under the doctrine of equivalents, claims 1, 8, and 17 of the '728 Patent[.]"  (Compl. ¶ 66; *see also id.* ¶¶ 68-69 (outlining other infringement claims)).  In relevant part, Claim 1 of the '728 Patent teaches:

> A method for telephone number grouping, comprising: provisioning, by a telephone service provider, a plurality of telephone numbers including associating each of the plurality of telephone numbers with a distinct physical telephone service user device of a grouped plurality of physical telephone service user devices, the quantity of the plurality of telephone numbers being no greater than the quantity of the grouped plurality of physical telephone service user devices;
>
> registering, with a telephone number grouping service, at least two telephone numbers of the plurality of telephone numbers as grouped telephone numbers with respect to incoming and outgoing telephone calls to and from the grouped plurality of physical telephone service user devices;
>
> providing, by the telephone service provider to the telephone number grouping service, at least partial call control for incoming and outgoing telephone calls with respect to the grouped telephone numbers
>
> with respect to incoming telephone calls to the grouped telephone numbers, activating one or more of the grouped plurality of physical telephone service user devices associated with the grouped telephone numbers in accordance with a grouped telephone number incoming call policy that governs incoming telephone

calls to the grouped plurality of physical telephone service user devices, the grouped telephone number incoming call policy being capable of causing activation of multiple of the grouped plurality of physical telephone service user devices responsive to an incoming call; and

with respect to an outgoing telephone call from a physical telephone service user device associated with the grouped telephone numbers, causing the outgoing telephone call to appear to originate from a selected telephone number of the grouped telephone numbers in accordance with a grouped telephone number outgoing call policy that governs outgoing telephone calls from the grouped plurality of physical telephone service user devices, the grouped telephone number outgoing call policy being capable of designating each of the grouped telephone numbers associated with the grouped plurality of physical telephone service user devices as the selected telephone number.

Claim 8 teaches:

A method for telephone service activity processing, comprising:

registering at least two telephone numbers of a plurality of telephone numbers as grouped telephone numbers, the plurality of telephone numbers having been provisioned by a telephone service provider as each associated with a distinct physical telephone service user device of a grouped plurality of physical telephone service user devices, the quantity of the plurality of telephone numbers being no greater than the quantity of the grouped plurality of physical telephone service user devices;

receiving, from the telephone service provider, at least partial service control for telephone service activity with respect to the grouped telephone numbers; and

processing the telephone service activity in accordance with a grouped telephone number call policy that governs telephone calls to and from the grouped plurality of physical telephone service user devices such that outgoing service activity appears to originate from

a single telephone number of the grouped telephone numbers and incoming service activity directed to a specified telephone number of the grouped telephone numbers is forwarded to one or more associated physical telephone service user devices independent of the specified telephone number of the grouped telephone numbers, wherein the grouped telephone number call policy is capable of causing activation of multiple of the grouped plurality of physical telephone service user devices responsive to incoming service activity and is capable of designating each of the grouped telephone numbers associated with the grouped plurality of physical telephone service user devices as the specified telephone number.

Claim 17 teaches:

A system for telephone service activity processing, comprising:

a user interface component configured at least to register at least two telephone numbers of a plurality of telephone numbers as grouped telephone numbers, the plurality of telephone numbers having been provisioned by a telephone service provider as each associated with a distinct physical telephone service user device of a grouped plurality of physical telephone service user devices, the quantity of the plurality of telephone numbers being no greater than the quantity of the grouped plurality of physical telephone service user devices;

a telephone service provider interface component configured at least to receive, from the telephone service provider, at least partial service control for telephone service activity with respect to the grouped telephone numbers; and

a telephone service activity handling component configured at least to process the telephone service activity in accordance with a grouped telephone number call policy that governs telephone calls to and from the grouped plurality of physical telephone service user devices such that outgoing service activity appears to originate from a single telephone number of the grouped telephone numbers and incoming service activity

> directed to a specified telephone number of the grouped telephone numbers is forwarded to one or more associated physical telephone service user devices independent of the specified telephone number of the grouped telephone numbers, wherein the grouped telephone number call policy is capable of causing activation of multiple of the grouped plurality of physical telephone service user devices responsive to incoming service activity and is capable of designating each of the grouped telephone numbers associated with the grouped plurality of physical telephone service user devices as the specified telephone number.

('728 Patent).

Defendants argue that each of these claims is, at its core, an abstract idea of grouping telephone numbers. In support, Defendants cite to the '728 Patent's "Detailed Description" section, which provides that:

> [t]he multiple provisioned telephone numbers may be grouped such that service activity originating from a device associated with one of the grouped telephone numbers ("outgoing activity") appears to originate from a selected (and possibly different) one of the grouped telephone numbers, and such that service activity destined for a device associated with one of the grouped telephone numbers ("incoming activity") may be forwarded to one or more and/or each of the devices associated with the grouped telephone numbers. For example, incoming telephone calls may be forked to multiple devices and outgoing telephone calls may be masked so as to appear to originate from a selected and/or primary one of the grouped telephone numbers.

('728 Patent 2:45-58).

Defendants argue, and this Court agrees, that the concept of grouping and forking of phone numbers is nearly identical to (i) the patent-ineligible claims addressed by the Federal Circuit in *BroadSoft, Inc.* v. *CallWave Communications, LLC*, 282 F. Supp. 3d 771 (D. Del. 2017), *aff'd*, 739 F. App'x

985 (Fed. Cir. 2018), and (ii) related claims regarding the routing of messages, calls, and emails that have similarly been deemed patent-ineligible by the Federal Circuit. (*See* Def. Br. 26-34). In *Broadsoft*, the patent at issue related to sequential dialing, wherein a call processing system allowed "the control and management of multiple calls, multiple devices, [and] calls to multiple devices." *Id.* at 780 (internal quotation marks and citations omitted). The *Broadsoft* Court found the claims to be abstract because they were "directed to organizing human activity: accessing stored information when prompted by a user's incoming call, and executing an automated response according to stored instructions provided in advance by a subscriber." *Id.* at 780-81. As relevant here, the *Broadsoft* Court found that "the call processing system ... facilitates connecting a caller with a called party by dialing multiple numbers for the called party if necessary." *Id.* at 781. It found that such a process was not only abstract, but failed to constitute an improvement in technology to render the claims patentable under *Alice* step two. *Id.*

The grouping or forking of calls at issue in the instant case is substantively identical to that in *BroadSoft*, and is similarly akin to the abstract concept of the routing of calls or email messages to a given folder, each of which the Federal Circuit has held to be patent-ineligible in separate cases. *See, e.g.*, *Voip-Pal.Com, Inc.* v. *Apple Inc.*, 411 F. Supp. 3d 926, 956-57 (N.D. Cal. 2019) (finding call-routing systems to be patent-ineligible), *aff'd*, 828 F. App'x 717 (Fed. Cir. 2020); *Intellectual Ventures I LLC* v. *Symantec Corp.*, 838 F.3d 1307, 1317-19 (Fed. Cir. 2016) (finding email-messaging patent to be

ineligible).  Indeed, in *Parus Holdings, Inc.* v. *Sallie Mae Bank*, the claim at issue focused on "the automated tasks of [i] receiving messages via a phone or Internet connection and then transmitting those messages to a subscriber by phone or Internet; and [ii] receiving a message from a subscriber by phone or Internet and then forwarding that message based on rules established by the subscriber."  137 F. Supp. 3d 660, 672 (D. Del. 2015), *aff'd*, 677 F. App'x 682 (Fed. Cir. 2017).  The Federal Circuit agreed that the claim "calls for using a 'computer and telecommunications network for receiving, sending and managing information from a subscriber to the network and from the network to a subscriber,'" and found the claim to be impermissibly abstract because it had "pre-Internet analogs" that could be performed by humans, such as a personal assistant directing calls.  *Id.*

The Supreme Court has similarly recognized that "fundamental economic practice[s]," *Bilski*, 561 U.S. at 611; "method[s] of organizing human activity," *Alice*, 573 U.S. at 220; and mathematical algorithms, *Gottschalk* v. *Benson*, 409 U.S. 63, 64 (1972), are abstract ideas, and this is no exception.  In navigating the parameters of such categories, courts have generally sought to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."  *Enfish, LLC* v. *Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).  Here, it is clear that the '728 Patent claims are of the same type as the claims held to be abstract in *BroadSoft*, *Alice, Intellectual Ventures*, and *Voip-Pal.com*, and, as such, the Court moves to *Alice* step two and considers

whether any of the three claims is sufficiently transformative to render the technology patentable despite its abstract nature.

Federal courts have consistently found that claims that "amount to nothing significantly more than an instruction to apply [an] abstract idea ... using some unspecified, generic computer," and in which "each step does no more than require a generic computer to perform generic computer functions," do not make an abstract idea patent-eligible. *Alice*, 573 U.S. at 226 (internal quotation marks and citations omitted). This is because "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" does not "provide a sufficient inventive concept[,]" as required under *Alice* step two. *Intellectual Ventures I LLC* v. *Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (citing *Bancorp Servs., LLC* v. *Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter.")). In this regard, the two steps of the *Alice* inquiry "are plainly related" and "involve overlapping scrutiny of the content of the claims[.]" *Elec. Power Grp.* v. *Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

What matters is whether a patent claim specifies *how* a desired result is achieved — here, how the '728 Patent would achieve number grouping or the mechanism with which calls could be masked so as to appear from one number. *See Two-Way Media Ltd.* v. *Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017). Fatal to Plaintiffs' argument, the '728 Patent

claims simply recites *what* the system would do, not *how* it would do it. *Two-Way Media Ltd.* provided that "[m]erely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention." 874 F.3d at 1338. So too here, where each of the '728 Patent claims at issue describes no more than using a telephone service provider to implement its idea of grouping telephone numbers. As such, the claims are missing the requisite inventive concept to qualify as eligible under Section 101, and the Court dismisses Plaintiffs' patent infringement claim.

## F.  The Court Denies Plaintiffs' Request for Leave to Amend

Plaintiffs request leave to replead any curable deficiencies if all or part of the Complaint is dismissed. (Pl. Opp. 6). Federal Rule of Civil Procedure 15 instructs a court to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "[i]t is well established that '[l]eave to amend need not be granted ... where the proposed amendment would be futil[e].'" *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (quoting *Advanced Magnetics, Inc.* v. *Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997)). Because the Court finds that (i) the '728 Patent is patent-ineligible as a matter of law, (ii) Plaintiffs' breach of contract claim is untimely, and, most importantly, (iii) the pleading of additional facts would not lead the Court to different results as to either claim, the Court denies Plaintiffs' request for leave to amend as futile.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' breach of contract and patent infringement claims is GRANTED, and Defendants' motion to dismiss the Individual Plaintiffs' correction of inventorship claim is DENIED. The Clerk of Court is directed to terminate the pending motion at docket number 130, and to terminate Network Apps as a Plaintiff in this case.

The parties are hereby ORDERED to submit a joint letter proposing redactions to this Opinion, as well as a proposed case management plan, on or before **April 21, 2023**. Also on or before **April 21, 2023**, Defendants will file an answer to the Complaint.

SO ORDERED.

Dated:      March 22, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge